000001                                                                                          000001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**Appeal from**
**In re: Cummings Manookian**
**Case No. 3:19-bk-7235**

**Brian Manookian, Appellant**

**v.**

**Trustee Jeanne Ann Burton, Appellee**

**Case No. 3:23-cv-00918**

**Judge Aleta A. Trauger**

---

## APPENDIX TO APPELLANT'S OPENING BRIEF

---



000002

Charles M. Walker
U.S. Bankruptcy Judge
Dated: 6/1/2022



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| _____ | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; | ) |
| AND Manookian, PLLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## ORDER QUASHING NOTICE OF DEPOSITION

THIS MATTER is before the Court regarding the Notice of Deposition ("Notice") of

Judge Charles M. Walker (Dkt. #177). For the following reasons, and under the noted authority,

the Notice is hereby quashed and thereby, unenforceable.

In a legal proceeding, a request for testimony from personnel of the federal judiciary is

governed by those regulations as set forth in Volume 20, Chapter 8 of the Guide to Judiciary

Policy ("Guide")[1] as established by the Director of the Administrative Office of United States

Courts. *U.S. v. Galvez*, 2019 WL 3927443, at *1 (S.D. Ohio Aug. 20, 2019). Federal judicial

---

[1] Guide to Judiciary Policy, available at https://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-20-administrative-claims-and-litigation/ch-8-testimony-and-production-records

1

personnel may not provide testimony of the type requested in the Notice of Deposition except as authorized by the provisions of the Guide. See *Guide at* § 820(a)[2].

The Guide is persuasive authority as it codifies the policies promulgated by the Director of the Administrative Office and "approved by the Judicial Conference of the United States." *In re Sony BMG Music Entm't*, 564 F.3d 1, 7 (1st Cir. 2009); see *also Kitzmiller v. Dover Area Sch. Dist.*, 388 F. Supp. 2d 484, 486-87 (M.D. Pa. 2005). It provides the "official medium by which direction as to courtroom procedures and other information are provided to the Federal Judiciary in support of its day-to-day operations." *In re Sony*, 564 F.3d at 7 (quoting *Kitzmiller*, 388 F. Supp. at 486-87). *Mackin v. Om Sai Corp*, 2021 WL 5937589, at *1 (D.N.M. Dec. 16, 2021).

The Notice requests testimony from Judge Charles M. Walker. Accordingly, the Guide controls in consideration of the request contained in the Notice.  According to § 810.30 of the Guide, the following definitions apply:

 "Information and records" is defined as follows:

 All information, records, documents, or materials of any kind, however stored, that are in the custody or control of the federal judiciary or were acquired by federal judicial personnel in the performance of their official duties or because of their official status.

"Judicial personnel" is defined as:

All present and former officers and employees of the federal judiciary and any other individuals who are or have been appointed by, or subject to the supervision, jurisdiction, or control of, the federal judiciary, including individuals hired through contractual agreements by or on behalf of the federal judiciary, or performing services under such agreements for the federal judiciary, such as consultants, contractors, subcontractors, and their employees and personnel. This phrase also includes alternative dispute resolution neutrals or mediators, special masters, individuals who have served and are serving on any advisory committee or in any advisory capacity, and any similar personnel performing services for the federal judiciary.

---

[2] Any reference to Section refers to a provision of the Guide unless otherwise noted.

"Legal Proceedings" means:

All pretrial, trial, and post-trial stages of all existing or anticipated judicial or administrative actions, hearings, investigations, cases, controversies, or similar proceedings, including grand jury proceedings, before courts, agencies, commissions, boards or other tribunals, foreign and domestic, or all legislative proceedings pending before any state or local body or agency, other than those specified in § 810.40(b).

"Request" is defined as:

An order, subpoena, or other demand of a court, or administrative or other authority, of competent jurisdiction, under color of law, or any other request by whatever method, for the production, disclosure, or release of information or records by the federal judiciary, or for the appearance and testimony of federal judicial personnel as witnesses as to matters arising out of the performance of their official duties, in legal proceedings. This definition includes requests for voluntary production or testimony in the absence of any legal process.

And "testimony" means:

Any written or oral statement in any form by a witness arising out of the performance of the witness' official duties, including personal appearances and statements in court or at a hearing or trial, depositions, answers to interrogatories, affidavits, declarations, interviews, telephonic, televised, or videotaped remarks, or any other response during discovery or similar proceedings that would involve more than production of documents.

Judicial personnel may not provide testimony in legal proceedings without the prior approval of a "determining officer." See *Guide* at § 840(a). In relevant part, the Guide provides the definition of "determining officer" as follows:

(b) The determining officer authorized to make determinations under these regulations will be as follows:
(1) In the case of a request directed to a federal court of appeals judge, district judge, Court of International Trade judge, Court of Federal Claims judge, bankruptcy judge, or magistrate judge, or directed to a current or former member of such a judge's personal staff (such as a judge's secretary, law clerk), the determining officer will be the federal court of appeals judge, district judge, Court of International Trade judge, Court of Federal Claims judge, bankruptcy judge, or magistrate judge himself or herself.

*Guide* at 840(b)(1).

3

The request as directed in the Notice is subject to the approval of the judge – in this case, Judge Charles M. Walker – as the determining officer.

The determining officer is authorized to determine whether the federal judicial personnel may be deposed, as well as whether federal judicial records may be produced, and "what, if any conditions will be imposed upon such interview, contact, testimony, or production of records." *Guide* at § 850(a). The determining officer may also deny a request if the request does not meet any requirement imposed by these regulations. *Guide* at § 850(a).

Section 850(a) requires the determining officer to consider the following factors when deciding the effect in the case, as well as future cases generally, which testifying or producing records will have on the ability of the federal judiciary or federal judicial personnel to perform their official duties. These factors are:

1. The need to avoid spending the resources of the United States for private purposes, to conserve the time of federal judicial personnel for the performance of official duties, and to minimize the federal judiciary's involvement in issues unrelated to its mission.

2. Whether the testimony or production of records would assist the federal judiciary in the performance of official duties.

3. Whether the testimony or production of records is necessary to prevent the perpetration of fraud or injustice in the case or matter in question.

4. Whether the request is unduly burdensome or is inappropriate under applicable court or administrative rules.

5. Whether the testimony or production of records is appropriate or necessary under the rules of procedure governing the case or matter in which the request arises, or under the relevant substantive law of privilege.

6. Whether the request is within the proper authority of the party making it.

7. Whether the request meets the requirements of these regulations.

8. Whether the request was properly served under applicable court, administrative, or other rules.

9. Whether the testimony or production of records would violate a statute, regulation, or ethical rule.

10. Whether the testimony or production of records would disclose information regarding the exercise of judicial or quasi-judicial responsibilities by federal judicial personnel in the decisional or deliberative process.

11. Whether the testimony or production of records would disclose confidential information from or pertaining to a presentence investigation report or pertaining to an individual's probation, parole, or supervised release, or would disclose any other information that is confidential under any applicable statute or regulation.

12. Whether the testimony or production of records reasonably could be expected to result in the appearance of the federal judiciary favoring one litigant over another or endorsing or supporting a position advocated by a litigant.

13. Whether the request seeks testimony, records or documents available from other sources.

14. Whether the request seeks testimony of federal judicial personnel as expert witnesses.

15. Whether the request seeks personnel files, records or documents pertaining to a current or former federal judicial officer or employee, and

    (A) the personnel files, records or documents sought by the request may be obtained from the current or former federal judicial officer or employee in question, or

(B) the personnel files, records or documents sought by the request would be made available to the requester with the written consent or authorization of the current or former federal judicial officer or employee in question.

16. Any other consideration that the determining officer designated in § 840(b) may consider germane to the decision.

As to the first consideration, the Court finds that the Notice serves no purpose other than to waste the resources of the United States for private purposes, and act to expend time of federal judicial personnel better used in the performance of official duties. Moreover, such involvement of the federal judiciary in issues unrelated to its mission serves no party and is a misuse of the resources available in order to avail oneself of the justice provided by the bankruptcy system.

Secondly, the Notice requests testimony that serves no purpose and has no relation to the merits of the case. Thirdly, the party seeking the testimony under the Notice – Manookian, PLLC - has alleged no specific instance of fraud or injustice. The request is inappropriate as the request for testimony from the sitting judge serves no purpose other than to taint the proceedings before the Court. The request is not appropriate or necessary under the rules of procedure or under substantive laws of privilege and is not within the proper authority of the party making the request.

Moreover, the Court, as determining officer, will not permit the testimony as requested because the Notice was not issued in accordance with the requirements established in the Guide. The Notice did not set forth, or contain an affidavit setting forth, an explanation of the nature of the testimony sought, the relevance of the testimony sought to the legal proceedings, and the reasons why the testimony sought, or the information contained therein, are not readily available from other sources or by other means. *Guide* at § 830(a). *U.S. v. Robinson*, 2018 WL 6322146, at *2 (S.D. Ohio Dec. 4, 2018). Furthermore, § 830(b) requires that the request be "provided to the

federal judicial personnel from whom testimony or production of records is sought at least fifteen (15) working days in advance of the time by which the testimony or production or records is to be required. Failure to meet this requirement will provide a sufficient basis for denial of the request." *Guide* at § 830(b). The request was not properly served under any applicable rules and such testimony would violate ethical rules as promulgated by the Judicial Conference and the Administrative Office of United States Courts. *Id*.

The request for testimony of the judge sitting on the case is sought in order to contaminate the exercise of judicial and quasi-judicial responsibilities by federal judicial personnel.

The eleventh factor is not applicable to these proceedings. For the twelfth and thirteenth factors, deposing the judge on a case is a manipulation of the judicial system in an effort to taint the proceedings. There is no expectation that any such testimony would serve any legitimate purpose.

The fourteenth and fifteenth factors are not applicable. As to the last factor, any other consideration that may be germane to the decision of this determining officer, it is important to note that the request to depose Judge Walker was made by a party that has made no specific accusation of bias linked to any ruling in the case. Moreover, two years after its inception, the case is merely at the discovery stage. No dispositive rulings have been issued. The request to depose the sitting judge has no basis in law or fact. Honoring such request would only serve to obstruct the justice administered through the bankruptcy system.

If, after considering the factors and the other requirements set forth in the Guide, the determining officer decides that the judicial personnel should not comply with the request, the judicial personnel should notify the requester of the Guide's procedures and respectfully decline to comply with the request. *Guide* at § 850(b). As the determining officer, having considered all

7

compulsory factors and other requirements set forth in the Guide, and after such deliberate consideration, it is my determination that, for the reasons stated above, the Notice is quashed and this Order serves as notice pursuant to the Guide at § 850(b).

Therefore, the Notice is hereby quashed as inappropriate and unenforceable pursuant to the findings made above and the requirements of the Guide.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

8

000010
000010

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

IN RE:                          .   Case No. 19-07235
                                .   Chapter 7
CUMMINGS MANOOKIAN, PLLC,       .
                                .
                                .
              Debtor.           .
                                .
. . . . . . . . . . . . . . .   .

JEANNE ANN BURTON,              .   Adv. No. 20-90002
                                .
              Plaintiff,        .
                                .
     v.                         .
                                .
HAGH LAW, PLLC, et al.,         .   701 Broadway
                                .   Nashville, TN 37203
              Defendants.       .
                                .   Thursday, March 17, 2022
. . . . . . . . . . . . . . .   .   8:48 a.m.

TRANSCRIPT OF PRETRIAL CONFERENCE AND MOTION HEARING
BEFORE THE HONORABLE CHARLES M. WALKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiff:        Thompson Burton PLLC
                          By:  PHILLIP G. YOUNG, ESQ.
                          One Franklin Park
                          6100 Tower Circle, Suite 200
                          Franklin, TN 37067
                          (615) 465-6008


APPEARANCES CONTINUED.


Audio Operator:           Tanja Brewer, ECR


Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):                                    2


```
For Hagh Law PLLC and     Bass, Berry & Sims PLC
Afsoon Hagh:              By:  CRAIG VERNON GABBERT, JR., ESQ.
                          150 Third Avenue South, Suite 2800
                          Nashville, TN 37201
                          (615) 742-6277

For Manookian PLLC:       Spragens Law PLLC
                          By:  JOHN T. SPRAGENS, ESQ.
                          311 22nd Avenue North
                          Nashville, TN 37203
                          (615) 983-8900
```

3

1          (Proceedings commenced at 8:48 a.m.)

2               THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Middle District of Tennessee is now in session,

4    the Honorable Charles M. Walker presiding.

5               THE COURT:  Good morning.  Please take your seats.

6               THE CLERK:  Your Honor, we're here on Case Number

7    20-90002, Burton v. Hagh Law, PLLC.

8               There's several matters set.  There's a pretrial

9    conference, motion to compel discovery responses from Manookian

10   PLLC.  We have a motion and notice to compel discovery

11   responses from Hagh Law, PLLC, a motion and notice to compel

12   discovery responses from Afsoon Hagh.  Also set this morning is

13   Manookian, PLLC's motion and notice to compel Trustee Jeanne

14   Burton, to respond to interrogatories, Manookian PLLC's motion

15   for the Court to determine sufficiency of plaintiff's responses

16   to request for admission, or alternatively to be deemed

17   admitted.  And the last matter is motion and notice to compel

18   Marty Fitzgerald to comply with subpoena for production of

19   documents.

20               THE COURT:  All right.  Thank you.

21               Obviously, with that long laundry list of discovery

22   related matters that we're here to resolve, as promised, we're

23   going to be resolving all of them today.

24               And if it gets hot in here, so be it.  There's

25   something wrong with the air, so if it gets warm in here, too

1  bad.

2          We have a hard break at 10:45 today.  We'll recess

3  from 10:45 to 2 p.m.  And at 2 pm., we'll come back and resolve

4  anything, if necessary, that remains.  And we will stay until

5  everything's resolved.

6          Obviously, with the many provisions within the Rules

7  of Evidence deemed in making discovery easy, it's the

8  responsibility of good lawyers to resolve discovery.  For us to

9  be here on such a list means that somewhere someone has failed.

10  So part of what I want to do today, I will be assessing who may

11  be responsible, or how many parties may be responsible, for

12  this breakdown in what typically is an orderly discovery

13  process.  And rather than let the secured creditors pay, if

14  it's one of the other parties, they'll pay.  Or the Trustee may

15  pay.  It all depends on who is responsible for this breakdown

16  in what, in my years on the bench, I don't think I've ever seen

17  quite the mess with discovery on what is not a complicated

18  case, and a case involving lawyers, which even makes it more

19  frustrating that we're here today.  That all these good lawyers

20  in the room, and all of the parties are either lawyers or law

21  firms, and the fact that this is Bankruptcy Court where we

22  typically resolve things, because there are limited funds and

23  everyone knows that.

24          So I'm a little discouraged to be here today.  I'll

25  just put it that way.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

1          So, Mr. Young, let's get started.  We're going line

2   by line.  Tell me what's remaining and the Court will rule

3   accordingly.

4          MR. YOUNG:  Yes, Your Honor.  And I'm happy to --

5   I'll put the screen up where it's appropriate, but I'd like to

6   just sort of talk globally a little bit if I can first.

7          THE COURT:  Okay.

8          MR. YOUNG:  I think on Tuesday afternoon, we filed a

9   report so that hopefully the Court was not coming in completely

10  cold.

11         THE COURT:  Right.  And just one note on the status

12  report.  Is everyone in agreement that the status report

13  contains all of the outstanding discovery issues?  That there

14  are no other issues that need to be discussed today?

15         MR. GABBERT:  The ones related to Hagh Law are fairly

16  specific and, basically, I think we respond to most of those

17  already.

18         THE COURT:  All right.

19         MR. YOUNG:  And that's, I guess that's the point.

20  That's why I filed the status report is, from the Trustee's

21  perspective, it's a fairly finite set of documents that we're

22  still looking for, and I'm happy to go through those.

23         If the Court will, I'd like to start, though, with

24  the Fitzgerald subpoena, because that's perhaps the easiest.

25         We issued a subpoena to Marty Fitzgerald, who's a

Case 3:20-ap-90082   Doc 161-1   Filed 05/15/23   Entered 05/15/23 20:44   Desc
Exhibit Hearing Transcript    Page 6 of 96

1  third party.  It was issued December 9th, served December 13th.

2  I assume Hagh emailed an objection on December 27th, said other

3  counsel would contact us.  We didn't get any other kind of

4  objection.

5         Mr. Spragens indicated to the Court last time that he

6  thought he could coordinate Mr. Fitzgerald's response, though

7  not making clear that he was not representing Mr. Fitzgerald,

8  so I'm not trying to hold him to that.

9         But we've received nothing.  Those documents were a

10  finite set of documents, just as the Court knows.  And I want

11  to explain what they are and why they're important.

12         What we sought there were any kind of communications

13  involving engagement or disengagement of Cummings Manookian,

14  Manookian, PLLC, Hagh Law, PLLC, Afsoon Hagh, or Brian

15  Manookian.  We've received from Mr. Manookian an engagement

16  letter from Cummings Manookian.  We've received from Mr.

17  Manookian, a letter that he purportedly sent to Mr. Fitzgerald

18  notifying him that he'd have to get other counsel.  I don't

19  know, frankly, whether that was delivered, whether that letter

20  was delivered or not.  And that was part of the reason that we

21  were seeking to see what Mr. Fitzgerald had in his files.  And

22  there's been some reference to a Hagh Law engagement letter

23  with the Fitzgeralds which we've not seen.

24         And so that's the purpose of the subpoena.  I tried

25  to keep it, he's a third party, he's not really involved in

1  this. I tried to keep it as finite as possible, as easy to

2  respond to as possible. It should just be a handful of

3  documents, but I've received nothing. And so we just ask the

4  Court to compel responses to that subpoena.

5          THE COURT: Granted.

6          MR. SPRAGENS: Your Honor, would you like an update

7  on the status of that?

8          THE COURT: Yes. Sure.

9          MR. SPRAGENS: As Mr. Young knows, I was out of town

10 until yesterday evening, and I inquired about that when I got

11 back, and I'm told that Mr. Fitzgerald will be providing

12 documents to me by tomorrow. I would like an opportunity to

13 look at them because I think that there may be attorney-client

14 communications in the documents that he provides. But then I'm

15 prepared to turn over whatever is given to me early next week.

16         THE COURT: All right.

17         MR. SPRAGENS: So I just wanted the Court to know

18 that I've looked into that matter.

19         THE COURT: All right. And one thing, let's go ahead

20 and get appearances. I kind of jumped into this before we got

21 to the basics.

22         So, if I can start on this side and work across the

23 room?

24         MR. YOUNG: Yes, Your Honor. Phillip Young, and

25 Jeanne Burton is with me, here on behalf of the Trustee.

Case 3:20-ap-90082   Doc 161-1   Filed 05/15/23   Entered 05/15/22 27:20:44   Desc
Exhibit Hearing Transcript     Page 8 of 96

1          MR. SPRAGENS:  John Spragens on behalf of Manookian,

2     PLLC.

3          MR. GABBERT:  Craig Gabbert on behalf of Afsoon Hagh,

4     Hagh Law, Bass, Berry & Sims.

5          THE COURT:  All right.  Thank you.

6          For the Fitzgerald subpoena the Court will grant the

7     relief with the condition that any production be provided no

8     later than the 25th.  That will give Mr. Spragens adequate time

9     to review.  And based on the representations of Counsel, please

10     add that to the order, that it specifically requires the

11     turnover in production of the requested documents to the

12     Trustee, Trustee's counsel, no later than March 25th.

13          MR. YOUNG:  Thank you, Your Honor.  I will.

14          The next matter I'd like to take up is the, if the

15     Court will, is the motion to compel against Manookian, PLLC.

16     There are actually only three remaining issues that we have and

17     I'll talk about them, and then if we need to bring them up I'll

18     bring them up on the screen.  I have them prepared.

19          But it's one interrogatory and two requests.  And

20     Manookian, PLLC did send us, on Tuesday, amended responses to

21     those.  And actually, I believe I attached that to my status

22     report, those amendments.  And those amendments did take care

23     of one of the four outstanding matters as of that time, but

24     there are still three outstanding matters and I tried to detail

25     the issues remaining in the status report.

1      The biggest one, Your Honor, is Interrogatory Number

2  5.  Interrogatory Number 5 asks, it has a list of particular

3  cases that Cummings Manookian had been involved in

4  pre-petition, and it asked Manookian, PLLC to say whether it

5  had an interest in the fees of any of those cases.  And if so,

6  state by dollar amount or percentage the interest in fees.

7      And we asked the same question of Hagh Law, and Hagh

8  Law answered that question correctly, the way we had asked.

9  But Manookian, PLLC has not responded to the question of the

10  dollar amount or percentage of the Fitzgerald or Shoemaker fees

11  to which it claims entitlement.

12      I want to explain to the Court why this question is

13  so critical to get an answer, because the answer so far has

14  essentially been, it's governed by -- it's governed by the

15  terms of some engagement letters and that's how it's going to

16  be decided, what percentage.

17      We need a percentage or a dollar amount for this

18  reason.  If Manookian, PLLC claims that they are entitled to

19  fees, to any portion of the fees, in either the Fitzgerald or

20  the Shoemaker case, that's inconsistent with the position

21  they've taken to this court so far.  That is that once a law

22  firm withdraws, it has waived its rights to fees.

23      So in that case, Mr. Manookian, when he was

24  suspended, withdrew in both of those cases.  So if they say

25  they are entitled to fees, there's an inconsistency.  If they

000020 000020

1    say they are entitled to no fees from either of those cases,

2    then I'm not sure they need to even be a party to this anymore,

3    because those are the only two remaining major assets of this

4    case.

5            And so either way, that's a significant outcome to

6    get a commitment in writing, not orally but in writing, as to

7    whether or not Manookian, PLLC claims an interest, a specific

8    interest, in those fees.  That's why that question is so

9    important, and that's why we've kept pushing on that.  It's why

10   I said that was the first and most important issue and that it

11   might moot all other issues as between the Trustee and

12   Manookian, PLLC.

13           So that's the only interrogatory that remains

14   unresponded to, or not satisfactory to the Trustee.

15           And then there are two other requests that we can get

16   to, but I'd like to deal with the interrogatory first, if the

17   Court will.

18           THE COURT:  All right.

19           Mr. Spragens?

20           MR. SPRAGENS:  Thank you, Your Honor.

21           As Your Honor probably saw in the correspondence that

22   was produced, well that was filed in support of the status

23   report, I have tried to figure out exactly the information that

24   Mr. Young has been looking for.  I have tried to make a

25   representative of the firm available to talk to Mr. Young to

1  try to get answers to these questions.

2          With respect to this specific interrogatory, we have

3  produced the written agreement itself.  I think that Federal

4  Rule of Civil Procedure 33(d) entitles us to produce documents

5  in response to interrogatories, documents that are maintained

6  in the course, the ordinary course of business.

7          There is a legal question that's at issue there, and

8  the Trustee can draw her own conclusions from the face of the

9  representation agreement about whether there is any entitlement

10  to fees, that the agreement does not claim any entitlement to

11  fees.  And I think the document speaks for itself.

12          So we have responded to that interrogatory.  We've

13  given them the source document now.  And in my view, this is

14  sort of a "gotcha" attempt to try to set up a heads I win,

15  tails you lose, situation by the Trustee.  In fact, we've just

16  given them the document and the Trustee can formulate its own

17  legal position about the document.

18          So in my view, we fully responded under 33(d).

19          THE COURT:  Just as someone who's practiced with

20  lawyers, for lawyers not to know how much money they think

21  they're going to make seems a little, frankly, ridiculous.  But

22  I see your position.

23          Mr. Young, did Hagh Law respond in a fashion that

24  would give you the information?

25          MR. YOUNG:  No, Your Honor.  Hagh Law, in response to

Case 3:20-ap-90002   Doc 161-16-1  Filed 05/15/23  Entered 05/15/22 22:27:20  Desc
Exhibit Hearing Transcript    Page 12 of 96

1  that same question, we asked the same question of Hagh Law, and

2  they actually gave a percentage that they say they're entitled

3  to.  So that I can understand.  I know what to do with that.

4          I'll note that Manookian, PLLC did produce one

5  agreement in the Shoemaker case.  It did not produce an

6  agreement related to Fitzgerald, but said that any right to

7  fees in Fitzgerald were defined in a Hagh Law engagement letter

8  with the Fitzgeralds, and we've not seen a Hagh Law engagement

9  letter with the Fitzgeralds.  So I don't know what to do with

10  that.  To say there's some document that's floating out there

11  that defines our interest, but we've not seen it, so I just, I

12  don't know what it to do with that.

13          MR. GABBERT:  Your Honor, with respect to the

14  Fitzgerald case -- do you mind if I stand here, or should I

15  come to the podium?

16          THE COURT:  You can --

17          MR. GABBERT:  With respect to the Fitzgerald case, we

18  responded we don't have a copy of any agreement.  But, you

19  know, we think that any -- it says, "Manookian PLLC's

20  entitlement, if any, to payment is governed by the specific

21  terms of a written agreement between the Fitzgeralds and Hage

22  Law.  Manookian, PLLC does not have a copy of the written

23  agreement."  So we've done our best to answer that one.

24      Obviously there's outstanding discovery to the

25  Fitzgeralds, maybe that will turn up what he's looking for.

1   Maybe Hage Law has documents, although my understanding is they
2   produced documents.
3          So, you know, I think the Fitzgerald question is
4   resolved, from our perspective.  We've given him what we have,
5   which is no written agreement.  And we've told him that we
6   looked and we don't have one.
7          With respect to the Shoemaker case, we've given him
8   the written agreement, and I think that that should resolve the
9   question.
10         MR. YOUNG:  And, Your Honor, just briefly.  That
11  resolves the request for production on that point.  What I'm
12  asking is whether or not they claim any entitlement to fee
13  based on any of that.
14         THE COURT:  All right.  What the Court's going to
15  order is a definitive statement from Manookian, PLLC as to any
16  percentage or dollar amount they believe they are owed, period.
17         Again, we're dealing with attorneys, attorneys know
18  how much money.  This is not a calculus question.  Provide the
19  information.
20         MR. YOUNG:  Thank you, Your Honor.
21         I'm ready to move on to the request for production,
22  if the Court's ready.
23         Request for Production Number 1 asked for any
24  documents that supported any affirmative defense or denial that
25  was set out in the answer.

1          And I understand the issue about that's awfully
2    broad.  I've tried to define that in subsequent pleadings to
3    say what I'm really looking for here is Manookian, PLLC, and
4    the other defendants as well, we'll get there, but Manookian,
5    PLLC has raised affirmatively that they have proof that would
6    disprove some of the -- some of the Trustee's allegations.  And
7    things that they've mentioned in the past were they had proof
8    by video or keyswipe information that showed that Afsoon Hagh
9    never went through the premises, the law office, after July of
10   2018.

11         They have documents showing that somebody other than
12   Cummings Manookian owned the furniture, equipment, telephone
13   number, website domain.  That they had documents concerning
14   Cummings Manookian's rights to use the premises, or not use the
15   premises, at 45 Music Square West.  And some, I guess, vague
16   illusion to time records for the cases, time records that the
17   lawyers may have kept.  If those exist, we need them.

18         If they can disprove that this is not -- we don't
19   want to go on a wild goose chase.  We want to narrow down what
20   the real issues are.  And if they can disprove the Trustee's
21   allegations, then, by all means, we'd like the evidence to
22   disprove that so that we can narrow this down.

23         Those issues that I just -- we don't really know what
24   we don't know, frankly, in this case.  But those are issues
25   that I've seen referenced in pleadings before.  And to the

1    extent that sort of information exist, we think the Trustee's
2    entitled to receive it now.  And if we're not, then, Your
3    Honor, we'd ask that the Court say what's not produced by a
4    certain date can't be used.  I think it's that simple with
5    regard to that.
6          If video really doesn't exist, or key fob information
7    really doesn't exist, that's fine.  If was just puffery or
8    whatever, that's fine.  We just don't want something to come up
9    later, well after discovery is closed, and we have to deal with
10   it at that time.
11         So that's what request Number 1 with regard to
12   Manookian, PLLC involves, and that's really all we're looking
13   for, Your Honor.
14              THE COURT:  Okay.
15         And, Mr. Spragens, Mr. Young has enumerated specific
16   items or documents.  What is your objection to providing what,
17   based off whatever conversations he's had with you, may or may
18   not exist?
19         MR. SPRAGENS:  Well, with respect to certain
20   information, like he asked about key fobs and swipes, you know,
21   what dates is he asking about, for example.  Because producing
22   here's -- let me tell you from my perspective what has happened
23   in this discovery process.
24         First of all, asking for all documents that support
25   your affirmative defenses is a very broad, extremely broad,

Case 3:20-ap-90082   Doc 161-1   Filed 05/15/23   Entered 05/15/23 22:41:40   Desc
Exhibit Hearing Transcript    Page 16 of 96

1  interrogatory.

2            THE COURT:  The Court agrees.

3            MR. SPRAGENS:  So that is a huge challenge for us to

4  respond to.

5            THE COURT:  Right.  There's no dispute with that.

6            MR. SPRAGENS:  Compounding that challenge is the fact

7  that the allegations in the complaint are sweeping allegations

8  about the conversion of property, the misuse of office

9  resources, furniture.  There's all this, you know, stuff in the

10  complaint, these very broad allegations.  And I think if you'll

11  indulge me just for a moment, what we have been trying to do in

12  discovery is understand the nature of those allegations so then

13  we could respond to them.

14            And we've tried it the formal way by saying, please

15  tell us what property are you talking about has been improperly

16  used by Hagh Law that is actually Cummings Manookian's

17  property, or has been used by Manookian, PLLC, that is actually

18  Cummings Manookinan's property.  On what dates was there access

19  to the premises at 45 Music Square West that was inappropriate?

20            So we're trying to get the information that is

21  underlying the allegations of the complaint so then we can

22  provide that information to the Trustee.  But as it stands

23  right now, just tell us everything about your involvement in

24  all these cases, that could turn up, you know, potentially

25  thousands of emails, a lot of which are attorney-client

1 privileged, and a lot of which are not relevant to the

2 allegations.

3    With respect to what property was used, what's our

4 defense. We don't know what property they're saying was used

5 improperly. So if it's that, you know, Ms. Hagh, or that

6 Cummings -- I mean, or that Manookian, PLLC was using 45 Music

7 Square West on certain dates, then we might be able to do a

8 search and respond to that.

9    And frankly, Your Honor, this is why I have offered,

10 time and time again, to make representatives of, you know,

11 Manookian, PLLC available to talk to Mr. Young so we can try to

12 figure out what's there and what exists and what is responsive

13 to their discovery requests.

14    But as it stands right now, they've made sweeping

15 allegations in the complaint. They haven't told us much of

16 anything about the details behind those allegations. I think,

17 as I've told the Court before, that those allegations couldn't

18 pass a Rule 9(b) scrutiny on these fraud allegations if we put

19 them to their burden. But I just want to know what they're

20 asking for and we will make a good faith effort to respond.

21    I have never before offered to make a client

22 available to the attorney from the other side for effectively

23 an informal deposition, and I will do so here. And I think the

24 fact that we're all lawyers, it would be a very productive

25 conversation, but he hasn't taken me up on that offer.

000028
000028

1        So if he could help me respond, I would respond.  As
2   it stands right now, it is extremely broad, sweeping discovery.
3   And, you know, I can't go through every piece of property at 45
4   Music Square West and talk about how it was acquired, on what
5   date, who used it.  I'd like a little bit more clarity in order
6   to respond.

7        THE COURT:  All right.  What the Court's going to
8   order on this one is, during our break I want the parties to
9   confer.

10       Mr. Young, I want you to provide time ranges, details
11  about what property you believe might be at issue.  And based
12  off the enumerated list of things that you mentioned, Mr.
13  Spragens, I want you to then say, okay, between this date range
14  and that date range, if there are videos, if there's swipe
15  records, we will provide X, Y, Z.  All right?

16       So that's your homework for the break.  Because
17  again, this one seems fairly easy to resolve.

18       As you've already admitted, Mr. Young, your original
19  request was overly broad.  You have some basis based off
20  representations from Manookian, PLLC as to what might be
21  available.  So any items that are in that list, or similar, or
22  were available and known once you get this date range, like any
23  other piece of discovery that isn't turned over, you run the
24  peril of at trial you're not able to use it.

25       I'm not making any ruling one way or the other,

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 3:20-cv-00092   Document 161-1   Filed 05/15/23   Entered 05/15/23 20:14:20   Page 19 of 96   Desc
Exhibit Hearing Transcript    Page 19 of 96

1 because I think it would be a very fact specific finding,

2 since, again, there is an unknown universe out there. But

3 obviously anything that was available and known that would meet

4 the request, once you get the date range and the specifics of

5 what property might be at issue, would be subject to being

6 excluded if you try to use it at trial.

7      So that one's an easy one to resolve, and I'll give

8 that as your homework for the break.

9      MR. GABBERT: And does the Court know what time March

10 madness tips off today?

11      THE COURT: No. But again, this is a painful day --

12      MR. GABBERT: I understand, Your Honor.

13      THE COURT: -- for all involved.

14      MR. YOUNG: Thank you, Your Honor.

15      The last issue with regard to Manookian, PLLC is

16 Request Number 8, which we were seeking documents and

17 correspondence related to the Fitzgerald case. Specifically

18 what we're looking for is any email communication with third

19 parties between Manookian, PLLC and any third parties.

20      I'm not looking for client confidentiality. I'm not

21 looking for that sort of thing. What we're trying to establish

22 here, the parties, both Manookian, PLLC and Hagh Law, have

23 claimed that they, and not Cummings Manookian, did all the

24 work. And so I think we can verify or deny that by seeing how

25 much work was done at different time periods by Manookian, PLLC

1  and by Hagh Law.

2          We've received no emails from Manookian, PLLC, and so

3  that's -- it's a finite universe and we're looking for emails

4  related to that case from Manookian, PLLC to any third parties,

5  not to clients, except to the extent that it's an engagement

6  communication, which we've already asked for.  But that's it on

7  Request Number 8.

8          THE COURT:  Okay.

9          MR. GABBERT:  Your Honor, on that one, which is, I

10  believe, Request Number 8, it requested all documents and

11  communications that relate or refer to the Fitzgerald case

12  including, but not limited to, correspondence between you and

13  counsel for the defendants in that matter.

14          What we have said is that it's a very broad universe

15  of documents.  It does include attorney-client privileged

16  documents.  It includes a lot of communications, frankly.  And

17  we said, if you can identify even general categories of

18  materials she wants, we will be happy to look for them.  But

19  right now, that is -- it is too broad.

20          So if what he is saying is, I'm looking only for

21  communications between Manookian, PLLC and opposing counsel or

22  third parties -- or I mean, I don't know what "third parties"

23  means, but if we can get some specificity, we will look and we

24  will try to produce those documents.  As it stands right now,

25  you know, it's thousands upon thousands of document requests.

1          THE COURT:  All right.

2          Mr. Young?

3          MR. YOUNG:  Yes, Your Honor.  I'll be as specific as

4  I can be.

5          What we are looking for are communications with

6  Defense Counsel, experts.  Anybody like that would not be

7  privileged.  I understand that there would be a number of

8  communications that are privileged.  We're looking for

9  non-privileged documents to establish whether or not, you know,

10 how involved Manookian, PLLC was in the trial of that case.

11         MR. GABBERT:  And, Your Honor, I would just note that

12 both of those categories could contain privileged

13 communications.  The expert communications, a lot of those

14 communications, may be privileged under the rules.  And when it

15 comes to correspondence with Defense Counsel, it depends on if

16 we're talking about negotiations towards settlement or not.

17         I know the Trustee has taken the position that

18 settlement negotiations are always completely protected, and

19 so, you know, we will look for those.  And if we have documents

20 that are responsive in those two categories that are

21 privileged, we'll produce a privilege log and he can evaluate.

22         MR. YOUNG:  And that's fine with me, Your Honor.

23         THE COURT:  All right.  Well, again, why are we here

24 on that one?  That should have been resolved amongst the

25 lawyers from day one.

Case 3:20-ap-90082   Doc 161-16-1  Filed 05/15/23  Entered 05/05/22 22:20:44  Desc
Exhibit Hearing Transcript    Page 22 of 96

1          So the Court will grant that request to make -- to
2   compel that production, because it is what it is.  And if there
3   are no responsive documents, there's no responsive documents.
4   Let's keep it moving.

5          MR. YOUNG:  Thank you, Your Honor.

6          That's all I have on the Manookian, PLLC motion to
7   compel.  If the Court would like me, I could take up the Hagh
8   Law and Hagh motions to compel next.

9          THE COURT:  Okay.

10          MR. YOUNG:  And those are related.  There's only one
11   distinction between those two, and I'll try to highlight that
12   first for the Court.  And then everything else -- everything
13   else is identical as between Hagh and Hagh Law.  The questions
14   were virtually identical, and the responses were virtually
15   identical.

16          The one exception, and this is Hagh Law Interrogatory
17   Number 8, and it asks to identify the basis for claiming the
18   percentages of interest that I referred to earlier in each
19   case.  And this is actually a pretty finite question here,
20   because there have been -- there have been engagement letters
21   produced that were between Cummings Manookian and the
22   Fitzgeralds, for example, and Cummings Manookian and the
23   Shoemaker plaintiffs.  And then there was one that was
24   Manookian, PLLC and the Shoemaker plaintiffs.  And then there
25   was one that was a much later one that was Hagh Law and the

1  Shoemaker plaintiffs.

2          What I would like in response to Interrogatory Number

3  8 is for Hagh Law to identify, by date and party, the

4  engagement letters it claims that -- the claims that gives it a

5  right to fees in Fitzgerald and Shoemaker.

6          So for example, if Hage Law is taking the position

7  that the Cummings Manookian engagement letter with the

8  Fitzgeralds is what gives rise to its claim for fees, I just

9  want to know that so that we know we have that document.  If

10 there's another document out there that they think gives rise

11 to the claim for fees, I just want to know what that document

12 is to know whether we have it or not.  Because, right now,

13 it's very difficult for me to ascertain.

14         So, for example, the only one I have in Fitzgerald so

15 far is an engagement letter between Cummings Manookian and the

16 Fitzgeralds.  And so I don't know if that's the engagement

17 letter upon which they base their client for a fee, or if

18 there's another one out there.

19         And so I'm looking just specifically for an

20 identification by date and party of the engagement letters that

21 they believe gives rise to a claim for fees in Fitzgerald and

22 Shoemaker, just in those two cases.  And that would resolve the

23 issue with Interrogatory Number 8 as to Hagh Law.

24         THE COURT:  Okay.

25         Mr. Gabbert?

1          MR. GABBERT:  Well, I think we sent seven -- we

2     resent six letters regarding fees this morning.  One of them I

3     think is on Manookian letterhead, but it says the attorneys are

4     Manookian and Hagh Law.  And I think I've sent that before, but

5     clearly that gives Hagh Law all the right to fees.  But, you

6     know, they're there, and she did all the work.

7          And Manookian couldn't get a fee because Manookian

8     didn't have a license, and she continued to represent all of

9     these plaintiffs and basically got the cases to conclusion.

10    And whether she had a fee agreement or not, quite frankly,

11    Manookian can't get a fee, Manookian has no license, and she

12    basically did all the work.

13         And we've already agreed, I agreed this morning -- my

14    client, I think you know, had a baby not too long ago, and

15    she's got the kids home on spring break this week.  Three kids.

16    I think the oldest may be 4.

17         But we've agreed to produce emails and everything

18    else by the Monday of the last week of the month.  I think it's

19    the 26th or 27th, or something like that.

20         But we produced the fee agreement.  I think we

21    produced them before, and I emailed them back to him again this

22    morning.

23         THE COURT:  All right.  So it's your understanding

24    there are no other agreements that would entitle Hagh Law to

25    fees?

1          MR. GABBERT:  Other than the ones I've sent him.

2          THE COURT:  All right.  So --

3          MR. GABBERT:  Well, wait a minute.  If she's doing

4   work on a case she's entitled to a fee.  Whatever agreement she

5   has, whether it's in writing or not, if she's working on a case

6   she's entitled to a fee.  She and the client may have done

7   that, and may have done it in writing, may have not done it in

8   writing, but that doesn't mean she's not entitled to a fee.

9          And Cummings, and Cummings Manookian, cannot get fees

10  because their named partner is disbarred, or basically, his

11  license is suspended.  And she didn't work for them, and she

12  never was a member of either one of those firms.  She had been

13  a contractor and she did work for them, but she was an

14  independent contractor.  But she was never a part of either one

15  of those firms.

16         So I don't know where he gets to that, quite frankly.

17  We'll talk about it another day.  That will be a legal issue.

18  But I think it's a fairly clear legal issue, based on what I

19  know as a as a prior disciplinary counselor, as well.

20         THE COURT:  Okay.

21         So, Mr. Young, it sounds like you've got the

22  information that is going to be responsive.  If you need to

23  actually pin it down with dates, I mean, Mr. Gabbert's

24  available right now.  During the break sit down and have him

25  answer any questions specific to the agreements.  And if

1  there's anything unanswered, he's available for you to ask, you

2  know, what does this really mean?

3           MR. YOUNG:  Well, Your Honor, here's the -- I just

4  looked through what was sent.  I had not looked through this

5  morning what was sent to me right before we started here, but I

6  just now looked through it.  And again, herein lies the issue.

7  I received one Fitzgerald engagement agreement, and that's a

8  Cummings Manookian Fitzgerald letter, a Cummings Manookian

9  engagement letter with Fitzgerald.

10          If there are none, I just wanted something in writing

11 that says, there are no more.  That's all we need in this case.

12 If this is it, if I've got the universe, a response to

13 Interrogatory Number 8 that says, you've now received

14 everything we have, is fine.

15          I just don't want to be facing a situation where

16 three months from now somebody finds another letter on a server

17 that hadn't been searched.  That's what I'm trying to void,

18 because I was -- I was told that she was still looking through

19 another server.

20          And so if that's it, then a written statement that

21 says that is fine.

22          THE COURT:  Okay.  Well, I think Mr. Gabbert made

23 that representation in open Court.

24          MR. GABBERT:  And this is just on the Fitzgerald

25 case, the question now that you're looking for?

1          MR. YOUNG:  What's that?

2          MR. GABBERT:  Just on the Fitzgerald case is all

3   you're looking for?

4          MR. YOUNG:  Yeah.  Unless there's -- I just want to

5   know that we've received everything on Fitzgerald and Shoemaker

6   that exists.  That's all I need.

7          MR. GABBERT:  Well, you've, I mean, I sent you some

8   on Shoemaker this morning.

9          MR. YOUNG:  Yeah.  Yeah.  And I've seen that already

10  in the -- there was one for Cummings, or from Manookian, PLLC

11  and one for Hagh Law.

12         MR. GABBERT:  Well, the Manookian, PLLC lists Hagh

13  Law as a co-defendant.

14         MR. YOUNG:  Right.  I understand.  There's two of

15  them there, but --

16         MR. GABBERT:  Okay.

17         MR. YOUNG:  Right.  But just a statement that says we

18  received everything, is fine.

19         THE COURT:  All right.  So between now and when we

20  come back at two o'clock --

21         MR. GABBERT:  Well, I'm going to have to check with

22  my client on whether there's anything else on Fitzgerald other

23  than what I have here.  I'll confirm that.

24         THE COURT:  All right.

25         MR. YOUNG:  Yeah.  And that's why I just asked for

1  that in writing.

2          THE COURT:  All right.  I'll expect that confirmation

3  to be provided by two o'clock today.

4          MR. YOUNG:  Thank you, Your Honor.

5          The other issues are all requests for production, and

6  they apply equally to Hagh Law.  And I assume Hagh, the first

7  is Request Number 1, which is the exact same one we just went

8  through with regard to Manookian, PLLC.  That is, that is

9  whatever you've got to prove your affirmative defenses.  And I

10 would presume that we can work that out the same way the Court

11 told us to work out Request Number 1 with regard to Manookian,

12 PLLC.  So --

13         MR. GABBERT:  Well, on that one, Your Honor, please?

14 Hagh Law had no ownership or light lease or anything on the

15 agreement.  It has no access to anything related to the

16 building, on access to the building.  So that's an

17 inappropriate thing to ask Hage Law, because they did not

18 maintain offices in that building.

19         MR. YOUNG:  Your Honor, I just ask whatever they

20 have, just to --

21         THE COURT:  Right.  So your response is -- there's

22 your response, and you've responded accordingly.

23         MR. GABBERT:  We've responded.  Yeah.

24         THE COURT:  All right.

25         So anything else on that one, Mr. Young?

1           MR. YOUNG: No.

2           THE COURT: I think Mr. Gabbert stated clearly his

3 client's position. And again, if something comes up later that

4 should have been known and should have been turned over, then

5 that's kind of how this works. But based off of his

6 representation, if they had no ability or access to get videos

7 or swipe records or anything like that, then there's your

8 response.

9           MR. YOUNG: Thank you, Your Honor. That satisfies

10 me.

11           Request Number 3, copies of all engagement letters.

12 This is the same issue that we just talked about before. And I

13 understand this will be resolved the same way, which is a

14 statement that says we produced all engagement letters that we

15 have, is fine. I just don't want -- again, I just don't want

16 to find out later that there's another engagement letter that

17 we didn't know and we've chased the case this way only to find

18 out that there's something else out there. So the same issue

19 as to Interrogatory Number 8 with regard to Request Number 3.

20 And I assume we'll handle that the same way?

21           THE COURT: Yes.

22           MR. YOUNG: Request Number 5. And this is somewhat

23 related. It asks for any document that supports its claims to

24 fees. Again, that's going to be -- I assume that's going to be

25 the engagement letters. But if there are anything else, like

Case 3:20-ap-90082 Doc 161-1 Filed 05/15/23 Entered 05/15/22 22:20:14 Desc
Exhibit Hearing Transcript Page 30 of 96

000039
000039

1  time records, I've seen some reference to time records, if any

2  of the parties have, if Afsoon Hagh or Hagh Law have time

3  records I think that would be responsive to Request Number 5.

4          I've received none.  I don't know whether that means

5  there are none, but I just want to get that on the record that

6  if there are time records, we want them turned over.  Because

7  I've seen some reference to them, but we've not gotten

8  anything.

9          So I don't know if Mr. Gabbert knows whether his

10 client has time records or not, but --

11         MR. GABBERT:  These cases were contingent cases. Time

12 was not an issue.

13         MR. YOUNG:  Fair enough.

14         And, Your Honor, the reason I bring that up is

15 because obviously there are two ways to get a fee.  One is by a

16 written engagement letter, and one is by equity.  And time

17 factors into an equitable analysis, which is why I've asked for

18 that question.

19         THE COURT:  All right.

20         MR. YOUNG:  But if there are none, we'll consider

21 that resolved.

22         THE COURT:  All right.

23         MR. YOUNG:  Request Number 8.  And this is what Mr.

24 Gabbert just alluded to, and he did send me an email last night

25 that said that they would produce any email correspondence

1    related to Fitzgerald or Shoemaker by that date that he
2    mentioned.
3              MR. GABBERT:  The 28th.
4              MR. YOUNG:  And so if we could just incorporate that
5    in an order?
6              THE COURT:  Please.  And put that date, the 28th, or
7    whatever was agreed, between the two of you.
8              MR. YOUNG:  That resolves the Trustee's issues.
9    Those are the only issues the Trustee had regarding outstanding
10   discovery.
11             THE COURT:  All right.
12             Mr. Spragens.
13             MR. SPRAGENS:  See if I can use the technology
14   without showing you my brackets.  All right.  Are you able to
15   see that, Your Honor?
16             THE COURT:  I can.
17             MR. SPRAGENS:  Okay.  We may not need to refer to it,
18   but I at least wanted to have it there.
19             As Your Honor is aware, this action was filed two
20   years ago, over two years ago.  There was a motion for turnover
21   expedited, there have been a lot of proceedings over the last
22   two years.  A year ago, we propounded this written discovery,
23   in January of 2021.
24             And sorry, I jinxed it.
25             And our motion deals with the fact that the Trustee

1  has still not been able to give us, even, responses to our

2  interrogatories, which are really taking the allegations in the

3  complaint and saying, what information do you have to back up

4  this allegation, or that allegation?  Questions like:  What

5  assets are you alleging were converted or fraudulently

6  converted?  What property are you alleging was misused, and

7  when?

8          And the Trustee's responses to each and every one of

9  these, we now have some amended responses to our

10 interrogatories, basically are, you know, you have the

11 information.  We don't have the information.  But there's

12 really no, there's no final statement that we don't know it's

13 the statements are -- they're very boiler plate objections,

14 Your Honor.

15         So I'm happy to go through each interrogatory one by

16 one and discuss them.  We have made repeated attempts to try to

17 get this information from the Trustee and we've met with

18 resistance every time.  So now we have essentially all of our

19 interrogatories that we've propounded, we haven't been given

20 the amount of damages that are being sought here, or how the

21 Trustee views damages.  What is the trustee's calculation of

22 damages?  We haven't been given the property, the assets that

23 were converted.  We haven't been given an itemization of the

24 real estate at the time that the real estate was improperly

25 used.

1          And so that's what our discovery is seeking.  Our

2   motion, which is docketed at 104, goes through each one and

3   lays out why we view the responses as deficient.  And I'm happy

4   to walk through each and every one with Your Honor.

5          I think once we get some guidance from the Court it

6   would be -- you know, that might help us meet and confer, which

7   we should have been able to do by now, I would think, and get

8   this resolved.

9          But it cannot be the case that the Trustee is allowed

10  to just make all these allegations, which sound like fraud and

11  are very specific and detailed, and then refuse to answer

12  discovery about, okay, well, what's the basis of these

13  allegations.  I would submit that we wouldn't have some of

14  these other issues with discovery that we've been talking about

15  this morning if we had gotten some basic information in

16  response to our interrogatories.

17         So, you know, if the Court would like, I could go

18  through these one by one.

19         THE COURT:  That's what we said we're going to do

20  today.  So start with Number 1.

21         MR. SPRAGENS:  All right.  Thank you, Your Honor.

22         Number 1 asks for case names of every previously

23  pending legal action in which Cummings Manookian withdrew,

24  terminated their representation, or stopped providing legal

25  services to any client from January 1st, 2018 to the present.

1        In other words, we are trying to find out in which

2   cases the Trustee's view as that the Cummings Manookian

3   withdrew.  The Trustee objected and refused to provide

4   information in response to that, other than citing a letter

5   that was sent to the Fitzgerald plaintiffs about notice of

6   withdrawal.

7        If that is the trustee's full response to

8   Interrogatory 1, and the Trustee is not going to be able to

9   supplement it, that's fine.  But I think the interrogatory

10  response needs to say that this is all we know.  Instead, it

11  says, this calls for information we're still seeking in

12  discovery.

13       So with each of these we're caught in this cycle of,

14  we ask a question and the response is, well, we don't know, you

15  tell us.  So that's our view on Interrogatory 1.

16       THE COURT:  So if I understand, Cummings Manookian

17  knows what cases and clients they were involved and during that

18  date range, knows when they withdrew, or if they withdrew, and

19  you want the Trustee, who stepped in the shoes with not all the

20  books and records, and certainly not all the information and

21  the knowledge of this, to answer that interrogatory?

22       MR. SPRAGENS:  I want the Trustee to answer what the

23  Trustee knew at the time she made these allegations in the

24  adversary proceeding.  And I think that's reasonable.  I don't

25  think you're entitled to make allegations of fraud in an

1  adversary proceeding, or any federal lawsuit for that matter,

2  and then say, well, I don't actually, I don't know the answer.

3  They just alleged fraud upon information and belief.  I don't

4  think that is how it works.

5          I understand that bankruptcy is a different universe

6  and, one, frankly, as the Court knows, that I don't practice in

7  very often, but I still don't think the Trustee is entitled to

8  just say, I don't know what the basis for these allegations

9  was.  But if that's the answer, the Trustee needs to say so.

10          THE COURT:  Okay.

11          Mr. Young?

12          MR. YOUNG:  I'm happy to address this one, Your

13  Honor, and I'm going to address it sort of in a global way.

14          As I think the Court knows, trustees have no

15  firsthand knowledge.  Trustees come into a case cold and they

16  learn what they can get from third parties, from the debtor,

17  from defendants, from creditors, from whomever like that.  And

18  in this case it's been incredibly challenging because nobody

19  will turn over the information without Court orders.

20          And even after Court orders, they still don't turn

21  over the information.  In the case of the Cummings Manookian

22  motion to compel that was entered a year-and-a-half ago, still

23  haven't gotten most of that information.

24          And so the complaint, as the Court may recall, Mr.

25  Manookian wanted the complaint filed by a certain date.  We

1  filed that complaint based on facts and reasonable inferences.

2  That's what the -- that's what the law allows, facts and

3  reasonable inferences.

4      We have a handful of facts.  We have stated where we

5  have facts.  Those facts, frankly, mostly come from pleadings,

6  and the few relevant documents that we've gotten from the

7  defendants and from Cummings Manookian, but a lot of it have

8  come from pleadings in other cases.  Everything else, at this

9  point, is just an assumption, really, based on the facts.  And

10 we've stated that where that's been the case.

11     It is a little bit like a game of hide the ball where

12 then the trustee's criticized for not knowing the color of the

13 ball that's being hidden.  We are doing the best we can to

14 respond.  After discovery I'm sure we can respond more fully,

15 and we will respond more fully, once we get all this

16 information.

17     But essentially, as the Court's noted, the parties

18 are asking us for information that's within their exclusive

19 control, that in a lot of respects they've withheld from the

20 Trustee, and then criticizing the Trustee because she doesn't

21 know information that's been withheld from her.

22     And I think the Court will -- if the Court will look

23 through our responses, you'll see that we filed objections, and

24 that in almost every case we said, notwithstanding the

25 objection, here's the best we know how to answer it at this

1  time.

2      I've never, I've represented trustee's for over 15

3  years, I've never gotten this sort of discovery to a trustee

4  because everybody understands the knowledge limitations of a

5  trustee, that a trustee goes out and gathers information, not

6  disperses information.  So I don't know what to say about it,

7  other than that.

8      But I think that our responses are very fair.  I

9  think that they're very complete under the circumstances.  If

10  there's something that we legitimately don't think is an issue,

11  we've said so.  If there is information that we have or

12  assumptions we're making, we've said so.

13      And so I don't really know how to better answer this.

14  I really tried.  I took the Court's admonition to heart.  The

15  Trustee and I spent a lot of time going back through these to

16  say, is there anything we can refine in these answers?  And

17  we've done that to the best of our ability.  But unfortunately,

18  we're still very early in discovery in this case.

19  Unfortunately, that's where we are.

20      And so until there's been some more thorough

21  discovery we can't possibly answer questions like -- and we'll

22  talk about this in a minute, but we just got another 86 request

23  for admission filed since the last -- served since the last

24  hearing that ask things like:  Admit that this engagement

25  letter is the authentic version.

1    The Trustee wasn't the author of that.  She wasn't

2  there when it was signed.  The only way she knows whether

3  something's authentic is whether the parties to that agreement

4  tell her it's authentic.  That's just one example, but there's

5  a 100 examples along those same lines.

6    So that's our frustration in this case, and those are

7  our limitations.  And if we need to handle this differently,

8  Your Honor, we're happy to.  But we think that we've handled it

9  appropriately and done the best job that we could do as a

10 fiduciary to the estate.

11    MR. SPRAGENS:  Your Honor, respectfully, two points

12 in response to that.  You know, one is that fraud must be pled

13 with particularity, and I don't care who pleads fraud, I don't

14 care if it's a trustee or a plaintiff, personal injury

15 plaintiff, whatever, you have to plead it with particularity.

16 And when I ask for the particulars of your allegations of

17 fraud, which is what Interrogatory Number 5 asks for, you know,

18 what are the fraudulent actions that you have identified, you

19 know, time, place, date, give us the who, what, where, when,

20 why of the fraud, the Trustee says I don't have that

21 information.

22    Well, that is a pleading requirement for fraud.  And

23 if the Trustee doesn't have that information, the Trustee needs

24 to say, I didn't know that at the time I filed it.  I mean, the

25 representation today that these allegations in the adversary

000049
000049

1  proceeding are based on, quote, "assumptions and inferences,"

2  frankly, doesn't satisfy Rule 9 or Rule 8, I would submit, or

3  Rule 11 for that matter.

4        However, when we ask for things like what furnishings

5  or equipment are you saying were converted by Manookian, PLLC

6  or Hagh Law, we don't get any response.  But it would be useful

7  to know what we're accused of so then we can respond to it.

8        And, you know, I'm sympathetic to the fact that the

9  Trustee doesn't have all the information.

10        The other thing I would like to point out again is

11  that I have offered on multiple occasions to make a

12  representative, and specifically Mr. Manookian, available for

13  Mr. Young to talk to.  So if he wants to talk about, okay, you

14  know, I don't really know what property was there, tell me

15  about the desks and the office, tell me about the file

16  cabinets, tell me about the alarm system, we could have had

17  that conversation.  Instead, we are handcuffed by the discovery

18  process where we're trying to find out what's the nature of the

19  allegations against Manookian, PLLC so we can respond to it.

20  And that is the nature of every interrogatory that we are

21  moving to compel further responses to.

22        And the idea that, you know, I don't have it and I'm

23  just going to say it's in your possession, or something like

24  that, we at least need a definitive statement of what they have

25  and don't have at this time.  And at the time, frankly, two

000050 000050

1    years ago, when they brought this action.

2           I do have a separate issue to raise about the request

3    for admission, but, you know, for now, I'd like to talk about

4    the interrogatories.  And if we can go through other

5    categories, stealing telephone numbers, or email addresses.

6           Okay.  What telephone numbers or email addresses, I'm

7    referring to Interrogatory Number 10, are we being accused of

8    converting?  I think that's pretty basic, you know, based on

9    public records, I guess, pleadings.  As Mr. Young had said,

10   they should be able to respond to that.

11          When they talk about stealing client files,

12   Interrogatory Number 11, which client files are they saying

13   were improperly converted?

14          You know, when they talk about work on the Fitzgerald

15   case that's just, I mean, essentially that's been made up and

16   called an inference here, but we'd like to know if they have

17   any information about specific work that was done on the

18   Fitzgerald case that Manookian, PLLC is liable for in the

19   nature of fraudulent conversion or some other tortious

20   interference.

21          So, you know, each and every one of the allegations

22   that they made is a very serious allegation, and the fact that

23   the Trustee is the Trustee does not immunize her from complying

24   with Federal Rule 9 in the pleadings and then backing that up

25   in discovery.  So that's what we're asking for.

000051
000051

1   And if they don't have certain information, and they

2 didn't at the time that they filed the case, then that is the

3 appropriate response.  But just pointing the finger back at us,

4 in my view, doesn't satisfy their obligations under the rules.

5   THE COURT:  Well, under that analysis I can tell you

6 virtually every adversary proceeding that I've seen a trustee

7 file for preferences or any other thing would be thrown out

8 summarily by the Court under that standard, because the trustee

9 just doesn't have that information.

10   And your client filed this bankruptcy on behalf of --

11 or Mr. Manookian filed on behalf of Cummings Manookian, right?

12 There's a list of assets on the statements and schedules.

13 There's a list of cases and clients that are no -- that's in no

14 universe that Cummins Manookian has personal knowledge of.

15   The Trustee doesn't have personal knowledge of any of

16 this.  The Trustee is getting information from pleadings that

17 were filed under penalty of perjury and the discovery process

18 here.  So the Court understands your frustration if you're not

19 used to practicing in bankruptcy Court.

20   MR. SPRAGENS:  Sure, Your Honor.

21   THE COURT:  But this is not an IP case.  This is a

22 trustee who you got a complaint that was filed on a date

23 certain with the information available when it was filed.  And

24 you certainly had the ability to file a motion to dismiss, move

25 for summary judgment.  Whatever's available to you in the

1    litigation process is still available to you, based on if
2    you're not satisfied with the answers and you don't believe
3    that there's a cause of action that can be carried forward.
4          But to ask the Trustee to go and create something the
5    Trustee can't create is not possible.  And the Trustee doesn't
6    have personal knowledge, because it was the Debtor who created
7    the information and the circumstances.
8          MR. SPRAGENS:  I appreciate that, Your Honor.  If I
9    can just respond briefly?
10         To get from point A, which is filing your bankruptcy,
11   to point B, which was filing an adversary proceeding, including
12   a lot of serious allegations of fraud.  And as Your Honor
13   knows, this has some significant overlap with the receivership
14   action in State Court in Williamson County, and what we're
15   trying to figure out is how do we get from point A, which is a
16   bankruptcy with a schedule of debts and creditors and all that
17   stuff, to this very serious adversary preceding with these very
18   serious allegations, which are based on what?
19         And so I take your point, Your Honor.  We will avail
20   ourselves of the motion for summary judgment opportunity.
21   However, the Trustee is just going to come in and say, it's
22   premature because we can't respond to that.  So I'd at least
23   like to get some finality from the Trustee in terms of
24   discovery responses so then we can come in and file our motion.
25         THE COURT:  All right.  Well, let's do what we're

000053                                                    000053

1  doing.  Let's go line by line and we will get finality while

2  all the parties are in the room.

3          MR. SPRAGENS:  Well, Your Honor, we had talked about

4  Interrogatory Number 1, which was the withdrawal dates for

5  Cummings Manookian, and what are the Trustee's allegations, or

6  what's the Trustee's information about Interrogatory Number 1.

7  I'm not sure that you've ruled on that one.

8          THE COURT:  The Court finds Trustee's response to be

9  acceptable.  And with the --

10         Mr. Young, is the Trustee in receipt of any

11 additional information based off of the subsequent items that

12 have been disclosed?

13         MR. YOUNG:  No, Your Honor.

14         THE COURT:  All right.

15         MR. SPRAGENS:  Interrogatory Number 2 relates to

16 Interrogatory Number 1, which is legal services after that

17 withdrawal date.  And essentially Trustee said, I didn't answer

18 1, so I'm not answering 2.

19         THE COURT:  And again, Mr. Young, you're now in

20 possession of various engagement letters that should encompass

21 the subsequent work by any other firms that are related to

22 these proceedings.  Do you have any responsive information in

23 addition to what has been given?

24         MR. YOUNG:  No, Your Honor.  Simply because there's a

25 we don't -- we have not been given anything that shows that

1    Cummings Manookian actually terminated its relationship with

2    anything.  So if it hasn't terminated as a relationship, then I

3    have nothing about what happened after a termination, so --

4            THE COURT:  Mr. Spragens?

5            MR. SPRAGENS:  I mean, in the response to Number 1,

6    there is the withdrawal letter in the Fitzgerald case.  So I

7    think that that would be one that they could respond to based

8    upon that.

9            THE COURT:  All right.

10           MR. YOUNG:  Your Honor, if I may address that?

11           A withdrawal letter doesn't mean that legal services

12   had stopped.  What has to happen is a withdrawal in the case,

13   and that didn't happen.  Cummings Manookian did not withdraw in

14   the case, and so --

15           THE COURT:  And here we go back to the argument of,

16   are you going to assert that you're owed money after the

17   withdrawal?  I mean, this thing is becoming a circular

18   argument.  Again, we're all lawyers here.  If that information

19   is necessary to prove a particular element of a cause of

20   action, it needs to be provided on what the Trustee is relying

21   on.

22           Now, it gets very circular in that we keep arguing

23   about, you know, is this the only agreement?  Was there

24   subsequent agreements?  The agreement stands for what it is.

25   At some point we just need to disclose the underlying, does

1 Cummings Manookian believe they're owed any money, and why.

2 Does the Trustee believe Cummings Manookian is owed any money,

3 and why.

4       I mean, that's the essence of what we're talking

5 about here.

6       MR. SPRAGENS: And, Your Honor, and only the Trustee

7 can answer that question, because Cummings Manookian is not an

8 entity. There's not even a lawyer associated with it. So it

9 couldn't exist in the future, or right now, because Mr.

10 Manookian doesn't have a law license.

11       So, you know, the Trustee is the one who gets to make

12 that decision at this point.

13       THE COURT: So I think that's the best way to frame

14 why we're here, right? It's all about the money. This is

15 Bankruptcy Court and every second we're here somebody's not

16 going to get a dollar, or in this case lots of dollars.

17 Because we're here talking about things that are obvious, and

18 should be for a bunch of lawyers who have resolved everybody

19 else's disputes for years and can't seem to get past the forest

20 for the trees on this dispute.

21       So let's keep going.

22       MR. SPRAGENS: So Interrogatory Number 3 says, "If

23 the Trustee alleges that Cummings Manookian is entitled to

24 attorney's fees, or payment from Afsoon Hagh, Hagh Law, or

25 Manookian, PLLC, identify in which cases."

000055

000055

000056                                                    000056

1          I mean, this is the theory of the case here, and so

2   that's all we're asking for.  And I, you know, I think that's a

3   reasonable thing to be requesting in your first set of

4   interrogatories.

5          MR. YOUNG:  And, Your Honor, if you'll look at the

6   response to Number 3, we did.  We cited every -- well, in the

7   amended responses we've actually cited the two remaining cases

8   to which are -- that are issues, and the dates that we

9   understand the start and we understand the stop.

10         But the questions about, you know, identify all

11  settlement offers obtained by Cummings Manookian, for example,

12  the Trustee has no way of knowing.  The Trustee hasn't been

13  given Cummings Manookian's case files.

14         You know, identify all legal work perform by Cummings

15  Manookian in the case such as research, drafting, number of

16  hours spent, there's no way for the Trustee to know that.  The

17  Trustee knows what cases, and the Trustee has done her best to

18  identify the start and stop dates.

19         THE COURT:  Okay.

20         MR. YOUNG:  The Trustee has come in and said that

21  Cummins Manookian is entitled to fees in these cases and we're

22  trying to figure out what's the basis for that allegation.  And

23  in fact, some of the cases, I mean, Cummins Manookian wasn't a

24  going concern during some of that time period, or at least --

25  and I haven't looked at these amended responses which just came

1 in earlier this week, but, you know, that's why we're trying to

2 find out what the Trustee's position is on this.

3     And if the Trustee's position is, you know, we think

4 that Cummings Manookian is entitled to some fee, but we can't

5 tell you on what basis that, you know, theory travels, whether

6 it's quantum meruit, or there was a settlement offer that was

7 turned down, and so Cummings Manookian has some entitlement to

8 that, that's all we're trying to learn here.

9     And now we have a list of two cases, and we've been

10 recently given an approximate start and stop date of Cummings

11 Manookian's involvement. We still don't really know much about

12 why Cummings Manookian is entitled to a fee.

13     MR. YOUNG: Your Honor, I can answer that question

14 right now. The complaint answers it. The answer to that

15 question is, because there are engagement letters between

16 Cummings Manookian and these plaintiffs that establish a legal

17 right to the fee. That's the answer to why Cummings Manookian

18 is entitled to a fee this case.

19     THE COURT: All right. There's your answer.

20     MR. SPRAGENS: Okay. Well, that's the Trustee's

21 position about the engagement letter, I guess.

22     And the Trustee's position about withdrawal letters

23 is that they don't actually constitute withdrawals. I mean,

24 we're learning, even today, about the theory of the case. This

25 is not information that had been provided to me before today.

1          Number 4, ask for hours.  Again, same inquiry.  We're

2     just trying to find out what's the basis.

3          I assume the Trustee's answer is, we don't know how

4     many hours were worked by Cummings Manookian.  If that's the

5     answer, I would just like the Trustee to write that, rather

6     than objecting to what I think is a reasonable interrogatory.

7               THE COURT:  Mr. Young?

8               MR. YOUNG:  Your Honor, we don't know.  And we said

9     that we're still seeking discovery on that issue.  Maybe Mr.

10    Manookian knows that and will say something in his deposition.

11    I don't know.

12              THE COURT:  All right.

13              MR. YOUNG:  There's no way for the Trustee to know

14    that.

15              THE COURT:  When is Mr. Manookian's deposition?

16              MR. YOUNG:  It's not been scheduled, Your Honor.

17              THE COURT:  All right.  We're going to do that today,

18    by the way.

19              MR. SPRAGENS:  And I assume, also, the Trustee's

20    deposition and Mr. Young's deposition.

21              THE COURT:  We're going to -- we're going to -- we're

22    going to get all these discovery issues resolved.

23          It appears that all of these are ripe for further

24    discussion after the full and total depositions are taken.  And

25    at that point, any answers that are deemed unresponsive the

1  parties can confer.

2           Because it sounds like most of this is going to be

3  driven by additional information that's available, not to the

4  Trustee at this moment, but is locked away deep inside Mr.

5  Manookian's brain somewhere.  That while he's under oath he

6  will enlighten the Trustee and the other parties on exactly

7  what happened so that the Trustee does what trustees do all the

8  time, they amend complaints, they dismiss complaints.  They

9  move on if there's nothing there or it's not sustainable for

10 the original theory of the case based off of the original books

11 and records or whatever they used with the filing of the

12 pleading.

13          So that's kind of how this works.  And so for the

14 parties to resolve these, you need to work together with the

15 total discovery that Mr. Manookian holds the keys to the

16 kingdom.

17          MR. SPRAGENS:  Well, that's certainly the Trustee's

18 theory.

19          THE COURT:  It's not a theory, Mr. Spragens.  The

20 Trustee was not there.  The Trustee has no crystal ball.  The

21 Trustee steps in to save the estate for the benefit of

22 creditors based off the actions of the people who put it in

23 bankruptcy.

24          I don't know -- I don't know what you expect the

25 Trustee to come up with when the Trustee physically has no

1 personal knowledge and was not involved in any of the time

2 frames that you're seeking information.

3        MR. SPRAGENS:  Well, Your Honor, respectfully, I

4 mean, Number 5 is the next interrogatory.  That's the one about

5 fraud.  The Trustee made a bunch of allegations about fraud.

6        And so it's one thing to preserve an estate, and to

7 administer an estate, I certainly agree with Your Honor that

8 that's an important function.  But let's talk about the

9 adversary proceeding that we're here today on, which is the

10 Trustee made a bunch of allegations about false representations

11 or material omissions.  We've asked for more information about

12 those.  And again on Number 5 we get told, well, actually, you

13 know, we allege fraudulent transfers, but no fraudulent

14 representations or material omissions.

15        Can we get a little more information about that one?

16        THE COURT:  All right.

17        Mr. Young?

18        MR. YOUNG:  Your Honor, I don't know what to say

19 about that other than fraudulent transfers are not for all.

20 548 is not fraud.  That's a fraudulent transfer and it's

21 totally different.  And there are no material omissions, there

22 are no fraudulent misrepresentations, and we've said that.

23 We've said this is a 548 case, not a fraud case.

24        And so I don't know how to say that more clearly than

25 we've said that.

1          THE COURT:  And you're basing the fraudulent

2    transfers on what?

3          MR. YOUNG:  On transfers to or for the benefit of

4    another party for less than reasonably equivalent value at a

5    time that the estate was insolvent, or that the transfer made

6    the estate insolvent.  This is a pretty basic 548 argument,

7    Your Honor.

8          THE COURT:  Okay.

9          Mr. Spragens, with the limitation on its merely

10   transfers, what do you believe would be responsive beyond what

11   Mr. Young has represented is the Trustee's position?

12         MR. SPRAGENS:  Well, Your Honor, I think intentional

13   conversion of property falls into the nature of fraud.  I mean,

14   any sort of intentional misrepresentation that's being accused

15   in this complaint, which, I mean, the complaint is full of very

16   specific allegations -- well, I misstated that, but very --

17   well, let's say, allegations that Hagh Law or Manookian, PLLC

18   have taken premises, furniture, equipment, intellectual

19   property, attorney's fees.  I mean, have taken them, so this is

20   intentional misconduct, that's in the nature of a fraud.

21         And I can't speak to the Bankruptcy Code if the fraud

22   alleged here doesn't really mean a fraud, but the complaint is

23   full of allegations of conversion, and essentially theft, that

24   taking a property that one is not entitled to.

25         So we are asking:  What exactly are you alleging has

1  happened here?

2      And again, I think that's an appropriate inquiry.  If

3  you're a Trustee, or any other plaintiff, I think you should be

4  able to say, well, here's what we are alleging was taken, here

5  are the fees that we allege the law firm, Cummings Manookian,

6  is entitled to, that Manookian, PLLC, Afsoon Hagh, and Hagh Law

7  have essentially stolen.

8      MR. YOUNG:  And, Your Honor, we answered that in

9  response to Number 9, that question.

10      THE COURT:  What is your answer?

11      MR. YOUNG:  The question is, "Identify the office

12  space and specific furnishings and equipment you allege Brian

13  Manookian or Manookian, PLLC utilized in Paragraph 20 of your

14  complaint."

15      And the response is, "Premises located at 45 Music

16  Square West, Nashville, Tennessee, and all the furnishings,

17  equipment, and personal property located therein."

18      MR. SPRAGENS:  I don't know what furnishings or

19  equipment they're referring to.  I understand there --

20      THE COURT:  There are statements and schedules --

21      MR. SPRAGENS:  Uh-huh.

22      THE COURT:  -- that list everything that Cummings

23  Manookian owned.

24      MR. SPRAGENS:  And I don't think -- and I don't have

25  them in front of me, I don't think that those statements and

1  schedules even refer to property inside 45 Music Square West.

2  I don't think Cummings Manookian owned that property.  They

3  didn't own 45 Music Square West, for starters.  And I don't

4  think that they own the property inside 45 Music Square West.

5           But if that's what this is based on, then that's

6  great, Your Honor.  Can they just write that in their response

7  to our interrogatory?  I'd love to -- I'd love to know.

8           THE COURT:  Mr. Young, if you could amend --

9           MR. YOUNG:  Your Honor, I read it verbatim out of our

10 responses.

11          THE COURT:  To Interrogatory Number 9.

12          MR. YOUNG:  Correct.

13          THE COURT:  All right.  So we're talking about Number

14 5.

15          MR. YOUNG:  But Number 5 asks for instances of fraud

16 that we're not alleging any material omission or false

17 representation, that is the question.  There are no allegations

18 of that.

19          MR. SPRAGENS:  You all can correct me if fraud means

20 something different in bankruptcy court than it does everywhere

21 else.  My understanding of the Bankruptcy Rules and the Rules

22 of Civil Procedure are that fraud must be alleged with

23 particularity.  And I don't think that the response to Number 9

24 is sufficient, either.  "Premises located at 45 Music Square

25 West and all furnishings, equipment, and personal property

000064

000064

1  therein."

2          So if he is not alleging that there was wrongful

3  conduct, or if the Trustee is not alleging that there was

4  wrongful conduct, the taking of property that was not -- that

5  Afsoon Hagh, Hagh Law, and Manookian, PLLC were not entitled

6  to, then I guess I've misunderstood the nature of the adversary

7  proceeding.  I think that this complaint includes very detailed

8  allegations of fraud.

9          THE COURT:  And here we go in another circle.  The

10  Trustee has made allegations based off information and belief

11  and the knowledge present when this was filed.  Mr. Young has

12  just articulated it's based on use, misuse, continued use,

13  whatever it ends up being or not, of the property that was at

14  the address that Cummings Manookian owned.  If they didn't own

15  anything, well, guess what?  You got a pretty easy defense.

16          MR. SPRAGENS:  I don't disagree, Your Honor.

17          THE COURT:  Right?  So what are we arguing about?

18          MR. SPRAGENS:  Well, I --

19          THE COURT:  I mean, you've got a pretty easy defense.

20  If you say, we don't own any property there.  Okay.

21          MR. SPRAGENS:  Well --

22          THE COURT:  Your witness will testify to such.  The

23  Trustee will take the list of anything there and say, okay,

24  here's what I got, do you own any of it?

25          MR. SPRAGENS:  But Your Honor understands that what I

000065
000065

1  don't want them to show up later and say is, oh, well,

2  actually, we've got this other property, or some other thing.

3  I mean, that's why I'm trying to find out, the nature of the

4  allegations.  And certainly when we get into depositions, which

5  we've been asking for for a long time --

6          THE COURT:  Well, but --

7          MR. SPRAGENS:  -- further light can be shed on some

8  of those questions.  But I want to know is there going to be

9  some other property that they're now going to say was misused

10 or converted?

11         THE COURT:  So the Trustee's bound by the property

12 that's in the bankruptcy estate.  It's listed on statements and

13 schedules.  There's no zinger here.  And if there is a zinger,

14 guess what?  It's subject to the same thing.  If the Trustee

15 knew, or should have known, and disclosed that, at this time

16 the Trustee's not going to be able to use that.

17         I mean, this is, we got a finite universe of what

18 could be.

19         MR. SPRAGENS:  And I appreciate that, Your Honor.

20 And I'm encouraged to hear you say that they are going to be

21 bound by these responses that are -- if they had information

22 that was available to them prior to this time.  And we're

23 relying on these responses as we prepare our defense of this

24 case --

25         THE COURT:  Right.

1       MR. SPRAGENS:  -- I appreciate that.

2       THE COURT:  And you should have known that from the

3  beginning.  I shouldn't have to reiterate that, that that's how

4  these rules work.  That's why there's rules, because discovery

5  is a pain in the side of everyone, and we've standardized the

6  practice and the process to ensure that there aren't zingers at

7  trial where one party holds back or then changes their story at

8  the end of the day.

9       MR. SPRAGENS:  Well, Your Honor, in my view, every

10 one of their responses includes a caveat that basically says,

11 if I learn something later, I might change what I'm saying.

12      THE COURT:  And that's how bankruptcy works.

13      MR. SPRAGENS:  I appreciate what you're saying.

14      THE COURT:  The Trustee doesn't have the information.

15      I mean, again, under that standard there would never

16 be a single adversary proceeding that would proceed in

17 bankruptcy.  Every company that files bankruptcy, and then the

18 Trustee who has a timeline where they have to file these

19 actions, no action would ever get through any litigation

20 because the Trustee doesn't -- the Trustee wasn't there.  The

21 Trustee doesn't have personal knowledge.

22      It's only through the discovery process that they

23 understand what happened.  So they're bound by their answers,

24 which is why the answers say, if we find something else out,

25 we'll include it.  And that's why Trustee's routinely drop

1　counts, add counts, you know, amend, dismiss the complaint

2　entirely, because that's how it works.

3　　　　　And that's why the collaboration here is different

4　from other places, because they don't have the information.

5　The Trustee is duty bound as a fiduciary to try to maximize the

6　value of the estate with a time certain that they have to

7　investigate and find what causes of action may or may not be

8　present.

9　　　　　So I'm hearing what you're saying, but by the same

10　token, the Trustee is doing what the Trustee does in cases, in

11　all cases.

12　　　　　MR. SPRAGENS:  I understand, Your Honor.

13　　　　　Here's one that maybe we could get a little light

14　shed on today.  Number 16 is, "Do you contend that Cummings

15　Manookian ever employed Afsoon Hagh?"

16　　　　　We just heard some conversation about that earlier on

17　the prior motion to compel.  So far, we've gotten an objection

18　and I don't know, can we supplement that based on the written

19　discovery that they've now acquired?

20　　　　　THE COURT:  Well, Mr. Young, that's a fair one,

21　right?  So is there any evidence or information that leads you

22　to believe that Ms. Hagh was ever an employee of Cummings

23　Manookian?

24　　　　　MR. YOUNG:  No, Your Honor.  We have no information

25　at this time to believe that.  But we've not seen -- we've not

1  seen the Debtor's employee records, we've not seen any bank
2  account records, we've not seen -- we've not seen anything.
3  So can I say that she's not an employee?  No.  But I also can't
4  say that she was never an employee.  We just don't know that.
5          I mean, we do know that she was acting as an agent,
6  because she signed pleadings on behalf of the firm and she was
7  listed as the point of contact on some of the invoices that
8  they've sent us.  So we do know she was acting as an agent, but
9  I have no idea -- we had no idea what the term of that agency
10  was.  It may have been an independent contractor, we just don't
11  know.
12          We do know she wasn't, and we said so, we do know
13  that she wasn't a partner.  We do know that.  But beyond that,
14  we don't know what the scope of her agency was.
15          MR. SPRAGENS:  I'm not sure how they are willing to
16  know that she wasn't a partner, but they're not willing to know
17  that she was an independent contractor, which we've now heard
18  Mr. Gabbert say here, and that the documents support that.
19          So again, from my perspective, representing, you
20  know, this entity, in this case, the allegations are made.  We
21  are guilty until proven innocent and, you know, he doesn't
22  accept the representations that he doesn't like, and he might
23  accept the ones that he does.
24          So it is a very tough situation to be in, in
25  discovery when we don't understand the basis for the

1  allegations and we don't understand why --

2          THE COURT:  Well --

3          MR. SPRAGENS:  -- you know, he'll agree that she's

4  not a partner, but he won't agree that she was an independent

5  contractor.

6          THE COURT:  Again, unless I'm missing something, if

7  your position is she never worked for your client, pretty easy

8  defense if they make an allegation that she was, that she never

9  did, and here's the proof.

10         MR. SCHWARTZ:  At what point, Your Honor, does Mr.

11 Young comment -- I mean, so let's just point out he said, well,

12 I don't have the time records, so I don't know.  And we're

13 saying, there aren't time records, she wasn't an employee.

14         But he says Manookian, PLLC you're a fraudster and

15 you just haven't produced the time records.  I mean, at some

16 point, this has to end and we get the benefit of --

17         THE COURT:  Yeah.

18         MR. SPRAGENS:  -- I mean, fulsome --

19         THE COURT:  And again, you know, you've said a couple

20 things.  You've used "fraud" a lot, and you talk about guilty

21 until proven innocent.  Let's be realistic here, right?  A

22 complaint is a complaint.  It's not a judgment.  It's not a

23 ruling by the Court.  Every party gets to start off with what

24 they're alleging.

25         MR. SPRAGENS:  Well, Your Honor, respectfully,

1  there's $750,000 that's been impounded now for how long?  Two

2  years.

3          THE COURT:  Which is exactly why we need to move on.

4          MR. SPRAGENS:  I appreciate that, Your Honor.  But

5  from my client's perspective, and I assume from Ms. Hagh's

6  perspective, you know, there has been a burden over these last

7  two years.  There have been very serious allegations made and

8  there has been money impounded and here we are still trying to

9  find out the nature of the allegations.

10          So forgive me, please, Your Honor, if I seem a little

11  exasperated by this process where, as I say, it's heads I win,

12  tails you lose.  And we're here two years later, we've been

13  asking to take the Trustee's deposition for a long time to find

14  out some of this information, as well.

15          THE COURT:  Well, again, your client either hired or

16  didn't hire Ms. Hagh as an attorney.  Your client knows that

17  information.

18          MR. SPRAGENS:  Potentially.  I mean, Mr. Cummings was

19  also a principal of Cummings Manookian, and so, you know, that

20  might be another source of information for the Trustee.

21          THE COURT:  Okay.  Well, in any event, again, it's an

22  easy defense to say, no, and here's why.

23          MR. SPRAGENS:  I appreciate that, Your Honor.  As

24  long as they don't say, unless there's some other information

25  out there that we don't know.

1          THE COURT:  The information that would be either

2  provided by your client --

3          MR. SPRAGENS:  Uh-huh.

4          THE COURT:  -- Ms. Hagh, the law firms, the only

5  information they're going to get is information that you

6  provide.

7          MR. SPRAGENS:  Well, they have the ability to get

8  information from other sources, as well, including

9  Mr. Cummings.  They've now sought Mr. Fitzgerald, the client in

10 one of those matters, to produce information.  And so we're

11 just trying to find out what they have, what they know, and

12 what they're alleging.

13         For example, Number 18, economic damages, we've asked

14 what's the basis for your allegation, what damages do you claim

15 Cummings Manookian are owed?  And we are in the circular

16 situation again where they say, we don't know, entitled to some

17 damages.  And that's, again, what we're trying to find out.

18         And if the answer is, we don't know, we can't answer,

19 we don't have that information, then they should say that and

20 be bound by it, is my request, Your Honor.

21         THE COURT:  Okay.

22         MR. YOUNG:  Your Honor, we've answered that by saying

23 some or all of the fees and expenses collected in those cases,

24 that's the universe.  I don't know whether yet, because I

25 haven't finished discovery, whether the Trustee right now would

1    say the Trustee is entitled to 100 percent of the Fitzgerald

2    fees and 100 percent of what's remaining of the Shoemaker fees,

3    because we have a written engagement letter.  But they may have

4    proved that, hey, we added equitably and we're entitled to some

5    portion of that.

6           MR. SPRAGENS:  Well, again, it's good -- useful to

7    hear some of these things, to learn that the Trustee's position

8    is that she's entitled to 100 percent of those fees, not

9    withstanding the withdrawal letter that we talked about earlier

10   and all that stuff.  This is part of the discovery process.  I

11   agree, we shouldn't have to do it in front of the Court.

12          I would love to learn these things in discovery,

13   understand the nature of the allegations and the basis for

14   these, you know, assertions.

15          THE COURT:  All right.  So what I want to do on all

16   of these --

17          Mr. Gabbert, you look like you want say something.

18          MR. GABBERT:  I'm want to ask a -- I want put

19   something on the record before -- for the record, now I'd like

20   to say something first.

21          MR. SPRAGENS:  And, Your Honor, I also have -- the

22   RFA question can be resolved in one fell swoop, I think.  But I

23   don't mean to interrupt.

24          THE COURT:  All right.  Well, we've got about --

25   we've got about another 30 minutes before I was going to take a

1  break.  If you want to save it to the bitter end.

2          MR. GABBERT:  I can do it either way, Your Honor.

3          THE COURT:  All right.  Well, I want to hear from

4  you.

5          MR. GABBERT:  Okay.  Actually, I want --

6          MR. SPRAGENS:  He's trying to jump in the line of

7  fire. I appreciate that, Mr. Gabbert.

8          MR. GABBERT:  Based off what I've heard today, I want

9  to get some clarifications.

10         Is it the Trustee's position that if Brian Manookian

11  did not specifically file something in the court, withdrawn on

12  the record after he lost his license, as a sole member of both

13  of these entities, Cummings Manookian and Manookian, and could

14  not practice anymore, if he did not specifically file something

15  in court, when he really wasn't allowed to because he'd lost

16  his license, is it the Trustee's position that since he didn't

17  withdraw, even though he had no license, he's still entitled to

18  all the fees?

19          MR. YOUNG:  Your Honor, I mean, if we want to talk

20  about the substance of this, I'm happy to do that.

21         So here are the facts.  Mr. Manookian gets suspended.

22  The firm continues its existence.  Afsoon Hagh continues filing

23  pleadings on behalf of Cummings Manookian for months after the

24  suspension.  Cummings Manookian never files a notice of

25  withdrawal in the case.  Instead, what I assume, and in fact

1  there was a motion to withdraw filed by Mr. Manookian in the

2  case, no order was submitted.

3       The motion specifically -- I'm talking about the

4  Fitzgerald case right now.  The motion specifically says Afsoon

5  Hagh will continue representing the plaintiffs in this case.

6  She continued filing pleadings under the name of Cummings

7  Manookian for a number of months until such time as she finally

8  just dropped the moniker, Cummings Manookian, and kept

9  everything else the same.  Didn't file a new -- a substitution

10 of counsel or a notice of new address or anything, and we're

11 supposed to say that that somehow was the transition to a new

12 code.  I think the Court can understand our reservations about

13 that.

14      So to answer the question.  Yes, a licensed attorney

15 continued filing pleadings on behalf of Cummings Manookian.  It

16 does not matter that it was not Mr. Manookian, it was a

17 licensed attorney filing on behalf of the law firm.

18      And Mr. Manookian didn't lose his license; he was

19 suspended.  He was still a licensed attorney.  He could still

20 run a PLLC, he was just suspended.

21      MR. GABBERT:  Okay.  I just wanted clarification on

22 where we were.

23      THE COURT:  All right.

24      Oh, Mr. Spragens.

25      MR. SPRAGENS:  We'll step away from the

1  interrogatories at this time and talk about the requests for

2  admission, if that's okay, Your Honor?

3              THE COURT:  Okay.

4              MR. SPRAGENS:  And then I'm sure you'll have

5  direction for us on the interrogatories.

6              The request for admission, you know, the rule states

7  that you have to respond.  If you don't have sufficient

8  information, you have to say you've made a diligent search.

9  It's pretty mechanical.  I agree that it's a bit of a

10 technicality, but it is what the rule says.  And it's important

11 to us that the Trustee in responding to requests for admission

12 follow the rule and certify that she made a diligent effort to

13 find all information that was available to her.

14             So it's a copy and paste that can be made to all of

15 their responses to the RFAs that we've propounded in this case.

16             And if she doesn't have the information, she's

17 entitled to say that.  That is part of the RFA response

18 process, but she needs to certify that she's made a diligent

19 effort to find those documents.

20             So that's it on the, RFAs, Your Honor.

21             THE COURT:  All right.  And I would assume you agree

22 that diligent effort is an ongoing effort based off the

23 Trustee's unique position in the continuing discovery, the lack

24 of depositions, that there will be other information that might

25 change a response?

 1          MR. SPRAGENS:  I agree with this much, Your Honor,

 2  which is that the parties have an obligation to supplement

 3  their discovery responses throughout the process.

 4          THE COURT:  Okay.

 5          MR. SPRAGENS:  So if she -- if something changes her

 6  response and she serves supplemental responses to the requests,

 7  you know, so be it.

 8          THE COURT:  All right.

 9          Mr. Young, I mean, that's kind of how it works,

10  right?

11          MR. YOUNG:  Yeah.

12          THE COURT:  So you answer based off of what you know.

13          MR. YOUNG:  And we've done that, Your Honor.  If what

14  he's looking for is a sentence in every one of these that says

15  we certify that we made a diligent effort to find information,

16  I can supplement it and add that sentence to every response, if

17  that's what he's looking for.

18          But we've, I mean, where we didn't know, we said why

19  we didn't know.

20          THE COURT:  Okay.

21       MS. DOWNING:  If the Court would just have them add that

22  sentence, I think that'll dispose of that issue.

23          THE COURT:  All right.  The Court's more than

24  happy --

25          MR. YOUNG:  No objection.

000077

1          THE COURT:  All right.

2          MR. SPRAGENS:  And, Your Honor, if I could just say

3    one more thing?  In general, you know, I'm sensitive to the

4    Court's perception.  I don't want to put words in your mouth

5    that I'm some lawyer from a different practice who's come in

6    here and dumbed up the works here, and I assure you that's not

7    been my intention.

8          THE COURT:  Mr. Spragens, if I at all alluded to

9    that, that's not the case.  I think you've represented your

10   client and yourself very well in front of this Court, and the

11   Court has no negative inference, connotation, belief, or

12   assumption.

13         MR. SPRAGENS:  Well, I appreciate that.

14         I just wanted to say, you know, I do think that there

15   is good faith.  You know, I don't -- I hope the Court won't

16   find that either side has been acting in bad faith.  I mean, I

17   guess I hope the Court might find that they're not responding,

18   but I'm not going to win that one anyway.

19         So, you know, in my view, we have been trying to

20   operate in good faith here.  I have been trying to make Mr.

21   Manookian available to talk to them.  And, you know, I think

22   that I've got a good basis for the request for more information

23   and response to our interrogatories.  But if the Court says we

24   need to move on with depositions, I'm eager to do that.  And

25   we've been seeking depositions on the plaintiff's side for some

000078

1 time now.

2          So that's all I'll say.  I'm sure you can tell us

3 where to go from here.

4          THE COURT:  All right.

5          And let's just go ahead and talk about depositions

6 real quick.

7          So I keep reading about one-on-one meetings.  Is that

8 separate from a deposition, or is that in reference to part of

9 the deposition?

10          MR. SPRAGENS:  No, Your Honor, that was part of the

11 meet and confer process that we were offering.  So to obviate

12 the need for this extremely pleasant hearing today I thought

13 that we could have an informal conversation to get a little

14 clarity about what each side was shooting at here, but then

15 there will be depositions obviously.  And we've been seeking a

16 deposition of the Trustee, and now Mr. Young has been

17 identified as a witness in their discovery responses, and so

18 we're going to seek to take a short deposition of him to find

19 out what he knows.  So that's where we are.

20          And in my view, you know, the Trustee should go

21 first.  She's the person who made the allegations and she has

22 the burden, and that's the practice that I'm familiar with, is

23 that the plaintiff goes first in these things.

24          THE COURT:  Okay.  Mr. Young?

25          MR. YOUNG:  Your Honor, we don't care if the Trustee

1   goes first, as long as everybody understands the Trustee, as

2   evidence by these discovery responses here, the Trustee knows

3   very little right now.  And that's going to be the Trustee's

4   response at this point, is she knows the information that she's

5   gotten from other parties, which, frankly, isn't a lot.

6           We have no objection if they want to take her

7   deposition first, that's fine.  But what we don't want to do is

8   have an eight-hour deposition, as they've suggested, only for

9   them to find out that she didn't really know that much.

10  And then say, after we've taken all these other depositions,

11  come back and say, now we want to depose the Trustee again.

12          But I'm open.  It doesn't matter to us.

13          I will say this.  I do want talk about scope,

14  specifically with regard to my deposition, because we did

15  identify the question was, anybody who had knowledge of

16  anything in the complaint.  I have not -- I was the receiver in

17  the case and I have knowledge of the references to what

18  happened in the receivership.  Frankly, all that's moot now,

19  because really all that had to do with was the movement of the

20  $750,000.  But if they want to take my deposition with regard

21  to anything prior to this bankruptcy, that's fine.

22          I want to make sure that we're all on the same page

23  that they're not going to ask me questions about what's

24  happened since the bankruptcy, since I've been operating as

25  counsel to the Trustee.  But I'm fine to tell them whatever I

1    know is, or knew, as the receiver.  That's fine.

2              But, you know, we're fine.  We would like a couple of

3    weeks to be able to look through anything that is going to come

4    in over the next couple of weeks.  The Trustee would like a

5    couple of weeks to look through all that before she gives a

6    deposition so that she can at least be as knowledgeable as

7    possible.  But beyond that, it's fine.

8              THE COURT:  All right.

9              MR. SPRAGENS:  I think we're mostly on the same page

10   there, Your Honor.  With respect to the -- I would not agree to

11   a specific time limitation on Mr. Young, on the questions to

12   Mr. Young, but I'm sensitive to the fact that if he has

13   confidential communications with his client we're not going to

14   be asking about those, or at least expecting any answers to

15   those.

16             If he has -- if there are things that he's done as

17   counsel to the Trustee involving third parties that are somehow

18   relevant to the claims, or the resolution of the claims, we may

19   want to get into that as well in the deposition.  But, you

20   know, this may be something that is not a live issue and we can

21   just think about it and come back if we foresee an issue.

22             THE COURT:  All right.  So between now and two

23   o'clock, by the end of this day, I want the parties to have

24   conferred and reached a schedule for depositions, and within

25   the order, a detailed scope of those depositions and any

1  specifics that are necessary to be fully disclosed within the

2  order.

3        And also, to address the request for admissions

4  issue.  It's fairly early in the process for admissions, given

5  all that needs to happen.  So please address that with some

6  formality once the formal discovery to include the depositions

7  are done, when the amendments for the admissions should be

8  propounded on the other side.

9        MR. YOUNG:  And, Your Honor, just as a formal matter

10  on our motions to compel further interrogatory responses.  What

11  I think I heard the Court saying was, after the depositions we

12  could expect to get more information from the Trustee.  But I

13  just want to know what the ruling is on our motion, I guess.

14        THE COURT:  So same with date certain.  After

15  conclusion of all depositions, that there would be amendments

16  provided and certification that each answer is still valid so

17  that there's no confusion of what the Trustee's position is.

18        And then, of course, you're postured to take whatever

19  next step you feel your client can take, whether it's an

20  outright motion to dismiss for failure to state a cause, or,

21  you know, one or -- one count or another that no longer is

22  sustainable, whatever you feel.  That's the appropriate time to

23  tee it up for further action from the Court.

24        MR. SPRAGENS:  Your Honor, may I address one other

25  thing?  I mentioned this, that since our last hearing we

1 received another 86 request for admission from Manookian, PLLC.

2 Could we include in that order -- because we could go through

3 this whole thing again and the Trustee is still saying, we

4 don't know, we don't know, we don't know, or we could simply

5 say that those responses will be due at the conclusion of

6 discovery and save everybody a lot of time and trouble on that

7 second set of requests for admission.

8      THE COURT:  Yeah.  And well, the Court has a

9 threshold question of, why were the requests propounded late,

10 or after the deadline in the original order?

11      MR. SPRAGENS:  I confess, Your Honor, that I did not

12 understand the order to apply to RFAs, which I think of as a

13 tool to sharpen the issues as the case proceeds.  So I

14 apologize if we violated the Court's order on written

15 discovery, that was not my intent.

16      In general, my view is that the RFAs help sharpen the

17 case.  And we can understand if the Trustee agrees that, okay,

18 this is the actual agreement.  And, you know, we're not going

19 to have debates about the authenticity of evidence and stuff

20 like that.  So that's the thought process behind them.

21      And I personally would prefer to have the responses

22 before the deposition so at least we can cross some things off

23 the list before we ask questions.  But, you know, the Court

24 will do what it will do.

25      MR. YOUNG:  And we're not going to know the answers

1  to all the authenticity questions until after depositions, Your

2  Honor.

3         THE COURT:  All right.  Let's keep them after

4  depositions, on the same time frame as all the other written

5  discovery that's going to be amended or supplemented.

6         And I think the parties should both bear in mind that

7  there's a dispositive motion deadline of June 24th.  So keep

8  that in mind when you propose something to the Court this

9  afternoon on the timing so that you don't back yourself into a

10 corner on the deadlines that are yet to come.

11        All right.  And although a little bit early, this is

12 probably a good time to take a break.  You've got your homework

13 for the next couple hours.  And I'll just say, the Court

14 understands that the parties are representing their clients,

15 and trying to zealously represent their clients, and as we've

16 seen today, I mean, I haven't seen either party be

17 unreasonable.  I have seen some discussions that had to happen

18 in order to get to the actual issues, but the Court believes

19 the parties are trying to be reasonable.

20        What the Court doesn't believe is happening is that

21 there's adequate communication going on.  So this is your

22 opportunity to communicate and effectively work through some of

23 these barriers so that we can press forward and resolve this

24 case, finally, so that you don't have to keep coming over here.

25        And the tip off is at 11:15, by the way.

1     So, you know, the Court wants to make sure that the
2 parties understand the Court's here to help you if needed.  But
3 there's enough smart lawyers in this room that self-help is the
4 best help, and, you know, let's try to resolve these things,
5 communicate, figure out where the issues are.

6     Understand that bankruptcy proceedings are a little
7 less certain at the beginning because the Trustee doesn't have
8 a lot of information.  But the reality is, at the end of the
9 day, it's a federal court proceeding subject to the same rules
10 and the same law as any other adversary proceeding.

11     So keep that in mind, that we're trying to minimize
12 the cost to the estate.  Because, ultimately, that costs
13 somebody else money.  The unsecured creditors are paying for
14 it, or, you know, if this is an excess case, Mr. Manookian was
15 paying for it.  I mean, somebody is paying for having three
16 lawyers and a Trustee sitting in a room.

17     It sounds like the beginning of a bad joke, but, you
18 know, that's where we are.

19     So please take the next couple hours.  I'll be back
20 on the bench at two o'clock.  If there's any other discovery
21 issues that haven't been addressed that we need to address --
22 is there anything else out there besides what we've already
23 talked about?

24     MR. SPRAGENS:  Not from my perspective, Your Honor.
25     MR. YOUNG:  I don't think so, Your Honor.

1          MR. GABBERT:  Your Honor, please, if I may?  I think

2     the only thing I'm looking for is any other Fitzgerald

3     agreement.  Other than, I don't have anything else on this

4     sheet, do I?

5          MR. SPRAGENS:  I think that's right.

6          MR. GABBERT:  So if I could just provided him a

7     statement regarding that, do I have to come back?  Because I'm

8     not involved in all this other stuff.

9          MS. YOUNG:  He's trying to save -- trying to save

10    money.

11         MR. SPRAGENS:  Your Honor, I --

12         THE COURT:  Mr. Gabbert, the Court's -- if all issues

13    are resolved, the Court's happy to send you on your way.

14         MR. GABBERT:  Well, he can -- he can advise that I

15    have responded by what the rules are.

16         MR. SPRAGENS:  I'll make that representation for

17    Mr. Gabbert.

18         THE COURT:  All right.  Good enough.

19         All right.  Court will be adjourned until -- or in

20    recess till two o'clock this afternoon.

21         THE CLERK:  All rise.

22      (Recess taken at 10:28 a.m.)

23      (Proceedings resumed at 2:08 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Please take your seats.

000086

000086

1          All right.  Mr. Young?

2          MR. YOUNG:  Your Honor, Phillip Young on behalf of

3   the Trustee.

4          I think we've made some progress on most things.  I

5   think there are still a few things that we'd like the Court's

6   input on.  Let me start with the things that I think that we've

7   agreed upon.  This is really just for the record.  This will

8   kind of be incorporated into the order we'll submit.

9          But Mr. Gabbert is going to confirm, by March 25th,

10  that's the only Fitzgerald letter.  We had referenced that.

11         THE COURT:  Okay.

12         MR. YOUNG:  I think he was unable to get in touch

13  with his client this afternoon.  So he's just agreed that by

14  March 25th, he'll do that.

15         We're also going to provide that Manookian, PLLC will

16  amend its response to Interrogatory Number 5, as the Court

17  instructed by March 25th, by that same date.

18         And then, as the Court suggested, we've given more

19  specific information on the Request for Production Number 1,

20  that's the one about defenses.  We provided more specific, kind

21  of bullet point things, that we're looking for to Manookian,

22  PLLC.  And so they're going to respond accordingly.

23         We've agreed that we're going to amend our response

24  to Interrogatory Number 1 by March 25th.  That's the one that

25  asks for what individuals have knowledge.

1       And the reason being, so the Court understands why
2  that is.  You know, the scope of the complaint when filed was
3  16 cases, there were 16.  Now we're talking about two case.  So
4  obviously that really funnels down what actually is in dispute.
5  And so that the parties don't waste time worrying about, you
6  know, depositions on parties that really don't matter anymore,
7  we're going to amend that to make that clear.

8       We already mentioned this, that I was going to add
9  the certification language to the request for admissions that
10 Mr. Spragens had requested.

11      We've agreed that by June 1 all parties will amend
12 interrogatory responses, requests for admission responses, that
13 we'll respond to those second -- that second set of requests
14 for admission by June 1.

15      We've also agreed that topics for depositions will be
16 identified in the deposition notices so that all the parties
17 will have notice of that.

18      And then we've agreed on a deposition schedule for, I
19 guess, the four primary depositions.  And that is Jeanne
20 Burton, me as receiver, Brian Manookian, and Afsoon Hagh.  And
21 those dates are, Jeanne Burton's will be April 20th at 10 a.m.,
22 mine will be April 21st at 10 a.m., Mr. Manookian, who the
23 notice will be for Manookian, PLLC, Cummings Manookian, and
24 Brian Manookian, we'll notice them all up on the same day, May
25 9th at 10.  And then Afsoon Hagh and Hagh Law at May 10th at

1     ten o'clock.

2            And so we'll put all that in the order.

3            MR. SPRAGENS: Mr. Young, can I just add?

4            MR. YOUNG: Yeah. Go ahead.

5            MR. SPRAGENS: Mr. Gabbert, I don't think, has agreed

6     on the deposition schedule. And so when I spoke to him he had

7     a preference for having the Trustee at the end, which I

8     understand is a more conventional practice in bankruptcy court.

9     My client has a preference for having the Trustee at the

10    beginning. And so as I said in the email to you, that's an

11    issue that is still sticky. But we agree with the scheduling

12    that you just announced.

13           MR. YOUNG: And I do want to address that issue,

14    because we want to avoid these repeat depositions. We don't

15    want to have to go through a deposition where the Trustee says,

16    you know, I don't know that yet, I don't know that yet, I don't

17    know that yet, and then go through another deposition at the

18    end to ask essentially the same questions.

19           We don't care if the parties want to take Ms.

20    Burton's deposition early, that's fine. What we don't want to

21    do is to have repeat depositions. To have, you know, one April

22    20th and one May 30th. And so we had a disagreement about

23    that.

24           And as Mr Spragens said, Mr. Gabbert, I think, has a

25    preference toward taking it towards the end, and Mr. Spragens

000089 000089

```
 1  has a preference toward taking it toward the beginning.  But we
 2  only want the Trustee to sit for one, eight-hour deposition.
 3  We don't want to have to, you know, spread this out.  And so
 4  that was --
 5            THE COURT:  Well --
 6            MR. YOUNG:  -- one of the issues that we were going
 7  to see --
 8            THE COURT:  I'll make a statement that if there is a
 9  second deposition, the party requesting it may end up paying
10  for it.  I'll leave it at that.  If Mr. Manookian drives this
11  such that what is probably the course of action that makes the
12  least amount of sense in this scenario, then if there is a
13  second deposition, he may be paying for that time to take that
14  deposition.  But I'll let the parties -- if the parties are
15  agreeable to that schedule, we'll go forward with that
16  schedule.
17            MR. SPRAGENS:  Right.
18            THE COURT:  But know that the nature of this
19  proceeding, it doesn't make a bit of sense to do the Trustee
20  first.
21            MR. YOUNG:  I hear you loud and clear, Your Honor.
22            THE COURT:  So --
23            MR. YOUNG:  Yeah.  The one thing I was going to say
24  is, I was always trying to split the hairs between the two
25  parties on our side of the table here.  I thought about if we
```

1    tried to take her deposition and reserved some of the time for

2    later -- I mean, one of the issues here is because the Court is

3    not going to require anybody to supplement their

4    interrogatories until after through depositions have been

5    taken, there is room for some serious changes in the written

6    discovery at that time, and that's what we want to sort of

7    guard against is that all of a sudden there's a new theory that

8    we couldn't anticipate, or new information that we couldn't

9    anticipate, that comes out.

10          I take your point though, that if a second deposition

11   is needed, and if the Court finds that it's not warranted or

12   whatever, Mr. Manookian would be paying for it.

13          THE COURT:  Yeah.  And again, it's bankruptcy, right?

14   We got limited number of theories that are going to be out

15   there.  Let's be real.  These are attorneys, everybody knows

16   what the theories are probably going to be, and the information

17   that's going to come out is going to drive that one way or the

18   other.  So let's not make it harder than it really is.  This is

19   not a new or novel concept.  These are not issues that are

20   first impression.

21          This is what happens here in bankruptcy court every

22   day.  You have a company that is no longer operating, there are

23   books and records, there's still effectively accounts

24   receivable out there that need to be collected, and the Trustee

25   is trying to collect those accounts receivable and look back as

000091
000091

1  to whether there's any transfers or transactions that can be

2  set aside.  I mean, it's not that hard, so --

3          MR. YOUNG:  And the Trustee does view this, for the

4  record, as an accounts receivable case.  That's what we view

5  this as, is as an accounts receivable case, primarily.  And

6  that's the way we've been proceeding, but --

7          THE COURT:  Yeah.

8          And I get it, Mr. Spragens, that -- and again, you

9  know, you're representing your client zealously, and the

10  Court's making no determination one way or the other.  You

11  know, your strategy and your client's strategy is what it is.

12  But know that, you know, this Court's seen these cases a

13  thousand times and is not going to be surprised or hoodwinked

14  by anything and is well capable of dealing with any "gotcha"

15  moments as they come, and will deal with them fairly harshly on

16  whichever side they come out, just given the fact that we're

17  wasting a day here to go over discovery requests.

18          So I'm taking copious notes on what's said here.  I'm

19  going to listen to this transcript again.  And if we get to a

20  trial situation where there's something that needs to be

21  addressed, it will not end well for whichever side is the cause

22  of it, period.

23          MR. SPRAGENS:  Thank you, Your Honor.

24          MR. YOUNG:  Your Honor, one other -- one other thing

25  about which we've been unable to reach an agreement is the

1　location of the depositions.  The Trustee suggested that these

2　four in-person depositions take place here in the Court, in the

3　courthouse.  There's lots of reasons for that.  It's a

4　centralized location, it has security, the Court's more

5　available if there becomes a problem.  We hope there's not a

6　problem, but --

7　　　　　　THE COURT:  We're having the depositions here.

8　　　　　　MR. SPRAGENS:  That's fine, Your Honor.  And just for

9　the record, I'll preserve my objection to that.  And I heard

10　Mr. Gabbert object to it earlier, as well.

11　　　　　　THE COURT:  Okay.  Well, if the parties can't agree,

12　you know, you still have the opportunity to agree on a

13　location.

14　　　　　　MR. SPRAGENS:  Sure.

15　　　　　　THE COURT:  But in the absence of agreement, we'll

16　hold a hearing.  I'll be in my chambers or available by video.

17　If the there's a problem, we'll address it on the spot.  So,

18　you know, I don't know of any other way to do this, if we can't

19　agree on something as simple as location.

20　　　　　　MR. SPRAGENS:  Well, I thought the normal rule was

21　you produce the witness at the witness's place of business or

22　convenience, basically.  So I was surprised to hear this

23　proposal, that all the depositions would be conducted here.

24　　　　　　This parking lot out back is $40 a day I noted, as I

25　tried to dodge parking tickets today.  And so I was thinking

1 there might be a more convenient reason. I don't buy that

2 there's a security issue in this case. The Court is available,

3 I appreciate that, by telephone, video, or all the other ways

4 that we can get access to the Court. So to me, it's overkill

5 to have them at the courthouse.

6         THE COURT: I agree.

7         MR. SPRAGENS: And I -- so this wasn't our proposal,

8 and I think it's a departure from the ordinary course and I

9 don't understand the basis for it.

10         THE COURT: Okay.

11         MR. SPRAGENS: So I --

12         THE COURT: So, Mr. Young, let's articulate a basis

13 on the record.

14         MR. YOUNG: Sure. First of all, I think the Court

15 knows that this is not -- it's not unusual for a Trustee to

16 conduct depositions at the courthouse. That's fairly common

17 for trustee's to do.

18         Secondly, you know, it's more centralized than having

19 parties come to my office in Williamson County, for example.

20 This is a lot more central location.

21         And third, we do think that there's a security issue

22 here. There's already been a restraining order put down

23 against Mr. Manookian by one of the creditor's lawyers in this

24 case, and I don't take that lightly on behalf of my client.

25         So those are the reasons.

Case 3:20-ap-90032 Doc 161-1 Filed 05/15/23 Entered 05/15/22 22:42:14 Desc
Exhibit Hearing Transcript    Page 84 of 96

 1          MR. SPRAGENS:  Well, and, you know, my office is just
 2  down the street and parking is free.
 3          There's no security issue.  I don't think that
 4  there's any record that would support that there is a security
 5  issue in this ordinary bankruptcy case involving professional
 6  lawyers on all sides.
 7          So this proposal was presented to me.  I said I
 8  disagreed with it.  And Mr. Young said, well, we'll take it up
 9  with the Court.  So, you know, in my view, this is the
10  departure from the norm, not the other way around.
11          THE COURT:  Okay.
12          And, Mr. Young, you're going to represent that you're
13  uncomfortable doing depositions in Mr. Spragens' office?
14          MR. YOUNG:  Yes, Your Honor.
15          THE COURT:  All right.  And then I'll just address
16  the 100 pound gorilla in the room on that issue.
17          To be candid, Mr. Spragens, I mean, your client's
18  past behavior before the tribunals, and I've had at least two
19  lawyers call the Court and say they don't feel comfortable if
20  your client is going to appear, and, you know, the Court takes
21  those concerns very seriously and makes no conclusion on
22  whether they are valid, they are perceptions which drive
23  behaviors of other parties.  And to eliminate any of those
24  perceptions, and to protect everyone against any allegations of
25  bad behavior, misbehavior, or perceived misbehavior, it makes

1 sense to do them here in an environment where no one can get

2 your client further down a rabbit hole of he did this or he did

3 that, that we're in a neutral environment, which affords

4 certain protections. And if nothing else, in terms of

5 everybody's on their best behavior.

6 And so the Court's going to make that determination,

7 that the depositions, unless the parties can agree, will be

8 held here in the courthouse. And as a matter of fact, again,

9 there will be some method available to reach the Court if

10 during those depositions we have further in issues with

11 discovery.

12 MR. YOUNG: Thank you, Your Honor.

13 I think the last issue that we needed, unless Mr.

14 Spragens has something else that I've forgotten. The last

15 issue that I have on my list that we needed some input from the

16 Court on is the scope of my deposition.

17 There was a question that was asked in the

18 interrogatories about, list all parties who had knowledge of

19 any element of the complaint, you know, any of the complaint.

20 The complaint originally, if the Court will recall, had a fair,

21 a substantial amount about the $715,000 and about the transfer

22 of that and about the genesis of that in the receivership.

23 Obviously, as the former receiver in that case I had

24 knowledge about that. That part's not so relevant anymore

25 because the money's frozen and now we're really talking about

1   two cases.  Nevertheless, I'm happy to sit for a deposition.

2   However, I do think that the Court needs to define the scope of

3   that.

4           I would suggest that the scope of that has to do only

5   with the allegations that are in the complaint and only with

6   regard to things up to the petition date.

7           I will represent to the Court that after the petition

8   date my role in this case has been as special counsel to the

9   Trustee.  Mr. Sprague has specifically mentioned, and this is

10  something that came up before, and I'm happy to address it

11  straight on if the Court wants to talk about it today, but this

12  allegation of some sort of a kickback that the Trustee allowed

13  or reduced, allowed a reduced claim to the Chase parties

14  because the Chase parties entered into an order that provided

15  that any remaining receivership, outstanding receivership fees,

16  be paid by the Chase party.

17          First of all, I wasn't involved in that order.

18          Second of all, it's not been paid, so this is a

19  complete non-issue.  Nonetheless, it keeps coming up, but it's

20  not related to this adversary proceeding.  That's related to,

21  if at all, it's related to the claims allowance and

22  disallowance.  That's not related to this adversary proceeding

23  at all.

24          And so I would just like the Court's guidance on what

25  the allowable scope is of a deposition, you know, of me

1  specifically, because that seems to be where some tension is

2          THE COURT:  All right.  Mr. Spragens?

3          MR. SPRAGENS:  In my experience, at least, it is

4  unorthodox, to say the least, to have a case in which an

5  attorney is negotiating the scope of his own deposition as a

6  fact witness in the case.  So we are in a weird posture here.

7  And I think that does speak to the potential for, you know,

8  what we will want to ask Mr. Young about.

9          He represented to me in the conference room that it's

10  really just about the $750,000 or whatever, that 715,000,

11  excuse me, in the receivership.  You know, I want to know what

12  he knows about what's in the complaint.  He's disclosed himself

13  effectively as a fact witness here.  I want to know how he's

14  being compensated for things, because I think that goes to his

15  bias.

16          And I think that is a permissible area of inquiry is,

17  do you stand to gain if you testify a certain way in this case

18  or not?  And I think that's reasonable, both about the knowing

19  about the Chase case and about his role here.

20          I don't need to go into any confidential attorney-

21  client communications, and I don't intend to.  But I do think

22  that, you know, we started this case, frankly, before I was

23  involved, talking about a potential need for disqualification

24  of Mr. Young.  And I do think that the fact that he's now

25  disclosed himself as a witness, which surprised us, opens him

1     up to inquiry on that.  And so certainly whatever he tells us

2     he knows about that's in the case right now is going to be the

3     bulk of what we talk about.

4              But I do want to probe for bias.  I want to probe for

5     any sort of improper motive.  It's awkward to do to a fellow

6     member of the bar.  You know, we were just talking about our

7     vacations and our hiking interests and all that stuff.  But I

8     think that's part of the job, and if he's going to be a witness

9     and the lawyer here, I should be allowed to ask some of those

10    questions.

11             So I would urge the Court not to set a strict date

12    cutoff, but, you know, admonish us to only stay within the

13    boundaries of what's acceptable as we try to prepare an

14    adversary trial in this court.

15             THE COURT:  All right.

16             And, Mr. Young, I think it is reasonable to probe

17    into any of those issues that Mr. Spragens has articulated.

18    So I will not bound the deposition to such limited scope that

19    he can't inquire about your motive, motivation, or compensation

20    in any way.

21             Again I will caution that it better be relevant and

22    stay relevant.  And as you've articulated today, that's within

23    the fair bounds of what we do as lawyers is answer questions

24    about why we're here, if we're ever in the position of being a

25    witness, and it goes to credibility, it goes to motivation.

000099
000099

1   And so that's perfectly permissible.

2           But what I do not want is an attempt to deviate in a

3   way that's not going to be productive for anyone and just waste

4   everybody's time.  Because, again, if we're going to waste

5   people's time, that person wasting time will pay for that time.

6   And I can't express how serious I am about charging back to the

7   party who is causing the unnecessary delay or being

8   unreasonable.

9           Again, these are attorneys talking about attorneys

10  and law firms.  And even Mr. Young, if he is a witness, he's

11  another attorney.  So everyone involved in this case is a

12  member of the bar in some form or fashion, and I expect a

13  little bit of common sense and not to take the Court for not

14  understanding what's going on if it deviates from that.  And so

15  just keep that in mind, all the parties that --

16          Again, this is not rocket science.  This is the

17  couple of thousand adversaries since I've been on the bench,

18  and there's nothing in this case that I haven't seen before

19  that surprises me or that I need to look up in WestLaw or

20  Google to figure out how this is going to go.  These are all

21  issues that are fairly routine.

22          I've got a Trustee over here who's been on the panel

23  for more than 20 years and has handled thousands of cases and

24  brought this adversary proceeding in the course of

25  administering it as an estate, that's not unique or novel.

1          So I understand we are all representing clients

2     zealously, but by the same token, you're wasting your time on

3     this forum that's going to be before a judge, not a jury,

4     that's seen this a thousand times before, where we routinely

5     stipulate to all the relevant facts, we proffer evidence more

6     likely than we present witnesses.

7     .          This Court is able to resolve these issues

8     expeditiously if given the opportunity.  And so let's drive

9     towards that opportunity for the Court to do what this Court

10    does in fairly efficient fashion.

11              MR. SPRAGENS:  We're eager to get to that point.  And

12    there aren't side shows on our side.  We intend to get to the

13    point where we can get an adjudication in this.

14              THE COURT:  Okay.

15              MR. SPRAGENS:  So I hear you.

16              MR. YOUNG:  Your Honor, with that, I believe those

17    are the only issues that we had open as far as the -- I think

18    every thing else was agreed upon.  And we understood the

19    Court's direction on everything else, as far as putting

20    together an order.

21              THE COURT:  All right.

22              MR. YOUNG:  And I'm going to circulate it to Mr.

23    Spragens before we submit it to the Court to make sure that --

24              THE COURT:  All right.

25              MR. YOUNG:  -- that everything is accurate.

000101

1          THE COURT:  And the only thing, I've got a couple

2    things.  On the depositions the order should detail the scope,

3    because I don't want any surprises from any party who later

4    says, well, I didn't know that's what was going to be asked.

5    So within this order there needs to be some detail as to the

6    scope of the depositions.

7          MR. SPRAGENS:  We can do that, Your Honor.

8          THE COURT:  All right.

9          And as far as length of depositions, is it correct

10   that you're anticipating an eight-hour deposition for the

11   Trustee?

12         MR. SPRAGENS:  No Your Honor.  I mean, I think that

13   the rules only allow seven hours, and I hope not to even need

14   all seven hours.  I never want to take a seven-hour deposition.

15         THE COURT:  Okay.

16         MR. SPRAGENS:  But I do think that the rules allow it

17   if we need it, and hopefully we won't.

18         THE COURT:  All right.

19         And obviously with the contentious nature, make sure

20   that that order specifically details the time in which the

21   Trustee and all the other witnesses will be available for their

22   deposition.  And if it's the full seven hours for each witness,

23   so be it.  But I don't want any other issues related to

24   discovery, so let's make sure that that order adequately

25   details everything.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 3:20-ap-09002   Doc 161-6   Filed 05/05/23   Entered 05/05/22 22:20:14   Page 4   #6876
Exhibit Hearing Transcript    Page 92 of 96

1          And I'd like it to be an agreed order.  So rather

2    than just circulate it to Mr. Spragens, I want he and Mr.

3    Gabbert to sign off on the order in its entirety.

4          MR. SPRAGENS:  Yes, Your Honor.

5          MR. YOUNG:  And, Your Honor, as I look at the biggest

6    area of, sort of outstanding question marks about the order,

7    it's what to do about this deposition.  I mean, we have

8    different positions on my side here about when the Trustee's

9    deposition should be taken.  So I'm looking for little

10   guidance, probably, on what we should put in the order that

11   says if there is a second deposition it will come at the

12   requester's expense, unless good cause is shown, or something

13   like that.

14         Is that an appropriate way to phrase that?  I suppose

15   that's what I'm asking.

16         THE COURT:  Yeah. I'll leave it to you all to come up

17   with the exact language.  But the intent is that the parties

18   are agreeing to this.  We need to be efficient and effective.

19   I'm not going to get into the weeds on who goes first, because

20   if I have to do that, then I might as well be trying and

21   representing your clients for you.

22         But I am going to say that common sense needs to

23   prevail here.  That, again, this isn't an IP case.

24         MR. SPRAGENS:  Thank God.

25         THE COURT:  I echo that sentiment.

1    You know, the Trustee needs -- you know, the goal

2 should be to maximize the Trustee's ability to answer the

3 questions.  And if taking the Trustee's deposition first is

4 going to be a waste of time, which I would bet my money to a

5 large extent it will be, then why are we doing it that way?

6    And if you choose to go down that road, the party who

7 made that choice is going to pay for that time for the

8 attorney, or attorneys, that have to sit there for seven, eight

9 hours, or however long it is, for the Trustee to then be in a

10 position to answer those questions.

11    So craft the language so that it's clear that -- I'm

12 going to leave it to the parties to cause a train wreck if you

13 want to.  But, you know, the party that led that train off the

14 tracks is going to be the one that's going to compensate the

15 other side for the time that it takes to actually do it right.

16    You know, and unfortunately, the Trustee gets

17 compensated based off of a formula and not actual time.  But,

18 you know, again, I'm not interested in wasting the Trustee's

19 time twice, as well, on when they, you know, she could move on

20 to other cases that are probably equally as frustrating and

21 difficult to get resolution to.

22    So those are the reasons why if you go down the wrong

23 road you're going to, you know, whichever party drives it is

24 going to be the one that compensates everyone in the room for

25 their time.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 3:20-ap-09002   Doc 161-1   Filed 05/05/23   Entered 05/05/22 22:20:14   Desc
Case 3:20-ap-09002   Doc 161-6   Filed 05/15/23   Entered 06/05/22 22:20:14   Page 4   D 0308
Exhibit Hearing Transcript    Page 94 of 96

000104                                                      000104

1          MR. SPRAGENS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MR. YOUNG:  Your Honor, I don't think we had any

4  other questions or comments about the order, unless the Court

5  has some other question for the Trustee.

6          THE COURT:  No other questions.  But again, make sure

7  it needs to be an agreed order, that it fully addresses

8  everything we've talked about today.

9          If there's any questions related to the dates that

10  are already in the scheduling order, such as the dispositive

11  motions or trial dates, we have not changed those.  And I need

12  to know now if the parties believe they're going to be unable

13  to comply with those dates.  So within that order each party

14  needs to certify that the remaining dates are still good to go.

15          MR. SPRAGENS:  Yes, Your Honor.

16          THE COURT:  All right.  And I think -- I think that's

17  all I have.

18          Anything else?

19          MR. YOUNG:  Nothing from the Trustee, Your Honor.

20          MR. SPRAGENS:  No, Your Honor.

21          THE COURT:  All right.  Again, thank you for your

22  time and attention.  And hopefully we'll get through this one

23  in a more expeditious fashion going forward.

24          But if there are issues, the Court is obviously

25  available to address those issues.  But I still hold out

Case 3:20-ap-09002   Doc 161-1   Filed 05/05/23   Entered 05/05/22 22:20:14   Desc
Exhibit Hearing Transcript    Page 95 of 96

1  confidence that with the good lawyers involved in this case
2  they'll be able to communicate a little bit better so that we
3  cannot be here on St. Patrick's Day in 2023, perhaps.
4          So with that said, the Court will be adjourned.
5          THE CLERK:  All rise.
6      (Proceedings concluded at 2:35 p.m.)
7                      * * * * *
8
9
10
11
12
13
14              **C E R T I F I C A T I O N**
15
16          I, Alicia Jarrett, court-approved transcriber, hereby
17  certify that the foregoing is a correct transcript from the
18  official electronic sound recording of the proceedings in the
19  above-entitled matter.
20
21
22
23  _____
24  ALICIA JARRETT, AAERT NO. 428    DATE: March 23, 2022
25  ACCESS TRANSCRIPTS, LLC

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235** |
| | **Chapter 7** |
| **CUMMINGS MANOOKIAN, PLLC** | **Judge Walker** |
| Debtor. | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| v. | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

## BRIAN MANOOKIAN AND MANOOKIAN PLLC'S MOTION TO DISQUALIFY BANKRUPTCY JUDGE CHARLES WALKER

Brian Manookian and Manookian PLLC ("the Manookian Parties") respectfully ask the Court to recuse itself from further consideration of this matter, pursuant to 28 U.S.C. §§ 455(a), (b)(1), and the Code of Conduct for Federal Judges.

The Court is required to disqualify itself from this matter because it engaged in multiple prohibited *ex parte* communications about Brian Manookian[1] and this proceeding with "at least two [unidentified] lawyers" while this action has been pending.[2]

---

[1] Brian Manookian is the sole member of the Debtor, Cummings Manookian, and the Sole Member of the Defendant, Manookian PLLC.

[2] Ex. 1, Transcript of Pretrial Conference and Motion Hearing, March 17, 2022, at 84:15-85:11. On April 21, 2022, the Manookian Parties learned that the Trustee, through her

The Court then failed to promptly notify the parties of its repeated *ex parte* conversations as required by the Code of Conduct for United States Judges.[3]  Instead, the Court only disclosed their occurrence much later, and only then to justify the Court's order that depositions in this matter be conducted at a secure courthouse location.  In doing so, the Court attributed its order to unarticulated "concerns" about Brian Manookian which were communicated directly to the Court by undisclosed attorneys in various *ex parte* phone calls — buttressed by other information the Court gleaned from extrajudicial research — calls that neither the Court nor those attorneys disclosed to the Manookian Parties at the time.

As a result, the Manookian Parties were never able to respond to the *ex parte* representations, or even make a record regarding those improper communications and independent research for review by a superior court. To this day, potentially years after the *ex parte* communications in this still-pending case, the Manookian Parties thus remain in the dark as to the substance of those prohibited communications, although their corrosive effect on the Court has recently become clear.

The Court and the as-yet unidentified attorneys have, intentionally or not, engaged in conduct that violates multiple provisions of the Code of Conduct for United States Judges as well as the Rules of Professional Conduct governing attorneys licensed in Tennessee.[4]  Recusal is required by statute. *See* 28 U.S.C. § 455(a) & (b)(1).

---

Special Counsel, has had at least one improper *ex parte* communication with the Court about Mr. Manookian.  Ex. 2, Deposition of Phillip Young, at 43:15-45:25.

[3] Code of Conduct for United States Judges, Canon 3(A)(4).

[4] *Id. See also* Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.5, Impartiality and Decorum of the Tribunal ("A lawyer shall not: (a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law; [or] (b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order.").

2

This is not a close call. The Court is required to immediately disqualify itself from this case. The Court should additionally submit a sworn declaration detailing the dates, substance of, and parties to each of its *ex parte* communications so that the Manookian Parties may: (1) determine which orders of this Court occurred after the improper communications; (2) ascertain whether the Court is now a witness to party or creditor statements such that depositions of the *ex parte* participants is necessary; and (3) report any improper conduct to the appropriate licensing and oversight authorities.

## I. LEGAL STANDARD

Canon Three of the Code of Conduct for Federal Judges provides that the Court shall not permit *ex parte* communications, except in limited circumstances, and if such a communication is received, the Court must give all parties prompt notice of the communication and an opportunity to respond:

> Except as set out below, <u>a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers</u>. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, <u>the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested</u>. A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;
>
> (c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the

> person to be consulted and the subject matter of the advice
> and affording the parties reasonable opportunity to object and
> respond to the notice and to the advice received; or
>
> (d) with the consent of the parties, confer separately with the
> parties and their counsel in an effort to mediate or settle
> pending matters.

(emphasis added).

The Tennessee Rules of Professional Conduct are likewise clear that attorneys may not engage in *ex parte* communications with the Court. Rule 3.5 states that, "A lawyer shall not seek to influence a judge, juror, prospective juror, or other official by means prohibited by law; [or] communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order."

Finally, federal law mandates that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This includes but is not limited to situations "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(b)(1). Receiving, failing to disclose, and then ruling based upon improper *ex parte* communications and extrajudicial information in violation of the Federal Code of Conduct for Judges is, definitionally, conduct resulting in a judge's impartiality reasonably being questioned.

## II. FACTUAL BACKGROUND

On March 17, 2022, counsel to the Trustee, Phillip Young, announced in a hearing that he sought to conduct depositions in this case exclusively at a "secured" location at the courthouse, because of a heretofore unrevealed "security issue" about Brian Manookian,

the sole member of the Debtor Cummings Manookian and the Adversary Defendant, Manookian PLLC.[5]  Counsel for Mr. Manookian and Manookian PLLC, John Spragens, immediately opposed the request, as did counsel for Adversary Defendants Afsoon Hagh and Hagh Law.[6]

Rather than permit briefing or argument on the issue, the Court gratuitously and *sua sponte* began holding forth on what it described as the "100 pound gorilla in the room on that issue," despite no such issue never having been previously addressed to the Court by any party (at least not properly or on the record).  First, the Court – after undersigned counsel said he would preserve his objection to this departure from the ordinary course of proceedings for appeal – undertook to create an evidentiary record in support of his ruling.[7]  Next, the Court solicited a representation from the Trustee's counsel to the effect that the Trustee's counsel was "uncomfortable doing depositions in [defense counsel's] office."  Finally, the Court described *ex parte* communications and offered its own view, based upon undisclosed information not in the record, purporting to justify that Mr. Manookian's unspecified "past behavior" in front of "the tribunals" posed an undefined security threat:

---

[5] Ex. 1, Transcript of Pretrial Conference, March 17, 2022, at 83:21-25.
[6] *Id.*, at Page 82:8-10.
[7] *Id.*, at Page 82:8-83:13 (The Court: "So, Mr. Young, let's articulate a basis on the record.").

5

```
11          THE COURT:  Okay.
12          And, Mr. Young, you're going to represent that you're
13  uncomfortable doing depositions in Mr. Spragens' office?
14          MR. YOUNG:  Yes, Your Honor.
15          THE COURT:  All right.  And then I'll just address
16  the 100 pound gorilla in the room on that issue.
17          To be candid, Mr. Spragens, I mean, your client's
18  past behavior before the tribunals, and I've had at least two
19  lawyers call the Court and say they don't feel comfortable if
20  your client is going to appear, and, you know, the Court takes
21  those concerns very seriously and makes no conclusion on
22  whether they are valid, they are perceptions which drive
23  behaviors of other parties.  And to eliminate any of those
```

Ex. 1, Transcript of Pretrial Conference, at 84:11-23.

In addition to admitting having participated in multiple *ex parte* conversations in this case, the Court additionally made reference to "[Brian Manookian's] past behavior before the tribunals" when it ordered that depositions be conducted at the Courthouse over "security concerns" about Mr. Manookian.  But the Court did not disclose what it believed that "past behavior" to include, or where it acquired such information.

To be clear, Mr. Manookian has conducted or attended hundreds of depositions over the course of his career, including as a witness on multiple occasions.  No court has ever found that he acted even remotely inappropriately, much less in a physically threatening manner, during a deposition — nor, crucially, does the record in this case support such a finding.  The Court's ruling could have only been based upon its *ex parte* communications and extrajudicial research – and its view was so deeply held that it

offered it *sua sponte* based upon an extrajudicial record the Court itself endeavored to create.

## III. ARGUMENT

28 U.S.C. § 455(a) states that "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This recusal standard is objective: the relevant inquiry is whether a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986) (internal quotation marks omitted), *aff'd*, 486 U.S. 847 (1988); *see Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc. (In re Continental Airlines Corp.)*, 901 F.2d 1259, 1262 (5th Cir. 1990); *In re Faulkner*, 856 F.2d 716, 720-21 (5th Cir. 1988).

"Ex parte contacts are improper where, given all the circumstances, they could cause a reasonable person to question that judge's impartiality." *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1219 (9th Cir. 2014). And "decisions made by the district court in reliance on any undisclosed ex parte communications are inappropriate." *United States v. Lanier*, 748 F. App'x 674, 678 (6th Cir. 2018) (citing *United States v. Hayes*, 171 F.3d 389, 390–91 (6th Cir. 1999)). "If any such communications do occur . . . the district court should endeavor to disclose, as appropriate, the ex parte communication to the parties as soon as possible." *Id.* at 678.

"Extrajudicial knowledge," meanwhile, is knowledge that the judge acquires "outside a courthouse." *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996) (citations omitted). "The point of distinguishing between 'personal knowledge' and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge

received in other ways, which can be neither accurately stated nor fully tested, is 'extrajudicial.' " *Id.*

The Court's repeated *ex parte* communications with practicing attorneys regarding this case and the parties to it – which were not disclosed at the time and only revealed by the Court to support a subsequent ruling, when the Court spontaneously revealed its concern about the "100 pound gorilla in the room on that issue" – require recusal. Indeed, the Court's ruling requiring that depositions be conducted in the courthouse was expressly premised upon concerns the Court developed based upon (1) *ex parte* communications about Mr. Manookian that Mr. Manookian had no knowledge of, nor any opportunity to rebut, and (2) the Court's views about "Mr. Manookian's past behavior before the tribunals" – again unspecified, and again, based upon information outside the record in this case. [8]

A reasonable observer would conclude that the Court has developed views of a litigant, based upon improper *ex parte* communications and information outside the record in this case, and – however unintentionally – has made a ruling based on those concerns. On any objective basis, recusal is appropriate and required, and is the course of action that best promotes respect for the rule of law.

The Court's statements confirm that it has entertained *ex parte* communications, failed to disclose those communications to the impacted parties, conducted its own

---

[8] The Court's views were so strongly – and mistakenly – held that it took a second unusual step, not just requiring that the depositions be held in the courthouse but also leaving instructions for the participants and setting a time for hearings on objections (a copy of which is attached as Exhibit 3). The depositions were predictably uneventful and conducted professionally by all parties, and no objections were brought to the Court. But the Court's overreaction to an ill-defined threat of misconduct based on not even a scintilla of record evidence, considered by a reasonable observer, further demonstrates that recusal is warranted here.

independent investigation into a litigant in this case, and has – most troublingly – formed impressions and opinions based upon the information gained in those improper exercises, relying on them in its rulings and approach to this case.

Of particular concern, the Court's multiple *ex parte* communications pertained to the character of a witness that, in the Court's view, "holds the keys to the kingdom," because – as the Court put it in partially denying the Manookian Parties' motion to compel discovery responses from the Trustee – the key knowledge in the case concerning the Trustee's allegations "is locked away deep inside Mr. Manookian's brain somewhere."[9] The Court emphasized Mr. Manookian's centrality to the case, volunteering that "while he's under oath he will enlighten the Trustee and the other parties on exactly what happened," enabling the Trustee to learn details about the allegations in her Complaint.[10] When in response to the Court, undersigned counsel stated that it was "certainly the Trustee's theory" that Mr. Manookian holds the "keys to the kingdom," the Court corrected counsel, stating, "It's not a theory, Mr. Spragens," and explaining that the Trustee could not be expected to provide further information about her adversary proceeding allegations because she merely stepped into "save the estate for the benefit of creditors based off the actions of the people who put it in bankruptcy."[11]

Taken together, these comments indicate that the Court has developed "concerns" that it takes "very seriously" about whether Mr. Manookian can attend a deposition at counsel's office without some unspecified harm occurring. The Court has formed the view that Mr. Manookian is the key witness whose testimony will unlock the case when he is

---

[9] Ex. 1, Transcript of Pretrial Conference, at 49:2-16.
[10] *Id.*
[11] *Id.*

put under oath, and it has also determined that he poses a threat to other individuals or the orderly proceeding of the case, such that he cannot be trusted to attend or give a deposition at counsel's office. Those concerns are based exclusively upon *ex parte* communications and the Court's own investigation into, and extrajudicial impressions formed about, this key witness in the case. Under these circumstances, where the Court is both law-giver and factfinder, the Court should, consistent with principles of fair dealing and judicial neutrality, recuse itself so another judge can preside over this case.

The Court's undisclosed *ex parte* communications and consideration of extrinsic information, all of which explicitly formed the basis of its ruling, are not the kinds of innocuous *ex parte* communications allowed under the Federal Rules. *See, e.g.*, *Blixseth*, 742 F.3d 1215 at 1219-20 (permitting *ex parte* communications regarding scheduling and a non-public bankruptcy auction). Instead, the communications and extrinsic evidence are relevant to the material disputed issues in the case and its forthcoming findings about the credibility of a material witness whom the Court believes holds the "keys to the kingdom" in this case.

In short, the Court's failure to promptly disclose the occurrence of *ex parte* communications, lack of disclosure about the total substance of, and participants to, those conversations, undertaking of an independent investigation into this matter, and reliance upon both *ex parte* communications and extrajudicial research require immediate recusal. It further requires full disclosure of the circumstances and substance of the *ex parte* communications and extrajudicial materials considered by the Court.

## IV. CONCLUSION

For all these reasons, the Court is required to immediately disqualify itself. Moreover, the Court should promptly submit a sworn declaration detailing the dates,

substance of, and parties to each of its *ex parte* communications as well as the particulars

of its independent investigation.

Date:  May 5, 2022                                         Respectfully submitted,


                                                           */s/ John Spragens*
                                                           John Spragens (TN Bar No. 31445)
                                                           Spragens Law PLC
                                                           311 22nd Ave. N.
                                                           Nashville, TN 37203
                                                           T: (615) 983-8900
                                                           F: (615) 682-8533
                                                           john@spragenslaw.com

                                                           *Attorney for Manookian PLLC and*
                                                           *Brian Manookian*




                                   **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that the foregoing was filed May 5, 2022 and
served electronically upon all parties in interest or their counsel as indicated on the
receipt issued by the Court's electronic filing system.


                                                           */s/ John Spragens*




000117

Charles M. Walker
U.S. Bankruptcy Judge
Dated: 5/11/2022

000117

## IN THE UNITED STATTES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| ——————————————— | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proceeding: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; and | ) |
| Manookian PLLC, | ) |
| | ) |
| Defendants. | ) |
| ——————————————— | ) |

## ORDER SETTING RESPONSE/OBJECTION DEADLINE
## AND SCHEDULING HEARING
## ON MOTION TO DISQUALIFY BANKRUPTCY JUDGE

THIS MATTER is before the Court on the motion to disqualify filed on May 5, 2022, located at Docket Entry #161. The Court being duly advised,

IT IS HEREBY ORDERED that:

(1) All responses/objections and filings related to the motion shall be filed no later than May 27, 2022.

(2) An evidentiary hearing is set for presentation of the motion on June 29, 2022, at 1:00 p.m.

(3) All parties and/or counsel must appear in person at the above scheduled date and time at Courtroom 2, Second Floor, Customs House, 701 Broadway, Nashville, Tennessee.

(4) Presentation of evidence is subject to applicable Federal and Local Rules.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235** |
| | **Chapter 7** |
| **CUMMINGS MANOOKIAN, PLLC** | **Judge Walker** |
| Debtor. | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| v. | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

## NOTICE OF DEPOSITION OF JUDGE CHARLES M. WALKER

Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7030, Manookian PLLC, by and through the undersigned counsel, respectfully gives notices that it will take the deposition of Judge Charles M. Walker on June 15, beginning at 10:00 a.m. Central time at 701 Broadway, Suite 260 Nashville, TN 37203. The deposition will be taken before a person authorized by law to administer oaths and will continue from day-to-day until the examination is complete. The depositions will be recorded by any means authorized by Fed. R. Civ. P. 30(b)(3), pursuant to Fed. Fed. R. Bankr. P. 7030, including audiovisually and stenographically.

The topics to be addressed are all non-privileged, relevant information; including, but not limited to, (1) Judge Walker and his staff's communications about this matter with third parties outside of court proceedings and (2) Judge Walker and his staff's investigation into this matter, the parties, or witnesses outside of the Court record.

Date:  May 31, 2022                                    Respectfully submitted,


                                                       */s/ John Spragens*
                                                       John Spragens (TN Bar No. 31445)
                                                       Spragens Law PLC
                                                       311 22nd Ave. N.
                                                       Nashville, TN 37203
                                                       T: (615) 983-8900
                                                       F: (615) 682-8533
                                                       john@spragenslaw.com

                                                       *Attorney for Manookian PLLC and*
                                                       *Brian Manookian*


## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed May 31, 2022 and served electronically via upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                                       */s/ John Spragens*

000120

Charles M. Walker
U.S. Bankruptcy Judge
Dated: 7/25/2022



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE: )
) Case No: 3:19-bk-07235
Cummings Manookian, PLLC, ) Chapter 7
　　　　Debtor ) Honorable Charles M. Walker
_____ )
)
Jeanne Ann Burton, )
　　　　Plaintiff )
)
　　v. ) Adversary: 3:20-ap-90002
)
Hagh Law, PLLC, )
Afsoon Hagh, )
Manookian, PLLC, and )
　　　　Defendants )
_____ )

**ORDER DENYING DEFENDANTS' MOTION FOR ENTRY OF UNOPPOSED
SUMMARY JUDGMENT ON ALL CLAIMS**

　　Defendants, Hagh Law, PLLC, Afsoon Hagh, and Manookian, PLLC, have moved this

Court for entry of unopposed summary judgment in their favor (See Dkt. #203, hereinafter

"Motion") as to all claims contained in the adversary complaint in advancement of their motion

for summary judgment (Dkt. #188) filed June 24, 2022. For the reasons stated below, the Motion

is DENIED.

**Procedural Posture**

　　This adversary proceeding was filed on January 8, 2020, by Jeanne Ann Burton, the

Chapter 7 Trustee in the underlying bankruptcy proceeding of Debtor Cummings Manookian,

PLLC, a now defunct law firm. (Dkt. #1). The complaint filed by the trustee put forward seven

claims for relief; conversion, state law fraudulent transfer, avoidance and recovery of fraudulent

1

transfers, tortious interference with contract, successor liability and alter ego, turnover, and declaratory judgement.

On May 5, 2022, Manookian, PLLC and Brian Manookian, a non-party to this proceeding, entered a Motion to Disqualify Bankruptcy Judge Charles M. Walker. (Dkt. # 161). In support of this motion, Defendant Manookian, PLLC entered a Notice of Deposition of Judge Charles M. Walker seeking testimony related to the circumstances alleged to provide grounds for recusal. (Dkt. #177). The Court entered an Order Quashing Notice of Deposition on June 1, 2022. (Dkt. #178). Brian Manookian and Manookian, PLLC appealed this Order to the United States District Court on June 14, 2022. (Dkt. #184). The matter currently remains pending on appeal.

On June 24, 2022, subsequent to the filing of the appeal, Defendants filed the aforementioned Motion for Summary Judgment, seeking summary judgment on all seven claims. (Dkt. #188). To date, the Plaintiff has filed no response to the Motion for Summary Judgment. The Motion for Recusal was set for hearing on June 29, 2022. At that time, the Court read a statement into the record wherein the effect of the appeal on the jurisdiction of this Court was acknowledged:

> Based on the pendency of the appeal in the United States District Court for the Middle District of Tennessee, this Court is divested of jurisdiction over aspects of the case subject to the appeal. Here, the appeal is from an Order Quashing a Deposition request in furtherance of a Motion to Disqualify the judge. The appeal is directly related to the issue of this judge's ability to render judgement in this case.
>
> *Statement of the Honorable Charles M. Walker read into the record on June 29, 2022, at hearing (See Exhibit A incorporated herein).*

On July 15, 2022, Defendants filed the instant Motion for Entry of Summary Judgement on All Claims and a proposed order.

2

## Discussion

        "A federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

        "This transfer of power, however, does not effect a total divestiture of jurisdiction from the district court: it retains jurisdiction to enforce its judgment, to proceed with matters that will aid the appellate process, and to adjudicate matter unrelated to the issues on appeal." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 626 (6th Cir. 2013) (citations omitted). The limited jurisdiction which a district court retains to take actions in aid of an appeal is a "narrowly defined" class of actions, which "does not include actions that alter the case on appeal". *United States v. Carman*, 933 F.3d 614, 617 (6th Cir. 2019) (internal quotations omitted). See also *United States v. Gallion*, 534 Fed. Appx. 303, 310 (6th Cir. 2013) ("[T]he test of whether an issue is collateral to a claim on appeal, and therefore whether a district court may retain jurisdiction . . . considers whether the action by the district court would alter the status of the case as it rests before the Court of Appeals".)(citation omitted) "Any action of the district court pertaining to matters involved in the appeal is null and void and will be vacated". *Kelley v. St. Paul Fire & Marine Ins. Co.*, No. 87-1639, 1988 U.S. App. LEXIS 11765 at *8 (6th Cir. Aug. 29, 1988).

        It is well settled law that entry or alteration of a judgment, including summary judgment, alters the status of a case such that it disturbs a matter on appeal. See *Knutson v. AG Processing, Inc.*, 302 F.Supp.2d 1023, 1030 (N.D. Iowa 2004)(citing *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990))(*rev'd on other grounds, Knutson v. AG Processing, Inc.*, 394 F.3d 1074 (8th Cir. 2005)). See also *Landman v. Mitchell*, 445 F.2d 274, 275 (5th Cir. 1971) (observing that a party's filing of an appeal divested the district court of jurisdiction to enter any order on that party's subsequent motion for summary judgment); *United States v.*

3

*Brown*, 17 Fed. Appx. 367, 368–69 (6th Cir. 2001) (declaring that a district court did not have jurisdiction to address a motion to dismiss an indictment pending an appeal); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1013 (6th Cir. 2003) (emphasizing a distinction "between actions that merely aid the appellate process and actions that alter the case on appeal"); *United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984) (declaring that a district court lacked jurisdiction to alter the status of a sentence while an appeal was pending). *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987) ("[A] district court may not alter or enlarge the scope of its judgment pending appeal"); *United States v. Harvey*, 996 F.3d 310, 313 (6th Cir. 2021) (determining that a district court could not issue an opinion after an appeal had been filed); *United States v. Sutton*, 573 Fed. Appx. 560, 562 (6th Cir. 2014) (filing of an appeal removed the district court's jurisdiction to enter a judgment); *Washington v. Kelly*, No. 1:05-CV-577, 2009 WL 233711 at *3 (N.D. Ohio Jan. 30, 2009) (declaring that a pending appeal removed the court's jurisdiction to consider either a motion for default judgment or a motion to disqualify the judge).

The appeal in this case is directly related to the ability of this Court to continue adjudication of this matter, and an entry of summary judgment would clearly alter the status of matters involved in the appeal. Therefore, because this Court lacks jurisdiction at this time to adjudicate the relief requested in the Motion and for the reasons stated in this Court's statement read into the record at the June 29, 2022, hearing (See attached Exhibit A incorporated herein), the Motion for Entry of Unopposed Summary Judgment on All Claims (Dkt. #203) is DENIED.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

# EXHIBIT   A

**Burton v Hagh, et al**                              **20-ap-90002**

**Statement Read Into the Record June 29, 2022**

On June 14, 2022, Defendant, Manookian PLLC and a member of that Defendant – a non-party to this proceeding - Brian Manookian, filed a Notice of Appeal and Statement of Election from this Court's June 1, 2022, Order Quashing the Notice of Deposition of Charles M. Walker, the judge assigned to the adversary, following the filing of a Motion to Disqualify the bankruptcy judge assigned this case.

Based on the pendency of the appeal in the United States District Court for the Middle District of Tennessee, this Court is divested of jurisdiction over aspects of the case subject to the appeal. Here, the appeal is from an Order Quashing a Deposition request in furtherance of a Motion for Disqualify the judge. The appeal is directly related to the issue of this judge's ability to render judgment in this case.

On the filing of a timely notice of appeal, the lower court is "[divested] of its control over those aspects of the case involved in the appeal" and the appellate court assumes jurisdiction. *Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).* Once the appeal has been filed the court cannot take any action that would "alter the status of the case as it rests before the Court of Appeals". *Knutson v. AG Processing, Inc.,* 302 F.Supp.2d 1023, 1029 (N.D. Iowa 2004) (citing *Dayton Indep. Sch. Dist. V. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990))(*rev'd on other grounds*, *Knutson v. AG Processing, Inc.,* 394 F.3d 1074 (8th Cir. 2005)).

The Defendants have filed a Motion for Summary Judgment. Summary Judgement is considered among those action that are impermissible for a lower court to adjudicate as it would disturb the case before the appellate court. Considering that the Defendants seek a ruling on summary judgement on all claims, it follows that any ruling on such a motion would disturb the

6

case as it sits before the appellate court. Allan Ides, *The Authority of a Federal District Court to Proceed After a Notice of Appeal has Been Filed*, 143 F.R.D. 307, 308 (1992). *See also*, *Landman v. Mitchell*, 445 F.2d 274, 275 (5th Cir. 1971)(upholding a District Court's decision to enter no order on a motion for summary judgement that was filed three weeks after a notice of appeal due to lack of jurisdiction).

      The Plaintiffs have filed an Expedited Motion for Status Conference and this Court has entered an Order setting that Conference, as well as a deadline to reply to the motion. Although the Court lacks jurisdiction to entertain any proceedings in this case that implicate the issues presented by the pending appeal, the Court retains limited authority to address ministerial affairs such as the evidentiary housekeeping issues present by the pending motion for a status conference, which has no bearing on the disposition of the appeal. "The filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Citing the *Griggs* case at P.58. "It is generally understood that a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously." *Ibid*. However, in certain circumstances limited power is retained to address aspects of the case not involved in the appeal, when the court's action "do[es] not threaten the orderly disposition of the interlocutory appeal." *Sanford v. Russell*, 2019 WL 12074092, at *1 (E.D. Mich. June 4, 2019) (citations omitted). This Court therefore, may issue the scheduling of evidentiary motions, but will not rule on those issues pending the appellate process as such scheduling will not affect any rights at stake in the pending appeal. Pretrial and Status Conference are set for July 13, 2022, at 11:00 a.m. in person in this Courtroom.

7

Therefore, given the issue on appeal, all matters before this Court are stayed pending the appeal. Ruling on discovery issues is stayed as well, except that the scheduling order entered regarding the Motion for Status Conference remains in effect. Moreover, the Court notes that the appeal is from one order of this Court and does not serve to disturb orders previously entered in this case.

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: CUMMINGS MANOOKIAN, PLLC, ) | |
| ) | |
| Debtor ) | |
| ) | |
| BRIAN MANOOKIAN, ) | |
| ) | |
| Appellant ) | |
| ) | |
| v. ) | No: 3:21-cv-00797 |
| ) | |
| JEANNE ANN BURTON, TRUSTEE, ) | |
| ) | |
| Appellee. ) | |

## MEMORANDUM OPINION AND ORDER

This bankruptcy appeal presents the question of whether the Bankruptcy Court applied the correct legal standard in determining that the debtor lacked standing to challenge a proposed settlement agreement. Because the Court finds that it did not, the settlement agreement will be vacated and this case will be returned to the Bankruptcy Court for further proceedings.

## I.

Brian Manookian, the appellant herein, filed a voluntary petition for Chapter 7 relief on behalf of the debtor, Cummings Manookian, PLC, a defunct Tennessee law firm. Jeanne Ann Burton, the appellee herein, was appointed to serve as the Chapter 7 Trustee for the estate of Cummings Manookian, PLC. Burton, in turn, sought to employ Thompson Burton, PLLC as special counsel, ostensibly because Phillip Young, a member of that firm, had been serving as receiver for the collection of the Debtor's accounts receivable in a state court action that was pending at the time the bankruptcy petition was filed. Over appellant's objection that such employment would create a

conflict of interest, the Bankruptcy Court approved the employment of Thompson Burton.

At issue on this appeal is Claim 5, or the Chase Claim, which is the largest claim brought against the estate. This is an unsecured claim filed by Dean Chase, Sandra Chase, and D.F. Chase, Inc. ("the Chase Parties" or "the Chase Claims") that arose from a sanctions judgment issued by Williamson County Circuit Court Judge Michael Binkley worth somewhere in the neighborhood of $750,000 to $800,000, with appellant putting the figure at $748,769.21 (which may have been the amount of sanctions imposed by the judge) and the appellee placing the figure at $806,927.04 (which may have been the entire amount listed in Claim 5). Regardless, the sanctions judgment was vacated by the Tennessee Court of Appeals because the trial judge harbored animus against Manookian. The appeals court also ordered a "retroactive recusal," and remanded the case for further proceedings before a different trial judge. Chase v. Stewart, No. M201801991COAR3CV, 2021 WL 402565, at *6 (Tenn. Ct. App. Feb. 4, 2021).

The Bankruptcy Trustee agreed to settle the Chase Claim for $250,000, and that decision was approved by the Bankruptcy Judge. The propriety of the decision by the Trustee to settle the claim, however, is disputed by the parties.

The Trustee claims that the decision to settle was straight-forward. At the time the Petition in bankruptcy was filed, the sanctions judgment was on appeal, but the underlying case was not stayed, making the Chase Claim "valid and enforceable." (Doc. No. 9 at 7). Even though the sanctions judgment was later vacated by the state appellate court, a new judge would have to determine whether sanctions were appropriate. "In the face of th[is] uncertainty," the Trustee decided to settle the Chase Claim for a fraction of its value in order to "reduce[] the potential exposure of the estate," and "allow[] the estate to avoid lengthy and costly ongoing litigation." (Id.

2

at 8).

Manookian presents a much more nefarious scenario. According to him, while the sanction judgment was on appeal in the state court, the Chase Parties filed a collections action in the Williamson County Chancery Court to create a receivership over Cummings Manookian's accounts receivable. Phillip Young, the same attorney who would later be appointed special counsel to the bankruptcy Trustee, was appointed as a receiver to collect on the judgment, and he immediately began placing liens on Cummings Manookian's receivables and levying on them as they came due. Young allegedly collected, and paid to himself, tens of thousands of dollars owed to Cummings Manookian, and instituted adversary proceedings against it.

After the appeals court issued its opinion vacating the sanctions judgment, the Chase Parties sought rehearing. Two days after that request was denied, the Chase Parties sent a settlement letter to Manookian's counsel, offering to "walk-away" from their claim in exchange for "no payment" and the signing of mutual releases. (Doc. No. 5 at 8). Days later, however, the Chase Parties "*sua sponte* and gratuitously announced they had agreed to pay all of Phillip Young's outstanding fees in the State Collections action." (Id. at 9). Shortly thereafter, Young, on behalf of the Bankruptcy Trustee, oddly proposed to pay the Chase Parties $250,000 as settlement for their claims, a vastly different outcome from the "walk away" settlement originally proposed.

It was against this backdrop that the Bankruptcy Court was presented with the Trustee's Motion to Approve Compromise and Settlement of the Chase Claim. The Bankruptcy Court held a bifurcated hearing on September 29, 2021. During the first phase, the issue of whether Manookian had standing to object to the proposed settlement was addressed, and the Bankruptcy Court found

that he did not.  During the second phase, the Bankruptcy Court  considered the settlement motion

and an objection that had been filed by attorney John R. Konvalinka.  Ultimately, the Bankruptcy

Court found that "[t]he Trustee properly exercised her business judgment in reaching the proposed

settlement of the Claim filed by the Chase Parties as proposed in the Settlement Motion," and

approved the proposed settlement.  (Doc. No. 1-3 at 3).  Whether the Bankruptcy Court committed

legal error in ruling that Manookian lacked standing is the subject of the appeal.

## II.

On appeal from the bankruptcy court, findings of fact are reviewed under the clearly

erroneous standard, while conclusions of law are reviewed *de novo*.  Rogan v. Bank One, N.A. (In

re Cook), 457 F.3d 561, 565 (6th Cir. 2006).  " Furthermore, when a question in the bankruptcy

context involves a mixed question of law and fact, [the court] must break it down into its constituent

parts and apply the appropriate standard of review for each part."  In re Am. HomePatient, Inc., 420

F.3d 559, 563 (6th Cir. 2005) (quoting Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty

Fin. Servs., Inc.), 106 F.3d 1255, 1259 (6th Cir.1997).

"A trustee in bankruptcy has the authority to seek a settlement of claims available to the

debtor, but any proposed settlement is subject to the approval of the bankruptcy court, which enjoys

'significant discretion.'"  In re MQVP, Inc., 477 F. App'x 310, 312–13 (6th Cir. 2012) (citing Fed.

R. Bankr. P. 9019(a); In re Rankin, 438 F. App'x. 420, 426 (6th Cir.2011)).  "When determining

whether to approve a proposed settlement, the bankruptcy court may not rubber stamp the agreement

or merely rely upon the trustee's word that the settlement is reasonable," but instead is under "an

affirmative obligation to apprise itself of the underlying facts and to make an independent judgment

4

as to whether the compromise is fair and equitable." Id. (citing Reynolds v. C.I.R., 861 F.2d 469, 473 (6th Cir.1988)).

In finding that Manookian did not have standing to contest the proposed settlement, the Bankruptcy Court orally ruled:

> Mr. Manookian, to date, has not offered any *concrete* evidence, and I'll use that same word that Mr. Young has used, that this is a surplus case. What has been shown is there are many variables. As I've already mentioned, that go into determining the exact monetary value of bankruptcy estate.
>
> In this instance, the burden was on Mr. Manookian to produce *something tangible and concrete* that the Court could rely on in making a determination that the [sic] it's *a high likelihood* that this case would be a surplus case.

(Doc. No. 4-1, Hearing Transcript at 53-54) (emphasis added). This was legal error because it placed too heavy a burden on Manookian to establish standing.

"[T]he standing question is purely a legal one," Moran v. LTV Steel Co. (In re LTV Steel Co.), 560 F.3d 449, 452 (6th Cir.2009), and in the bankruptcy context only those that "are adversely affected pecuniarily" have standing, In re Moran, 566 F.3d 676, 680 (6th Cir. 2009). "Debtors, particularly Chapter 7 debtors, rarely have such a pecuniary interest because no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." In re Lunan, 523 F. App'x 339, 340 (6th Cir. 2013) (citing Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.), 151 F.3d 605, 607 (7th Cir.1998)). Where, however, a debtor can show that the estate has assets in excess of liability that would entitle him or her to a distribution of the surplus, then the debtor has standing as a "person aggrieved." Id. In this regard, "[t]he debtor must show more than a metaphysical possibility of surplus; instead it 'must show that such surplus is a reasonable possibility.'" In re Khan, 544 F. App'x 617, 619 (6th Cir. 2013) (quoting In re Lunan,

5

523 Fed. App'x at 340).

Because Manookian did not present "something tangible and concrete" to establish a "high likelihood" there would be a surplus (as opposed to a reasonable possibility), he was unable to argue against the proposed settlement, and this may have affected his due process rights. Although the Trustee argues that Manookian's "interests were . . . considered" because Konvalinka's objections were heard during the second phase of the bifurcated hearing (Doc. No. 9 at 8), and while the Bankruptcy Court stated that "there is no harm to Mr. Manookian because the Court still is addressing the sufficiency of the settlement agreement in which the Trustee is attempting to enter into," (Doc. No. 4-1 at 56), different litigant's arguments do not necessarily go hand-in-hand, nor are they always fungible. As the Bankruptcy Court observed with regard to the propriety of the settlement agreement, "Mr. Manookian . . . doesn't get his day in court, but the issue gets its day in court." (Doc. No. 4-1 at 55). Nevertheless, a litigant's due process deserves consideration applying the correct legal standard.

In their respective briefs, the parties suggest that there either was or was not a reasonable possibility of a surplus, and this Court could make that determination based upon the appellate record. However, because "[a] bankruptcy court's finding that a reasonable possibility of a surplus does not exist is a finding of fact," In re Licata, 659 F. App'x 704, 706 (2d Cir. 2016), the Court will leave it to the Bankruptcy Judge to make that determination under the proper standard because he is intimately familiar with the facts of this case.

## III.

For the foregoing reasons, the Bankruptcy Court's "Order Granting Motion to Approve

Compromise and Settlement and Finding that Brian Manookian Lacks Standing" (Doc. No. 1-3) is

hereby **VACATED**. This case is **REMANDED** to the Bankruptcy Court for further proceedings not

inconsistent with this Memorandum Opinion.

      IT IS SO ORDERED.

                                 _____

                                 WAVERLY D. CRENSHAW, JR.
                                 CHIEF UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **MANOOKIAN PLLC and BRIAN MANOOKIAN,** | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) ) | **Case No. 3:22-cv-00474**<br>**Bankr. Case No. 3:19-bk-07235**<br>**Adv. Pro. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE,** | ) ) | **Judge Aleta A. Trauger** |
| Appellee. | ) ) ) | |

## MEMORANDUM and ORDER

Before the Court is the Notice of Appeal filed by defendants/appellants Brian Manookian and Manookian PLLC. (Adv. Pro. No. 185; Doc. No. 1.)[1] The appellants have filed a Statement of Issues, supporting Brief, and the record pertaining to their appeal. (Doc. Nos. 4, 5, 5-1.) The plaintiff/appellee, Trustee Jeanne Ann Burton, has filed a responding Brief (Doc. No. 6), and the appellants filed a Reply (Doc. No. 7). The court finds that a hearing on this matter is unnecessary and, therefore, **DENIES** the appellants' request for oral argument. For the reasons that follow, defendants/appellants' Notice of Appeal, which the court construes as a motion for leave to appeal, is **DENIED**.

---

[1] Citations to "Doc. No." refer to the docket number of filings made in the case in this court. Citations to "Bankr. No." are to the lead bankruptcy court docket in the underlying bankruptcy case, *In re Cummings Manookian, PLLC*, Case No. 3:19-bk-07235 (Bankr. M.D. Tenn.). Citations to "Adv. Pro. No." are to filings in the subject adversary proceeding, *Burton v. Hagh Law PLLC et al.*, Adv. Pro. No. 3:20-ap-90002 (Bankr. M.D. Tenn.).

# I. BACKGROUND

On November 6, 2019, Cummings Manookian, PLC[2] filed a Chapter 7 Voluntary Petition in the Bankruptcy Court, which was assigned to Bankruptcy Court Judge Charles M. Walker. (Bankr. No. 1.) Trustee Jeanne Ann Burton was appointed to serve as the Chapter 7 Trustee for the debtor on the same day and continues to serve in that capacity.

On January 8, 2020, the Trustee filed the Adversary Proceeding against Hagh Law PLLC ("Hagh Law"), Afsoon Hagh, Manookian PLLC ("Manookian Law"), and First-Citizens Bank and Trust Company (the "Bank"), asserting claims for conversion, fraudulent transfer, tortious interference with contract, successor liability/alter ego, and turnover, and seeking a declaratory judgment, injunctive relief, and other related relief. (Adv. Pro. No. 1, at 1.)[3] What followed was a contentious eighteen months or so of discovery, culminating in a hearing on March 17, 2022 ("March 17 hearing") before Judge Walker, for the purpose of resolving a number of outstanding discovery disputes.

The court and the parties were able to resolve several matters during the first half of the March 17 hearing. (*See generally* Mar. 17, 2022 Hr'g Tr., Adv. Pro. No. 140.) The court then adjourned for several hours while the parties continued to work toward further resolution on their own. When court reconvened on the afternoon of March 17, the parties reported to the judge the progress they had made and areas in which they had reached an impasse. One of the remaining areas of conflict was where to conduct four depositions the parties agreed should be taken. (Adv.

---

[2] The debtor's correct name is apparently Cummings Manookian, PLC. It was named incorrectly as Cummings Manookian, PLLC in the Petition.

[3] After the Bank turned over $715,000 (representing disputed fees in a case in which the debtor had represented one of the parties) being held by the Bank to the Clerk of Court, pursuant to the Bankruptcy Court's Order, the Trustee dismissed the Complaint as to the Bank on January 28, 2020.

Pro. No. 140, at 81–82.) The Trustee had suggested that the depositions take place in the courthouse, a proposal Judge Walker immediately approved. Counsel for Brian Manookian and Manookian Law registered his objection, and the court observed that, while the parties still had the ability to agree on a location, in the absence of an agreement, they would have to hold a hearing. (*Id.* at 82.) Counsel for the appellants continued to express the reasons why he believed that holding the depositions at the courthouse would be inconvenient for all concerned. He noted in particular that parking at the courthouse was expensive and that he did not understand the basis for departing from the ordinary course of holding depositions at lawyers' offices. The court then asked counsel for the Trustee to articulate a basis for conducting the depositions at the courthouse. Counsel for the Trustee stated several reasons why he believed the depositions should be taken at the courthouse, including his belief that there was, as he explained it, "a security issue here. There's already been a restraining order put down against Mr. Manookian by one of the creditor's lawyers in this case, and I don't take that lightly on behalf of my client." (*Id.* at 83.)

Counsel for the appellants again posited that his office was "just down the street" and offered free parking, and he objected to the suggestion of a security issue "in this ordinary bankruptcy case involving professional lawyers on all sides." (*Id.* at 84.) At this point, the court asked counsel for the Trustee if he was "uncomfortable doing depositions" in the appellants' counsel's office. (*Id.*) Counsel for the Trustee stated that he was. The court then made the following statement:

> All right. And then I'll just address the 100-pound gorilla in the room on that issue.
>
> To be candid, Mr. Spragens, I mean, your client's past behavior before the tribunals, and I've had at least two lawyers call the Court and say they don't feel comfortable if your client is going to appear, and, you know, the Court takes those concerns very seriously and makes no conclusion on whether they are valid, they are perceptions which drive behaviors of other parties. And to eliminate any of those perceptions, and to protect everyone against any allegations of bad behavior, misbehavior, or perceived misbehavior, it makes sense to do them here in an

environment where no one can get your client further down a rabbit hole of he did this or he did that, that we're in a neutral environment, which affords certain protections. And if nothing else, in terms of everybody's on their best behavior.

And so the Court's going to make that determination, that the depositions, unless the parties can agree, will be held here in the courthouse.

(*Id.* at 84–85.) No further discussion on this topic ensued, and counsel did not object contemporaneously to the court's statement regarding his "client's past behavior" or the two phone calls to the court by unidentified lawyers.

However, on May 5, 2022, Brian Manookian and Manookian Law, through counsel, filed their Motion to Disqualify Bankruptcy Judge Charles Walker, on the basis that the judge had "engaged in multiple prohibited *ex parte* communications about Brian Manookian and this proceeding . . . while this action has been pending." (Adv. Pro. No. 161, at 1–2.) In addition to the "communications with at least two [unidentified] lawyers" referenced by the judge at the March 17 hearing, the appellants represented that they had learned during the deposition of Phillip Young[4] that the Trustee, "through her Special Counsel, has had at least one improper *ex parte* communication with the Court about Mr. Manookian." (*Id.* at 1–2 n.2 (citing Adv. Pro. No. 161-2, Young Dep. 43–45).)[5] The Bankruptcy Court scheduled a hearing on the Motion to Disqualify

---

[4] Phillip Young functioned as receiver in a state court action filed in Williamson County, before being retained as counsel for the Trustee in Cummings Manookian's Chapter 7 bankruptcy proceeding. In that capacity, he was identified by the Trustee as a fact witness in the Adversary Proceeding. (*See* Adv. Pro. No. 140, at 69, 85.)

[5] As relevant here, Young testified as follows during his deposition:

[T]he very, very first hearing in this case, I called [Judge Walker's] courtroom deputy to alert her to the fact that a creditor's lawyer had an order of protection [against Brian Manookian]. And I didn't know how that was going to work logistically when you have a lawyer who's representing a creditor in the bankruptcy and the debtor's representatives and there was an order of protection down. And so I called to alert them to that so they would know how to handle that. But I don't know if anybody else called.

(Adv. Pro. No. 161-2, Young Dep. 44.) Specifically, he did not know if the lawyer who had obtained the order of protection had also called chambers. (*Id.*)

for June 29, 2022.[6] Counsel for Hagh Law and Afsoon Hagh filed a Response expressing their support for the Motion to Disqualify. (Adv. Pro. No. 173, at 1, 2.) The Trustee filed a Response opposing the motion and pointing out that counsel for the Trustee testified that he had had a brief conversation with the judge's courtroom deputy—not with the judge himself—and that the conversation involved a procedural question rather than substantive issues. (Adv. Pro. No. 174, at 2.) The Trustee also argued that the judge's comments at the March 17 hearing and the decision to hold depositions at the courthouse did not reflect bias but instead a desire to have the depositions conducted at the courthouse in order "to avoid any allegations of bad behavior, whether real or perceived." (*Id.* at 4.) The Trustee also objected to the appellants' characterization of the legal standards purportedly supporting disqualification.

On May 31, 2022, defendant/appellant Manookian Law noticed the deposition of Judge Walker, for the purpose of addressing "(1) Judge Walker and his staff's communications about this matter with third parties outside of court proceedings and (2) Judge Walker and his staff's investigation into this matter, the parties, or witnesses outside of the Court record."(Adv. Pro. No. 177.) Judge Walker entered an eight-page Order the next day, quashing the Notice of Deposition. (Adv. Pro. No. 178.) Manookian Law and Brian Manookian filed their Notice of Appeal and Statement of Election on June 14, 2022, specifically giving notice of their appeal to this court "from the Bankruptcy Court's June 1, 2022 Order (Doc. 178)," that is, from the Order Quashing Notice of Deposition.

At the hearing on the Motion to Disqualify, which convened as planned on June 29, 2022, Judge Walker read a statement into the record. In this statement, he expressed his conclusion that,

---

[6] The docket reflects that the parties, throughout this time period, continued to engage in discovery disputes.

in light of the appeal of the Order Quashing Notice of Deposition, the court was divested of jurisdiction over certain aspects of the case, specifically including both the Motion to Disqualify and the appellants' Motion for Summary Judgment, filed ten days after their Notice of Appeal. (Adv. Pro. No. 212, at 4; *see also* Adv. Pro. No. 188 (Motion for Summary Judgment).)

The appeal of the Order Quashing Notice of Deposition is now before the court.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 158, a district court has jurisdiction to hear a timely appeal as a matter of right from final orders or decrees issued by a bankruptcy court and, "with leave of court," from interlocutory orders. 28 U.S.C. § 158(a)(1), (a)(3). Rule 8004(a) of the Federal Rules of Bankruptcy Procedure provides that, to appeal from an interlocutory order, a party should file a motion for leave to appeal with its notice of appeal. Fed. R. Bankr. P. 8004(a)(2). At the same time, however, Rule 8004(d) allows the district court to treat a timely notice of appeal as a motion for leave to appeal.

Rule 8004(b) identifies the required elements of a motion for leave to appeal, including (1) "the facts necessary to understand the question presented"; (2) "the question itself"; (3) "the relief sought"; (4) "the reasons why leave to appeal should be granted"; and (5) "a copy of the interlocutory order." With respect to the fourth element, neither Rule 8004 nor 28 U.S.C. § 158(a) states what factors a district court should consider in deciding whether to grant a motion for leave to appeal. District courts within the Sixth Circuit have adopted the standard set forth in 28 U.S.C. § 1292(b), which deals with interlocutory appeals from district courts to courts of appeal. *In re Energy Conversion Devices, Inc.*, 638 B.R. 81, 88 (E.D. Mich. 2022) (citations omitted). Thus, a district court may permit an interlocutory appeal if (1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the

litigation. *Id.* (citations omitted). "It is well-established that all three statutory requirements must be met for the court to certify an appeal under § 1292(b)." *Id.* (quoting *Lang v. Crocker Park LLC*, No. 1:09 CV 1412, 2011 WL 3297865, at *5 (N.D. Ohio July 29, 2011)). Even when all three criteria are met, "district courts have 'unfettered discretion to deny certification' in light of the strong bias in federal practice against interlocutory appeals." *In re Great Atl. & Pac. Tea Co.*, 615 B.R. 717, 722 (S.D.N.Y. 2020) (citation omitted). Further, it is well established that permitting interlocutory appeals is "the exception, rather than the rule." *Energy Conversion Devices*, 638 B.R. at 89 (citing *In re Doria*, No. 09-75261, 2010 WL 2870813, at *2 (E.D. Mich. July 21, 2010)).

## III.  ANALYSIS

### A.  The Order Quashing Subpoena Is Not a "Final Order"

In their opening Brief, the appellants contend that the court has jurisdiction over this appeal as a matter of right, under 28 U.S.C. § 158(a), because the Order Quashing Notice of Deposition is a final, appealable order. (Doc. No. 5, at 3.) Alternatively, they ask the court to consider their timely Notice of Appeal as a motion for leave to file an interlocutory appeal. (*Id.*)

"Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015)). Thus, for example, "the adjudication of a motion for relief from the automatic stay forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court unreservedly grants or denies relief." *Id.* Likewise, orders "denying an application for an administrative expense," "sustaining an objection to a creditor's claim," or "denying a motion under Federal Rule of Civil Procedure 60(b)" all qualify as "final orders" that are appealable as of right. *In re Murray Energy Holdings Co.*, 640 B.R. 558, 560–61 (B.A.P. 6th Cir. 2022). Courts distinguish between "discrete disputes" and "discrete issues," with only the

former being subject to immediate appeal. *In re Comdisco, Inc.*, 538 F.3d 647, 651–52 (7th Cir. 2008). "A discrete dispute is one that is essentially separable from the larger case," while "a decision or order that resolves only an issue that arises during the administration of a bankruptcy estate is too small a litigation unit to justify treatment as a final judgment." *Id.*; *see also In re Jackson Masonry, LLC*, 906 F.3d 494, 500 (6th Cir. 2018) (identifying the "appropriate 'judicial unit' for finality analysis" as a "discrete 'proceeding'" (citations omitted)), *aff'd sub nom. Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020).

The order appealed from in this case is an order quashing a deposition that was sought for the purpose of obtaining evidence in support of the appellants' Motion to Disqualify Judge Walker. Irrespective of the appellants' attempts to cast it as a final order, the bankruptcy judge stayed the case pending this appeal, finding that he was divested of jurisdiction over the Motion to Disqualify and the appellants' Motion for Summary Judgment as a result of their appeal of the Order Quashing Notice of Deposition. The appellants, thus, are not in a position to appeal the disposition of the Motion to Disqualify or the Motion for Summary Judgment, because those motions are still pending. While the Motion to Disqualify might arguably constitute a discrete dispute, the resolution of which would qualify as a final order (an issue the court does not reach here), the Order Quashing Notice of Deposition is clearly not. It is an issue arising in the context of resolving the Motion to Disqualify. The court finds, therefore, that the Order Quashing Notice of Deposition is an interlocutory order, not a final order as contemplated by 28 U.S.C. § 158(a).

## B.    Whether to Grant Leave to Appeal

As set forth above, the court may permit an interlocutory appeal if (1) the order in question involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *Energy Conversion Devices*, 638 B.R. at 88.

The appellants' argument in support of an interlocutory appeal glosses over the nature of the order they seek to appeal. Thus, for instance, they argue that their appeal "involves a controlling question of law, because the "[d]isqualification of a judge . . . is governed by statute," which creates an objective standard. (Doc. No. 5, at 9.) They argue that the bankruptcy judge "refused to apply the objective standard or otherwise disclose its *ex parte* communications about Appellant Manookian," instead scheduling an evidentiary hearing requiring the appellants to put on evidence in support of their Motion to Disqualify—evidence that, they claim, is "exclusively in the Court's possession." (*Id.* at 10.) The court quashed the Notice of Deposition, thereby allegedly depriving the appellants of the only means by which they could obtain the evidence of the judge's *ex parte* communications needed to support their Motion to Disqualify.

The appellants are wrong, of course: they possess evidence (such as it is) in the form of the judge's comments during the March 17 hearing and Phillip Young's deposition testimony—the evidence upon which their motion was premised in the first place. Moreover, because they took an appeal prior to the evidentiary hearing and before the judge ruled on their Motion to Disqualify, they have no idea how the judge might have ruled on that motion. More to the point, the appellants have not discussed the law that actually controls the issue they seek leave to appeal: the law establishing the standards for either setting or quashing the deposition of a presiding judge.

Instead, they argue that this court's guidance on the "appropriate standard for recusal and the correct process for considering disqualification requests relating to *ex parte* communications and extrajudicially developed bias will aid the parties and the Bankruptcy Court." (*Id.*) They posit that, "[i]f the Bankruptcy Court's Order is vacated and the case returned with instructions that it be transferred to another judge," that new judge "can promptly address remaining discovery and dispositive motions." (*Id.*) Again, however, the disqualification of the judge is not the question on

appeal. The Motion to Disqualify is still pending before the bankruptcy judge, albeit stayed pending resolution of this appeal of the Order Quashing Notice of Deposition. The appellants have not referenced or even alluded to the standard the judge applied in quashing the Notice setting his own deposition, much less shown that he applied the wrong standard or that a substantial ground for difference of opinion exists regarding the correctness of the decision.

Regarding the third factor, the appellants argue that denying leave for an interlocutory appeal would result in "wasted litigation and expense," as it would require them to go back before the Bankruptcy Court for an evidentiary hearing "in which Appellants lack key evidence." (*Id.* at 11.) Then, if the Bankruptcy Court denied their disqualification motion, "Appellants would seek review of the denial for the same reasons they now seek review of the Bankruptcy Court's handling of the disqualification motion." (*Id.*) The appellants, again, place the cart before the horse. Judge Walker has not yet "handled" the disqualification motion, and the appellants do not know how he would have ruled on it if they had not sought an interlocutory appeal of the Order Quashing Notice of Deposition. They have engaged in wasteful litigation and incurred unnecessary expense in seeking to appeal the Order Quashing Notice of Deposition rather than waiting to see how the judge ruled on their Motion to Disqualify and whether they actually had substantial grounds at that point for seeking to appeal that ruling.

In sum, the appellants have not made the requisite showing on even one of the three required factors. Moreover, even if the court were inclined to grant leave to pursue an interlocutory appeal, the only issue appealed is the appropriateness of the Order Quashing Notice of Deposition. That eight-page Order encompasses six pages of detailed consideration of the regulations governing requests to take the deposition of a judicial officer, set forth in Volume 20, Chapter 8

of the Guide to Judiciary Policy, promulgated by the Director of the Administrative Office of United States Courts.[7] (*See* Adv. Pro. No. 178, at 2–7.)

Generally, "[o]rders quashing a subpoena and limiting discovery are reviewed for an abuse of discretion." *In re Milholland*, No. AP 14-01589, 2017 WL 895752, at *4 (B.A.P. 10th Cir. Mar. 7, 2017) (citations omitted); *accord Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1326 (11th Cir. 2020); *In re Grand Jury Proceedings*, 744 F.3d 211, 220–21 (1st Cir. 2014); *Pointer v. DART*, 417 F.3d 819, 821 (8th Cir. 2005); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). Moreover, although authority is somewhat limited, courts considering the issue appear to have universally held that, if a presiding judge can be subpoenaed to testify at all "concerning actions taken in his judicial capacity," it is "[o]nly under extraordinary circumstances." *In re Thompson*, 77 B.R. 113, 114 (N.D. Ohio 1987); *see also Kananian v. Brayton Purcell, LLP*, No. 1:07 CV 3188, 2009 WL 10689208, at *8 (N.D. Ohio May 29, 2009) (noting that those cases finding that a subpoena to compel a judge's deposition "may proceed in extreme and extraordinary circumstances, in fact never find that such circumstances exist" (collecting cases)). The appellants have not argued that extraordinary circumstances warrant compelling Judge Walker to appear for a deposition and, further, have provided *no* basis for finding that Judge Walker abused his discretion in issuing the Order Quashing the Notice of Deposition directed to him personally.

Thus, even if the appellants had shown that an interlocutory appeal was warranted, they have not provided a basis for setting aside the Order they seek to appeal.

---

[7]   Available   at   https://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-20-administrative-claims-and-litigation/ch-8-testimony-and-production-records#810.

## IV.     CONCLUSION AND ORDER

The court finds that the Order the appellants seek to appeal is not a "final order" that the appellants have an automatic right to appeal. The court, therefore, construes the Notice of Appeal as incorporating a motion for leave to appeal an interlocutory order. That motion is **DENIED**, for the reasons set forth herein.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 4/5/2023



IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:                                              )
                                                   ) Case No: 3:19-bk-07235
Cummings Manookian, PLLC,                          ) Chapter 7
                                                   ) Honorable Charles M. Walker
            Debtor.                                )
_____                    )
                                                   )
Jeanne Ann Burton, Trustee,                        )
                                                   )
            Plaintiff,                              )
                                                   )
      v.                                           ) Adv. Proceeding: 3:20-ap-90002
                                                   )
Hagh Law, PLLC; Afsoon Hagh; and                   )
Manookian PLLC                                     )
                                                   )
            Defendants.                             )
_____                    )

**ORDER DENYING MOTION TO DISQUALIFY
BANKRUPTCY JUDGE CHARLES WALKER**

THIS MATTER came before the Court for an evidentiary hearing[1] on April 4, 2023. At

that time, Counsel for the Plaintiff and Counsel for Defendants and Brian Manookian[2] appeared

and were heard. When counsel for the Movants sought to call his first witness, Trustee's counsel

---

[1] The hearing was set to afford the opportunity for the movants to prosecute their motion either by introduction of evidence and/or argument. "The purpose of an evidentiary hearing is to permit both parties to present their cases and to challenge the other side's case in court and on the record."
*In re McCashen*, 339 B.R. 907, 908 (Bankr. N.D. Ohio 2006)
[2] John T. Spragens and Craig V. Gabbert, Jr. for Hagh Law PLLC and Afsoon Hagh. Mr. Spragens also appeared on behalf of Manookian PLLC and Brian Manookian as Movants.

1

objected on the grounds that Movants filed their Witness list in violation of Local Rule 9014-1.[3]

The Court sustained the objection and no witnesses were presented per that oral ruling. The

Court then heard argument from both sides, and for the following reasons, the Motion to

Disqualify is DENIED.

The Motion to Disqualify

Brian Manookian, a non-party to this action,[4] and Manookian PLLC (hereinafter

"Movants"), seek to have the sitting judge in this case recused for *ex parte* communications and

extrajudicial research regarding this case. The bases for this motion lie in statements made by

Trustee's counsel during a deposition[5] on April 12, 2022[6], and those made in Judge Charles M.

Walker's decision regarding discovery disputes that were the subject of a March 17, 2022

hearing.

This motion alleges that *ex parte* communications about Brian Manookian made to the

Court were improper *ex parte* conversations requiring Judge Walker to recuse himself for

---

[3] Local Rule 9014 provides in relevant part: (1) Pretrial Court Filings. In addition to the initial disclosures that may be invoked by paragraph (2) below, and regardless of whether such pretrial disclosure process has been invoked,
every party shall file with the court and provide to every other party by noon 2 business days prior to the hearing the following information regarding evidence it may present at a hearing or trial (other than solely for impeachment purposes):
       (a) The name, address and telephone number of each witness the party expects to present or may call if the need arises;
       (b) A copy of the transcript of testimony or affidavit of any witness whose testimony will be offered in that form;
       (c) A list and copy, with appropriate identification, of each document or other exhibit a party expects to offer or may offer as evidence. (For any matter to be heard in the Nashville Division, the exhibits shall be filed and exchanged utilizing the court's Electronic Evidence Submission Application pursuant to the Electronic Evidence Procedures.) . . .
[4] Sole member of the Debtor and of Defendant, Manookian PLLC
[5] Philip Young, Trustee's counsel in this matter, also served as the receiver in a related state court case.
[6] Although the referenced communication is referred to in footnote #2 of the motion and the transcript attached, the communication is repeatedly referred to as a communication with chambers. Mr. Young states that he spoke with Judge Walker's courtroom deputy-at-the-time, an employee of the Clerk of Court. No reference, allegation, or argument appears in the motion regarding any *ex parte* communication between Mr. Young and chambers staff.

2

violating 28 U.S.C. §§ 455(a) and (b)(1), and the Code of Conduct for Federal Judges.[7]

Specifically, the motion refers to Judge Walker's statements on the record in open court, with all

parties' counsel present, regarding calls to the court from lawyers expressing their discomfort if

Mr. Manookian were to appear at hearings and depositions in this case. Transcript, P.84.

Movants allege that Judge Walker "engaged in multiple prohibited *ex parte* communications

about Brian Manookian and this proceeding with 'at least two [unidentified] lawyers' while this

action has been pending." ECF 161, P1. It appears the allegation of "multiple . . . at least two

[unidentified] lawyers" includes a conversation the Trustee's attorney had with a courtroom

deputy.[8]

 Movants go on to accuse Judge Walker of failing to notify the parties of "its repeated

conversations" alleging that the Court only did so much later to justify a ruling regarding the

location of depositions, and movants were not afforded the opportunity to respond. Additionally,

movants state that these communications had a "corrosive effect on the Court" which has only

recently become clear. *Id.* at P.2.

 The motion goes on to assert that Judge Walker's statements regarding Mr. Manookian's

"past behavior before tribunals" indicates that the judge has engaged in extrajudicial research

and has formed a bias against Mr. Manookian as a result – also requiring recusal. *Id.* The motion

quite emphatically states that "No court has ever found that he [Mr. Manookian] acted even

remotely inappropriately, much less in a physically threatening manner, during a deposition –

nor, crucially, does the record in this case support such a finding." *Id* at P6.

---

[7] See § 20:118.25. Ethics and Code of Conduct for Federal Judges, 6 Pat. L. Fundamentals § 20:118.25 (2d ed.).
[8] The Trustee's attorney is identified in the motion at FN 2.

3

Co-counsel for Defendants Afsoon Hagh and Hagh Law PLLC filed a response joining in the motion. In this response (ECF 173), those Defendants question the Court's Order setting this motion for evidentiary hearing (ECF 165)[9] "when the person holding the most pertinent factual information to resolve this motion is the Court, in terms of the contents of the *ex parte* communications bearing on safety issues." Id at P2. The Plaintiff/Trustee also filed a response, emphasizing that the communications at issue although *ex parte*, were permissible. ECF 174.

Recusal Standards

Fed. R. Bankr. P. 5004(a) mandates that a bankruptcy judge shall be governed by 28 USC § 455 and disqualified from presiding over a proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case. 28 U.S.C. § 455 provides the legal standards for disqualification of a Judge from a proceeding: 28 U.S.C. § 455(a) and 28 U.S.C. §455 (b)(1). [10]

1. Mandatory Recusal under 28 U.S.C. §455(a)

The relevant sections of 28 U.S.C. 455 require that a judge be disqualified if there exists a reasonable question as to his impartiality. 28 U.S.C. § 455(a). Specifically:

> **(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> **(b)** He shall also disqualify himself in the following circumstances:
> **(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> 28 U.S.C.A. § 455 (West)

"A violation of § 455(a) is established when a reasonable person, knowing the relevant facts, would expect that a justice, judge, or magistrate knew of circumstances creating an

---

[9] ECF 165 set the motion for evidentiary hearing on June 29, 2022. That hearing was canceled pending resolution of the Appeal of this Court's order at ECF 178

[10] For the purposes of this Order, only the relevant sections of 28 U.S.C. 455 will be discussed. Additionally, 28 U.S.C. § 455(d)(1) provides terminology infra.

4

appearance of partiality...." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (1988). Scienter of the Judge is not required for a violation of § 455(a). *Id.* at 859. "[S]ection 455(a) was intended to establish an objective test." *Health Services Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986). Judges must recuse themselves if a reasonable, objective person, knowing all of the circumstances, would question the judge's impartiality. *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990).

While this statute imposes a duty to recuse where grounds exist, there is also a duty not to do so if no cause is shown. *In re Fowler,* No. 01-10615, 2004 Bankr. LEXIS 67 at *10 (Bankr. E.D. Ky. Jan 29, 2004) (citing *Computer Dynamics, Inc.*, 253 B.R. 693, 698 (E.D. Va. 2000)). Since the standard is objective, "the judge need not recuse himself based on the 'subjective view of a party' no matter how strongly that view is held." *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990) (citing *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988), cert. denied, 488 U.S. 1018, 109 S. Ct. 816, 102 L. Ed. 2d 805 (1989). In fact, "there is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *Easley v. Univ. of Mich. Bd. of Regents*, 853 F.2d 1351, 1356 (6th Cir. 1988) (quoting *In re Union Leader Corp.*, 292 F.2d 381, 391 (1st Cir. 1961))."

2. Mandatory Recusal under 28 U.S.C. §455(b)(1)

A Judge shall disqualify himself "where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1)

a. Personal bias or prejudice

Personal bias is prejudice emanating from a source other than participation in the proceedings or prior contact with related cases. *Wheeler v. Southland Corp.*, 875 F.2d 1246,

5

1251 (6th Cir. 1989) (citing *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir. 1985), *cert. denied*, 475 U.S. 1016, 89 L. Ed. 2d 312, 106 S. Ct. 1198 (1986)).  Disqualifying prejudice or bias must ordinarily be personal or extrajudicial. *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990); *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (6th Cir. 1989).  Predilections resulting from the record and/or proceedings before the judge, do not constitute bias unless they display such a high degree of favoritism or antagonism as to make fair judgment impossible. *Liteky v. United States*, 510 U.S. 540, 555 (1994).  A judge's conduct must be "so extreme as to display clear inability to render fair judgment" to be characterized as bias or prejudice.  *Id* at 551.

 Moreover, a judge is charged with efficient and justiciable case administration. This sometimes means navigating potential difficulties between the parties, as well as ensuring that all proceedings are conducted fairly and do not put any party participating in the proceeding in a position of concern or discomfort. "A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune."  *Id* at 556.

 Under § 455(b)(1), **t**he issue to be determined is whether the judge retains bias or prejudice as to a particular party or has knowledge of disputed facts.  *In re AVN Corp.,* No. 98-20098-L, 1998 WL 35324198 at *3 (Bankr. W.D. Tenn. Dec. 8, 1998).  A judge should not recuse himself if his alleged personal bias stems from the facts the judge learned when participating in the case in his judicial capacity.  *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983).  "Under § 455(b)(1), as under § 455(a), inferences drawn from prior judicial determinations concerning a party in the case in which recusal is sought are insufficient because it is the duty of the judge to rule upon issues of fact and law and questions of conduct which form part of the proceedings before him."  *In re AVN* at *3.  The United States Supreme Court

has emphasized that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky* at 555.

### b.  Personal knowledge of disputed evidentiary facts

'[P]ersonal knowledge' is "knowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." KNOWLEDGE, Black's Law Dictionary (11th ed. 2019).  Therefore, when it is clear that the facts at issue were gleaned from the court record, including court filings and proceedings before the judge, and thereby not from extrajudicial sources, the judge need not, and should not, recuse himself.  *United States v. Baker*, 441 F. Supp. 612, 618 (M.D.Tenn. 1977).  See also *Liteky* at 551 ("[N]ot subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.")

### 3.  Code of Conduct for Federal Judges[11]

The Code of Conduct for Federal Judges sets forth the obligations and constraints imposed upon federal judges. This Code of Conduct is not a suggestion or a guideline, it contains provisions that are to be adhered to in an effort to maintain the integrity of the judiciary and cultivate confidence in the judicial process. The relevant provisions or Canons are set forth below:

### Canon 3: A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:
(A) *Adjudicative Responsibilities*.
- [.]..

---

[11] Hereinafter "Code of Conduct"

- (4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider *ex parte* communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized *ex parte* communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:
- (a) initiate, permit, or consider *ex parte* communications as authorized by law;
- (b) when circumstances require it, permit *ex parte* communication for scheduling, administrative, or emergency purposes, but only if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication; . . .
- (C) *Disqualification*.
- (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:
  - (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

§ 20:118.25. Ethics and Code of Conduct for Federal Judges, 6 Pat. L. Fundamentals § 20:118.25 (2d ed.)

Canon 3C of the Code of Conduct mirrors § 455. The statutory provision is binding on the courts as law applicable to whether recusal is required. "The substantially identical canon provision is a subset of a code of judicial obligations that are ethically binding." *Ragozzine v. Youngstown State Univ.*, 783 F.3d 1077, 1080 (6th Cir. 2015).

"Based on Canon 2 of the Code of Judicial Conduct which states that '[a] judge should avoid impropriety and the appearance of impropriety in all his activities' § 455(a) provides that a 'judge . . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" *Securities Investor Protection Corp. v. Bell & Beckwith*, 28 B.R. 285, 288, (Bankr. N.D. Ohio 1983).

8

### 4. *ExParte* Communications

#### A. Definition

Black's Law Dictionary defines "*ex parte* communication" as "A communication between counsel or a party and the court when opposing counsel or party is not present." COMMUNICATION, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary further defines "*ex parte*" as "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest; of, relating to, or involving court action taken or received by one party without notice to the other." EX PARTE, Black's Law Dictionary (11th ed. 2019)

#### B. *Ex Parte* and the Code of Conduct: Communication Regarding Scheduling is Allowable.

The Code of Conduct for Federal Judges discusses *ex parte* communications in Canon 3(A) stating specifically that "*except as set out below*, a judge should not initiate, permit, or consider *ex parte* communications." (emphasis added). Then below, Canon 3 states "A judge may (b) when circumstances require it, permit *ex parte* communication for scheduling, administrative, or emergency purposes, but only if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication." Code of Conduct Canon 3(A)(4)(b). Additionally, Canon 3 states that "[i]f a judge receives an *unauthorized ex parte* communication bearing on the substance of the matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." Id. (emphasis added).

9

The 6th Circuit in *Gerber v. Veltri* verified that a communication between Judge and counsel for limited, administrative purposes was not prohibited by Canon 3(A)(4)(b):

> "When circumstances require it, Canon 3(A)(4)(b) 'permit[s] *ex parte* communication for scheduling, administrative, or emergency purposes,' but only 'if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication.' Judge Zouhary's discussion with defense counsel was for these limited, administrative purposes. What is more, plaintiff identifies no advantage that defendant received as a result of the communication."
> *Gerber v. Veltri*, 702 Fed. App'x. 423, 433 n.7 (6th Cir. 2017).

### C. *Ex parte* communications on the record provide all parties meaningful opportunity to address.

Disclosing *ex parte* communications on the record and before counsel allows for any objections and affords all parties the opportunity to correct any errors which may have resulted. See *Moore v. Mitchell,* No. 1:00-CV-023, 2007 WL 4754340, at *30 (S.D. Ohio Feb. 15, 2007) (citations omitted).

As described by other Bankruptcy Courts and as noted in Black's Law Dictionary, "the term '*ex parte*' includes in the definition: 'a judicial proceeding, order, injunction, etc., is said to be *ex parte* when it is taken or granted at the instance and for the benefit of one party only, *and without notice to,* or contestation by, any person adversely interested.'" (emphasis supplied). *Attorney Registration & Disciplinary Com. of Supreme Court of Illinois v. Betts*, 143 B.R. 1016, 1019 (Bkrtcy.N.D.Ill. 1992) (quoting *Black's Law Dictionary,* (6th ed. 1990)).

Discussion

The movants here rely on three immaterial facts to support their request for disqualification: (1) the calls to the court by two lawyers advising of their concerns for their safety regarding Brian Manookian, (2) Mr. Young's communication with a courtroom deputy

regarding the same concerns; and (3) Judge Walker's statement on the record regarding Mr.

Manookian's behavior in other tribunals.

Movants argue that Judge Walker received numerous phone calls from attorneys

informing the court that there existed a restraining order against Mr. Manookian put in place by

an attorney for one of the creditors of the case and that those calls were impermissible *ex parte*

communications that prejudiced the judge against Mr. Manookian. The motion alleges that Mr.

Young also contacted the judge regarding the same situation.

In fact, Judge Walker did not refer to his personal receipt of any calls regarding the case.

He did refer to the court receiving communication from lawyers about Mr. Manookian, but at no

time did Judge Walker indicate that any material issue was the topic of an *ex parte*

communication, nor did he state that there was any *ex parte* communication involving himself or

any chambers staff:

> [.] . . and I've had at least two lawyers call the Court and say they don't
> feel comfortable if your client is going to appear, . . .
> Transcript at p. 84

Despite accusations to the contrary, Judge Walker fully explained on the record the effect

those calls had on his view of the matter before him:

> . . . and, you know, the Court takes those concerns very seriously and makes no
> conclusion on whether they are valid, they are perceptions which drive behaviors of other
> parties.
> Transcript at p. 85

The Court is charged with the integrity of the record. Part of maintaining that integrity

involves courts calling for parties to articulate matters on the record. It is also important to note

that the record contains past rulings made by a tribunal in the proceeding, or in the case of

bankruptcy, an adversary to the proceeding. Moreover, Courts communicate with the parties to

an action via the record. That is why this Court disclosed the *ex parte* communications from

11

counsel regarding the restraining order against Mr. Manookian on the record in open Court. That is the way courts disclose these things.

Although the motion states that the movants were never able to respond to the *ex parte* representations or even make a record regarding those allegedly improper communications, when given the opportunity, Mr. Spragens merely objected to the depositions being held at the courthouse:

> MR. SPRAGENS: That's fine, Your Honor. And just for the record, I'll preserve my objection to that. And I heard Mr. Gabbert object to it earlier, as well.
> THE COURT: Okay. Well, if the parties can't agree, you know, you still have the opportunity to agree on a location.
> MR. SPRAGENS: Sure.
> Transcript at p.83
>
> MR. SPRAGENS: Well, and, you know, my office is just down the street and parking is free. There's no security issue. I don't think that there's any record that would support that there is a security issue in this ordinary bankruptcy case involving professional lawyers on all sides. So this proposal was presented to me. I said I disagreed with it. And Mr. Young said, well, we'll take it up with the Court. So, you know, in my view, this is the departure from the norm, not the other way around.
> Transcript at p. 84

Mr. Spragen's disagreement that there was a security issue was heard and considered by the court because it is the responsibility of the judge to consider any issues brought before him that would impact the integrity of the judicial process. Mr. Spragen's opinion, however, does not trump a state court judge who found there to be a threat such that a restraining order was issued. Security is one of the issues Judge Walker is charged with addressing. Doing so in an abundance of caution does not indicate overreach or prejudice, but instead indicates his diligence in protecting the parties and the veracity of the proceedings.

The third occurrence that movants insist requires disqualification stems from Judge Walker's comments regarding Mr. Manookian's behavior before other tribunals. Although

12

movants insist that there is nothing in the record regarding information that would support these comments, movants would be dead wrong.

On November 18, 2019, the Trustee filed an *Application and Notice to Employ Thompson Burton PLLC as Special Counsel* to the Trustee in the main bankruptcy case. See 3:19-bk-07235, ECF 6. Brian Manookian, acting *pro se[12]*, filed an objection to the application. The Court conducted a hearing on December 17, 2019 at which time both parties appeared and presented argument. The Court took the matter under advisement, entering *Order Regarding Trustee's Application and Notice to Employ Thompson Burton PLLC as Special Counsel for the Estate and Allowing the Trustee Until December 24, 2019 to File Supplemental Application and Supporting Affidavit to Specifically Detail the Scope of Work and Provide Details and Full Disclosure of Any Current or Potential Conflicts that May Exist*. ECF 20. On December 21, 2019, the Trustee filed a *Supplemental Brief/Memorandum in Support of the Application to Employ Special Counsel*. ECF 21. Exhibit A to that filing was a copy of a *Motion to Subject Property, Issue Writs of Execution and Distrings/Fieri Facias, Appoint Receiver and Grant Injunctive Relief as filed in the Circuit Court of Williamson County, Tennessee*, filed on April 25, 2019. *Id*. at Ex. A. The motion included the following relevant statements:

> 5. After a series of hearings and follow-up motions that spanned more than two years, Judge Binkley of this Court found that Mr. Manookian had knowingly, willfully, and intentionally violated the Protective Order and, inter alia attempted "to mislead the Court from uncovering his violations of the Court's Orders by any means necessary.". . [.]
> 6. Finding that Messrs. Manookian and Hammervold had (a) abused the discovery process, (b) failed to maintain candor with this court, (c) continuously violated the Agreed Protective Order, and (d) attempted to defaud the court for over two years, this Court imposed monetary sanctions on Mr. Manookian . . [.]

---

[12] Brian Manookian was acting in his capacity as owner of the Debtor, Cummings Manookian, PLLC. He was not acting as an attorney representing himself as the owner due to his disbarment by the Tennessee Supreme Court.

13

Additionally, on page 14 of the referenced motion, there is an entire section entitled MR.

MANOOKIAN'S HISTORY OF VIOLATING COURT ORDERS in which Mr. Young, as

potential Receiver, illustrates Mr. Manookian's behavior in other tribunals by recounting

sanctions imposed against him by federal and state courts for:

- Acting in bad faith and disrupting the litigation process

- Engaging in a pattern of obfuscation

- Failure to provide credible explanations

- Engaging in conduct that essentially amounted to a flouting of the Court's Orders

- Repeatedly ignoring the clear directives of the Court

- *Conducting himself in a reckless manner* (emphasis added)

Mr. Manookian prosecuted his objection to the Application but did not at any time

contest any supplement to the application that contained information about his behavior before

other courts.

In the same vein, during the March 17, 2022 hearing, Mr. Spragens at no time expressed

any concern or asked even one question regarding the issue of the *ex parte* communications or

any alleged extrajudicial inquiry, despite numerous opportunities to address these alleged

egregiously prejudicial acts. In fact, Judge Walker expressed his objective approach to the

situation by pointing out that it would protect all parties from any uncomfortable situation or any

accusation, as well as aid in the expeditious and efficient administration of discovery:

> And to eliminate any of those perceptions, and to protect everyone against
> any allegations of bad behavior, misbehavior, or perceived misbehavior, it
> makes sense to do them here in an environment where no one can get your
> client further down a rabbit hole of he did this or he did that, that we're in a
> neutral environment, which affords certain protections. And if nothing else,
> in terms of everybody's on their best behavior.
> Transcript at p. 85

14

And so the Court's going to make that determination, that the depositions, unless
the parties can agree, will be held here in the courthouse. And as a matter of fact,
again, there will be some method available to reach the Court if during those
depositions we have further issues with discovery.
Transcript at p. 86

Moreover, despite alleging a "corrosive effect on the Court," movants point to no other

prejudice to Mr. Manookian than the location of the depositions. There was no accusation linked

to any ruling on a material issue, no objection overruled that hindered or impaired the movant's

rights in this matter, and in fact, no instance of prejudice against the movants was articulated at

all. The prejudice alleged from these three occurrences  was that the depositions in this case were

conducted in the courthouse. The location of depositions is an administrative issue, not a material

issue. It does not impact the issues before the Court. Although Movants insist that requiring the

depositions to be held in the courthouse reflects the presence of the Court's prejudice against Mr.

Manookian, what it more reasonably reflects is the judge's familiarity with the case. The hearing

on March 17, 2022 involved cross-motions to compel and reflected the biggest issue so far in this

adversary: discovery. In fact, the case is comprised mostly of three years of discovery disputes,

with rulings reflecting the Court's stamina for fairness and justiciable administration of the case.

Moreover, none of these issues are material to the case. Material to the logistics of the

case, sure, but given the inability of these parties and these witnesses to conduct discovery

without disagreeing about every little detail, it was necessary for the judge to rule on all of the

discovery matters and to do so in an equitable, fair and reasonable manner – and that he did. The

judge's directions and rulings regarding the exhausting number disclosure disputes were clearly

issued so as to prevent all involved from becoming hostages of the discovery process.

The expectation of lawyers in the discovery process, as reflected in the applicable rules,

is to conduct themselves in a professional, civil, and agreeable manner in order to resolve the

15

case, either on the merits or by settlement. The contentious nature of these discovery proceedings are a beast – one might say a gorilla - with which the Court has tamed as best as possible.

Furthermore, this Court never had to rely on extrajudicial research. The record contains the rulings from other tribunals that have found Mr. Manookian to have acted in bad faith, engaged in a pattern of obfuscation, and conducted himself in a reckless manner. Specifically, a Williamson County judge found that Mr. Manookian had knowingly, willfully, and intentionally violated a Protective Order and then attempted to mislead that court about the violation. That judge found Mr. Manookian's behavior regarding discovery matters to be so egregious that he imposed significant monetary sanctions against him. All of this is part of the record of *this* case.

Additionally, *this* Court did not find that Mr. Manookian posed a threat. That was a conclusion found by the state court that issued the restraining order. This Court simply sought to honor that order – as federal courts do with most state court orders – and protect the integrity of these proceedings. Further, Movants neglect to mention that this judge emphasized that having the depositions in the courthouse protected everyone, including Mr. Manookian.

<u>Conclusion</u>

Therefore, although the Movants express their perceptions of bias and prejudice, the record does not support that as a reasonable view. The record shows not only evenhanded judgment in this proceeding, but also illustrates this Court's elevated patience with a painful number of discovery disputes, including the one that is the catalyst to this motion. Since any *ex parte* communication was permissible in that it was not material but concerned security and administrative procedures within the Court, and because no extrajudicial research was conducted to impair this Court's impartiality, it is mandatory that the motion to disqualify be denied. Since

16

there was no reasonable possibility that the sitting judge's objectivity and neutrality has been

compromised, it is incumbent that he remain on the case

      Therefore, for the reasons stated above, IT IS HEREBY ORDERED that the Motion to

Disqualify is DENIED.

 

          ***THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS***
              ***INDICATED AT THE TOP OF THIS PAGE***

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.
17

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235** |
| | **Chapter 7** |
| **CUMMINGS MANOOKIAN, PLLC** | **Judge Walker** |
| Debtor. | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| **v.** | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

## BRIAN MANOOKIAN, MANOOKIAN PLLC, AFSOON HAGH, AND HAGH LAW PLLC'S NOTICE OF APPEAL AND STATEMENT OF ELECTION

Manookian PLLC, Brian Manookian, Afsoon Hagh, and Hagh Law PLLC ("Appellants") through counsel, give notice of their appeal from the Bankruptcy Court's April 5, 2023 Order (Doc 229).  In furtherance of the same, Appellants state as follows.

## Part 1: Identity of Appellant

1.      The names of the appellants are Brian Manookian, Manookian, PLLC, Afsoon Hagh, and Hagh Law PLLC.  Mr. Manookian is the sole owner and member of the Debtor, Cummings Manookian, PLLC as well as the sole owner and member of Adversary Proceeding Defendant, Manookian, PLLC.  Afsoon Hagh is the sole owner and member of Adversary Proceeding Defendant, Hagh Law PLLC.

1

**Part 2: Subject of the Appeal**

     2.     Appellants appeals from the Court's Order Denying Motion to Disqualify

Bankruptcy Judge Charles Walker (Doc. 229). The Order was entered on April 5, 2023.

**Part 3: Parties to the Appeal**

     3.     The names of the Parties to the Order appealed from as well as the contact

information for their attorneys are:

     a.  Debtor Cummings Manookian,
        Jay R. Lefkovitz
        Lefkovitz & Lefkovitz, PLLC
        312 East Broad Street, Suite A
        Cookeville, TN 38501
        (931) 528-5297 (T)
        931-526-6244 (F)
        JLefkovitz@lefkovitz.com

     b.  Trustee Jeanne Anne Burton
        Phillip Young
        One Franklin Park
        6100 Tower Circle, Suite 200
        Franklin, TN 37067
        (615) 465-6008 (T)
        phillip@thompsonburton.com

     c.  Creditor Grant, Konvalinka & Harrison, P.C.,
        John P. Konvalinka
        Grant, Konvalinka & Harrison, P.C.
        633 Chestnut Street Suite 900 Republic Centre
        Chattanooga, TN  37450-0900
        (423) 756-8400 (T)
        (423) 756-6518 (F)
        jkonvalinka@gkhpc.com

     d.  Creditor D.F. Chase, Inc.
        Daniel Puryear
        Puryear Law Group
        104 Woodmont Boulevard, Suite 201
        Nashville, TN 37205
        (615) 255-4859 (T)

(615) 630-6602 (F)
dpuryear@puryearlawgroup.com

## Part 4: Election to have appeal heard by District Court

4.    Appellants elect to have the appeal heard by the United States District Court
rather than by the Bankruptcy Appellate Panel.

Date:  April 18, 2023                              Respectfully submitted,

*/s/ John Spragens*
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Manookian PLLC, Brian
Manookian, Afsoon Hagh, and Hagh
Law PLLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed April 18, 2023 and
served electronically upon all parties in interest or their counsel as indicated on the
receipt issued by the Court's electronic filing system.

*/s/ John Spragens*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **IN RE:** | **Case No, 3:19-bk-07235** |
| **CUMMINGS MANOOKIAN, PLLC** | **Chapter 7** |
| | **Judge Walker** |
| Debtor. | |
| | **Adv. Proc. No. 3:20-ap-90002** |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| v. | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

**APPELLANTS BRIAN MANOOKIAN, MANOOKIAN PLLC, AFSOON HAGHM HAGH LAW PLLC STATEMENT OF ISSUES ON APPEAL AND DESIGNATION OF RECORD**

Pursuant to Federal Rule of Bankruptcy Procedure 8009, and the District Court's Acknowledgement of Receipt of Appeal dated April 24, 2023 (Doc. No. 235) Appellants Brian Manookian, Manookian PLLC, Afsoon Hagh, and Hagh Law PLLC ("Appellants") hereby file this Statement of the Issues to be Presented on Appeal and Designation of Items to be Included in the Appellate Record.

**I.    Issues To Be Presented**

Whether the Bankruptcy Court erred in failing to recuse itself where it belatedly revealed, but declines to detail, engaging in multiple *ex parte* communications about this

1

litigation with one or more attorneys representing parties in this litigation ; and where the Court continues to decline to reveal the substance, date, and parties to each of the *ex parte* communications.

Whether the Bankruptcy Court erred in failing to recuse itself where it quashed a subpoena to itself seeking to determine the specifics of the Court's *ex parte* communications and, in that Order, articulated additional biases and prejudices against the moving party.

Whether the Bankruptcy Court erred in failing to recuse itself where it belatedly revealed that it has been relying upon, and, indeed, admitted to basing its decisions in this case on, a highly inflammatory, vacated Tennessee state court order, which had long since been overturned by the Tennessee Court of Appeals, about one of the parties to this litigation; and which order was issued by a Tennessee state trial court judge who was additionally disqualified from that action on the bases of bias.

## II.    Designation of Items To Be Included in Appellate Record

The items to be included in the appellate record consist of the following:

•  All docket entries in the bankruptcy proceeding (No. 3:19-bk-07235) and related adversary proceeding (No. 3:20-ap-90002), specifically including adversary proceeding docket entries 161, 165, 173, 174, 177, 178, 229 and all attachments thereto.

•  Transcript of June 29, 2022 adversary proceeding hearing on motion to disqualify.

•  Transcript (forthcoming) of April 4, 2023 hearing on motion to disqualify (transcript requested at Docket No. 226).

Date:  May 5, 2023                    Respectfully submitted,


                                      */s/ John Spragens*
                                      John Spragens (TN Bar No. 31445)
                                      Spragens Law PLC
                                      311 22nd Ave. N.
                                      Nashville, TN 37203
                                      T: (615) 983-8900
                                      F: (615) 682-8533
                                      john@spragenslaw.com

                                      *Attorney for Appellants*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed May 5, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                      */s/ John Spragens*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

```
                                    .
IN RE:                              .  Case No. 3:19-bk-07235
                                    .  Chapter 7
CUMMINGS MANOOKIAN, PLLC,           .
                                    .
            Debtor.                 .
                                    .
                                    .
. . . . . . . . . . . . . . . . .   .
JEANNE ANN BURTON,                  .  Adv. No. 3:20-ap-90002
                                    .
            Plaintiff,              .
                                    .
v.                                  .  701 Broadway
                                    .  Nashville, TN 37203
HAGH LAW PLLC, et al.,              .
                                    .  Tuesday, April 4, 2023
            Defendants.    .  8:03 a.m.
. . . . . . . . . . . . . . . . .   .
```

TRANSCRIPT OF MOTION TO RECUSE JUDGE CHARLES M. WALKER [161]
BEFORE THE HONORABLE CHARLES M. WALKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiff:            Thompson Burton PLLC
                              By:  PHILLIP G. YOUNG, ESQ.
                              One Franklin Park
                              6100 Tower Circle, Suite 200
                              Franklin, TN 37067
                              (615) 465-6008

APPEARANCES CONTINUED.

Audio Operator:              Alison DeVore, ECR

Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com


        Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Defendants:
                          Spragens Law PLC
                          By:  JOHN T. SPRAGENS, ESQ.
                          311 22nd Avenue North
                          Nashville, TN 37203
                          (615) 983-8900

                          Bass, Berry & Sims PLC
                          By:  CRAIG VERNON GABBERT, JR., ESQ.
                          150 Third Avenue South, Suite 2800
                          Nashville, TN 37201
                          (615) 742-6277

1              (Proceedings commence at 8:03 a.m.)

2              THE COURTROOM DEPUTY:  All rise.  The United States

3    Bankruptcy Court for the Middle District of Tennessee is now in

4    session.  The Honorable Charles M. Walker presiding.

5              THE COURT:  Good morning.  Please take your seats.

6              THE COURTROOM DEPUTY:  Your Honor, we're here on Case

7    20-90002, Burton v. Hagh Law, PLLC.

8              THE COURT:  All right.  Mr. Spragens, your motion.

9              MR. SPRAGENS:  Yes, Your Honor.  Your Honor, as the

10   Court knows, excuse me, we're here today on a motion to recuse

11   the Court from proceeding -- presiding over this matter.  I'd

12   be happy to reserve argument for the end, if that's okay with

13   the Court, and just go ahead and put on a witness.

14             THE COURT:  Proceed.

15             MR. YOUNG:  Your Honor, at this time I'm going to

16   lodge an objection to any witnesses or exhibits being offered

17   because of failure to comply with Rule 9014-1.  That rule

18   requires any witness and exhibit list to be filed by noon on

19   the second business day prior to a hearing.  That would have

20   been Friday at noon.

21             In this case, no witness and exhibit list was filed

22   until yesterday at about 10:30, and even then it didn't comply

23   with the rule in that there was no substance of testimony

24   listed.  So we would object to the presentation of any

25   witnesses or exhibits in this case.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2225)

            1            THE COURT:  Okay.  Mr. Spragens, response?

            2            MR. SPRAGENS:  Your Honor, it is true that we filed

            3    our exhibit list inside of two business days prior to this

            4    morning's hearing, and I apologize to the Court for that.  That

            5    was an oversight on our part.  I thought that the substance of

            6    the testimony that we were expecting to offer was well known to

            7    everyone since we had put it in the briefing.  I didn't think

            8    there were any surprises there.

            9            So I would ask the Court to let me call Mr. Young to

           10    testify about the limited topic of his conversations with the

           11    Court or the Court staff, for purposes of today's evidentiary

           12    hearing.

           13            THE COURT:  All right.  Mr. Young?

           14            MR. YOUNG:  Yes, Your Honor.

           15            THE COURT:  Do you still have an objection to

           16    offering that limited scope?

           17            MR. YOUNG:  I do, Your Honor, because Rule 9014-1

           18    wasn't complied with, and the Local Rules are here for a

           19    reason.  The Court's order specifically directed the parties to

           20    comply with all federal rules and all local rules.  The Court

           21    put that in the order itself scheduling this hearing.  So we

           22    would have an objection, and if the Court is going to allow me,

           23    I also want to -- is going to allow testimony on my part, I

           24    want to talk about Rule 3.7 of the Rules of Professional

           25    Conduct as well regarding my participation in the hearing, if

1    the Court's inclined to allow that testimony.

2                MR. SPRAGENS:  Your Honor, could I just briefly

3    respond to that?

4                THE COURT:  Yes.

5                MR. SPRAGENS:  I haven't heard any articulation of

6    prejudice.  I do apologize for failing to follow the local

7    rule, but I -- since we've talked about this subject now for

8    several months, and we briefed the testimony that we're seeking

9    from Mr. Young previously, I don't think there's any unfair

10   surprise.  And I don't think that the very limited nature of

11   the testimony we're seeking, you know, there's any prejudice

12   from filing the list 26 hours in advance of the hearing instead

13   of 48 hours on business days.

14               THE COURT:  Well, I guess here's the question.  Since

15   you've already got Mr. Young's deposition, that's been

16   submitted in the record already, what new is to be gained by

17   further testimony from Mr. Young covering the same ground?  Why

18   not just proceed with your argument?

19               MR. SPRAGENS:  Well, I would be inclined to ask Mr.

20   Young if he stands by all the testimony in that deposition,

21   just to confirm that.  I would certainly be prepared to impeach

22   him with that testimony if he changes his responses, you know,

23   typical of any courtroom testimony.

24               Beyond that, if the Court declines to let Mr. Young

25   testify today, we do have his deposition transcript, and I

1    would ask the Court to take judicial notice of it.

2              THE COURT:  Okay.

3              MR. YOUNG:  And we would have no objection to the

4    entry of that deposition testimony.

5              THE COURT:  All right.  Well, this one is an

6    interesting case, as all parties are aware.  The fact that this

7    case was scheduled last week, so there was an actual additional

8    week to file and comply with all the rules, makes the Court

9    hesitant to extend further grace in this matter.  So the Court

10   is going to sustain the objection lodged by the trustee's

11   counsel, and you may proceed with your argument.  And,

12   obviously, the Court's well aware of the issues.  Mr. Young has

13   given his deposition.  So you're welcome to proceed.

14             MR. SPRAGENS:  Your Honor, the next matter with

15   respect to argument is how -- how I might inquire about the

16   Court's knowledge of ex parte communications between Mr. Young

17   and the Court's office, or the Court's staff.

18             As you know, we attempted to notice your deposition

19   to try to find out what you knew.  You quashed that subpoena.

20   I've tried to list you again as a witness today because we're

21   in a tough situation here as a litigant who is -- I'm trying to

22   find out about ex parte communications between some outside

23   attorneys and the Court, and we don't know what's been said.

24   We don't know who said them.  So --

25             THE COURT:  I think you do know.  You took

1   Mr. Young's deposition, and you have exactly what you have that

2   led to you filing the motion in the first place.  You have my

3   statements on the record.  You may proceed however you like,

4   but the Court doesn't have any knowledge other than what you've

5   already been given.

6            MR. SPRAGENS:  Okay.  Well, if that's the Court's

7   statement on the matter, I appreciate it.  Your Honor,

8   my -- I'll just argue and let you know the way we look at this

9   issue in this case.

10           THE COURT:  And let me clarify.  When you say "we,"

11  Mr. Gabbert, are you joined in with this argument in full or

12  partially?

13           MR. GABBERT:  I'm supporting the motion, Your Honor.

14           THE COURT:  Okay.

15           MR. SPRAGENS:  So, Your Honor, the fact is this

16  Court, in setting up the logistics of depositions, which

17  ordinarily would be occurring at my office when I'm putting

18  forward a witness -- that's routine in my practice.  You know,

19  I've got parking places.  I've got a conference room, and we

20  have depositions there on a weekly or every other weekly basis.

21  You know, Mr. Young made a representation at a hearing that he

22  was not comfortable with that deposition being set in my

23  conference room and with Mr. Manookian testifying there.

24           We stood at this podium and had a discussion about

25  that, and the Court undertook to address the hundred pound

1    gorilla in the room, that's the Court's language, and what the

2    Court said was that my client's "past behavior before the

3    tribunals -- I've had at least two lawyers call the Court and

4    say they don't feel comfortable if your client is going to

5    appear and you know the Court takes those concerns very

6    seriously and makes no conclusion on whether they're valid.

7    They are perceptions which drive behaviors of other parties."

8           That was the first I had ever learned or, you know,

9    my client had ever learned about contact from outside lawyers

10   with the Court about whether Mr. Manookian posed a safety risk

11   or whether other people felt uncomfortable, whatever that

12   means, appearing with him in this court.  We endeavored to

13   learn more about that.  I did ask Mr. Young those questions

14   during his deposition.  I learned about one contact that Mr.

15   Young had had, and that was at the outset of this whole

16   proceeding.

17          Mr. Young testified, on Page 44 of his deposition,

18   that he called this Court's Courtroom Deputy to alert her to

19   the fact that a creditor's lawyer had an order of protection.

20   And he, Mr. Young, represented that this was a logistical

21   question about an order of protection that Dan Puryear had and

22   that he was contacting the Court about that.  He testified he

23   believed that the person he spoke to was Lauren, the courtroom

24   reputy, and the record speaks for himself -- itself that he did

25   not file a motion about this issue.  He did not alert me at any

1  time.  The first we learned about this contact was when the

2  Court mentioned it, assuming the Court is talking about the

3  same telephone call that Mr. Young testified about.

4       So there was an ex parte communication specifically

5  about the safety risk posed by my client.  That was how we

6  started this case, and I first learned about that when the

7  Court mentioned it sua sponte in endeavoring to build a record

8  sua sponte to justify holding depositions in this courthouse

9  instead of in the ordinary course at my office.  So to me, that

10 contact is troubling.  That contact was not disclosed by the

11 Court.  It was not disclosed by Mr. Young, and I learned about

12 it in this courtroom from this Court's, you know, statements on

13 the record.

14       Then there has been apparently another -- you know,

15 you said at least two.  I don't know who the second phone call

16 was.  I don't know what attorney called.  I don't know if it

17 was Mr. Puryear or somebody else, but there have been

18 apparently two phone calls to the Court or its personnel about

19 my client, and the Court formed enough of a view about

20 Mr. Manookian that it departed from the ordinary course in how

21 depositions were to be conducted.

22       I would add that those depositions were completely

23 uneventful.  We all sat in those -- in those rooms down the

24 hall and, you know, I can't prove the counterfactual, but

25 that's how they would have been if they were held at my office

1  too.  I have every reason --

2              THE COURT:  Well, you can't prove that, can you?

3              MR. SPRAGENS:  No, I can't, Your Honor.

4              THE COURT:  Were other depositions taken here in the

5  courthouse?

6              MR. SPRAGENS:  Yes, Your Honor.

7              THE COURT:  So it wasn't just Mr. Manookian's

8  deposition?

9              MR. SPRAGENS:  That's right.  You ordered that all

10  depositions would be taken in the courthouse based on the

11  finding that Mr. Manookian posed some sort of a risk to other

12  parties.  That's my recollection.  I think that was the basis

13  for your ruling.

14              So the -- the issue here is we know about one contact

15  that is, I think, very prejudicial to my client.  I think the

16  fact that we departed from the ordinary course demonstrates

17  that it has tainted the Court's view of my client.  Your

18  comments about his behavior toward the tribunals and other

19  lawyers calling, I believe that that gives a reasonable

20  observer a basis to question this Court's impartiality.

21              And to this day, I don't know about the second

22  contact.  I know that there's been another attorney who's

23  called your chambers, and I don't know who it was.  I don't

24  know what they said, and this Court never came out and

25  disclosed that to us until it served the interest of the ruling

1    that the Court was making.  It never disclosed it on the

2    record.  It never said I think everyone just needs to know

3    about this.  And, certainly, Mr. Young never disclosed his

4    contact to us, didn't get me on the phone to call the Court.

5    And there was nothing emergent about the phone call.  It could

6    have been done through the ordinary adversary process.  It

7    could have been put on the docket.

8             So in our view, the two contacts, the failure to

9    disclose the contacts, the departure from the ordinary course,

10   all provides a reasonable basis to suggest that this Court's

11   impartiality can be questioned.  It is not to say that this

12   Court is a, you know, biased tribunal.  It's not to say that

13   this Court is unfair, and I make no judgments about this

14   Court's, you know, fairness or decency.  It's, obviously, not

15   fun to have to come stand here and argue this motion in front

16   of you.  However, the standard is an objective standard.  It is

17   would a reasonable observer question this Court's impartiality,

18   and I think given the multiple contacts, the lack of

19   disclosure, and the fact that the litigation somewhat sua

20   sponte departed from the ordinary course suggests that a

21   reasonable observer would raise those questions.

22            So that's why we've asked this Court to recuse

23   itself.  It shouldn't slow down the litigation.  There are

24   other bankruptcy judges in this courthouse who can pick right

25   back up where we left off.  If they have formed views of

1   Mr. Manookian, by reading news articles or other interactions

2   they've had with lawyers in the community, they can disclose

3   them.  We can figure out what to do about them, and we can find

4   a bankruptcy judge who doesn't have any knowledge or

5   prejudgment of Mr. Manookian's character or his propensity for

6   some sort of unspecified misconduct.

7           Finally, I would just point out that I don't think

8   there is anything in the record that suggests that he's ever

9   behaved in any sort of dangerous or threatening way in front of

10  a court or in a deposition.  I would just note that for the

11  record.  So if Your Honor has any questions, I'm happy to

12  answer them.  I appreciate the hearing.

13          THE COURT:  Well, are there any documents that have

14  filed in this case from other tribunals?

15          MR. SPRAGENS:  I'm not sure I understand what the

16  Court is asking.

17          THE COURT:  Just that.  There are documents that have

18  been filed on the record in this case from other tribunals.

19  Could that possibly be a way that a court might find out about

20  what's going on in a case?

21          MR. SPRAGENS:  If you're talking about the Williamson

22  County Court in front of Judge Binkley, is that the -- I'm

23  sorry, Your Honor.  I can't -- it feels a little bit like law

24  school where I don't know the answer that you're looking for

25  here, so --

000182                    000182

```
 1          THE COURT:  I'm not looking for an answer at all,

 2   Mr. Spragens.  I -- and disregard -- disregard the question.

 3          MR. SPRAGENS:  Okay.  I mean, to me I don't know

 4   anything in the record in this case that demonstrates some sort

 5   of misconduct toward a tribunal.  If the Court is suggesting

 6   that it contacted another judge to ask about Mr. Manookian, or

 7   something like that, you know, I think that that's also

 8   improper and an ex parte communication.  So I'd love to hear

 9   about that if that is what we're getting at here.

10          THE COURT:  That's not what we're getting at.  So any

11   other argument?

12          MR. SPRAGENS:  No, Your Honor.  Thank you.

13          THE COURT:  All right.  Anything, Mr. Gabbert?

14          MR. GABBERT:  No, Your Honor.

15          THE COURT:  All right.  Mr. Young?

16          MR. YOUNG:  Your Honor, Phillip Young on behalf of

17   the trustee.  I'm going to keep this very brief because this

18   isn't our motion, and the motion seeks relief that's not

19   directly related to the trustee's case.  I'll only note really

20   two things just for the record.

21          I don't think that scheduling depositions at the

22   courthouse is a departure from the ordinary course.  Trustees

23   depose people at the courthouse all the time.  We discussed

24   that at this status conference.

25          I also would note that the Chase -- the orders that
```

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

1    gave rise to the Chase claim, that's what we've referred to it,

2    so the Williamson County orders have in fact been filed in this

3    case on multiple occasions by multiple parties, and I

4    don't -- I think that could certainly form the basis of the

5    Court's opinion about other tribunals.

6         We filed a response in this case at Docket Number

7    174.  The purpose of that response was just to clarify some of

8    the facts and to clarify the law and the issues related to the

9    motion.  But unless the Court has further questions of me,

10   we'll just rely on that response.

11        THE COURT:  All right.  No questions.

12        MR. GABBERT:  Just for the record, I've been

13   practicing in this court for 40 years, over 40 years.  This is

14   the first case I have ever had that depositions have been

15   required at the courthouse without any explanation except that.

16        THE COURT:  All right.  Anything else?

17        MR. SPRAGENS:  No, Your Honor.  We'll rest on our

18   brief and the argument presented today.

19        MR. YOUNG:  Nothing else, Your Honor.

20        THE COURT:  All right.  The Court will take a short

21   recess, and I will rule from the bench.

22        THE COURTROOM DEPUTY:  All rise.

23     (Recess taken at 8:19 a.m.)

24     (Proceedings resumed at 9:17 a.m.)

25        THE COURTROOM DEPUTY:  All rise.

1            THE COURT:  Please take your seats.  All right.  We

2     are here in the Burton v. Hagh, Case Number 20-90002, motion to

3     disqualify.  I will read an oral ruling from the bench at this

4     time.  Court would like to thank counsel for the briefings and

5     the arguments in this case.

6            This matter is before the Court today to address

7     Defendant's motion to disqualify the presiding judge from the

8     case pursuant to 28 U.S.C. Sections 455(a) and (b)(1), and the

9     Code of Conduct for Federal Judges.  Mr. Gabbert advised the

10    Court that he joins in the motion on behalf of the Defendants,

11    Afsoon Hagh and Hagh Law.

12           We opened today with the objection of the trustee to

13    the presentation of any witnesses or evidence based on the

14    motion -- on the movant's failure to comply with Local Rule

15    9014-1.  Mr. Spragens apologized to the Court and stated that

16    there was no prejudice from the filing of the witness list a

17    mere 26 hours prior to the hearing.  That argument begs the

18    question then why have a rule.  The rules are in place to

19    maintain the balance and integrity of these proceedings.  That

20    is why the Court ordered compliance with all applicable federal

21    and local rules in the order setting this hearing.

22           It is also important to note that upon Mr. Gabbert's

23    motion the afternoon before the original hearing, this matter

24    was continued with no witness list filed prior to that hearing

25    or in the week after.  And, finally, as Mr. Gabbert so

 1  graciously reminded the Court, he has been practicing in this

 2  Court for 40 years.  So the rules and procedures are not

 3  unknown to him.  They should, in fact, be second nature.

 4  Therefore, the objection to the presentation of witnesses and

 5  evidence is sustained.

 6          As for the motion, movants allege the -- that

 7  impermissible ex parte communications have occurred between the

 8  Judge, the Judge's chamber staff, and third parties, as well as

 9  Plaintiff's attorney, and this Court failed to disclose these

10  communications.  They also allege that the judge conducted an

11  independent investigation involving extra judicial research

12  into matters regarding Brian Manookian, and these allegations

13  have resulted in a prejudice against Mr. Manookian.

14          Although it appears that it is an impermissible

15  stretch to accuse a sitting judge of having direct

16  conversations with third parties, as well as conducting an

17  investigation regarding a person who is not a party to any case

18  before him, the movants insist that the allegations are so

19  egregious that disqualification is the only judicial -- the

20  only judiciable outcome of their motion.

21          The accusations here are that the judge is prejudice

22  against a potential witness in this adversary proceeding.  The

23  accusations are based on various fragments and snippets, both

24  on and off the record, all attributed to the judge in some

25  convoluted way and that somehow these allegations pieced

1    together, like letters cut from a magazine for a ransom note,

2    contains some legitimacy simply because Mr. Manookian says they

3    do.  The motion is rife with language and projections crafted

4    to incite indignation.  But Mr. Manookian is mistaken to think

5    that such presentation lends legitimacy to an argument relying

6    on a reasonable belief.

7            He is also mistaken to think his judgment rules the

8    day.  Although his belief is the subject of the motion, that

9    belief is also subject to a test for reasonableness.  The

10   determination he seeks is an objective one.  In other words, it

11   is not legitimate simply because he believes it.  It is only

12   valid if a reasonable person would believe the same thing.

13           28 U.S.C. Section 455(a) states any United States

14   judge shall disqualify himself in any proceeding in which his

15   impartiality might reasonably be questioned.  28 U.S.C. Section

16   455(b)(1) states that a judge shall disqualify himself where he

17   has a personal bias or prejudice concerning a party, or

18   personal knowledge of disputed evidentiary facts concerning the

19   proceedings.  Canon 3(c) of the Code of Conduct for Federal

20   Judges is almost identical to 28 U.S.C. Section 455, requiring

21   a judge to remove themselves from a case if there is a

22   reasonable appearance of impartiality, personal bias or

23   prejudice, or personal knowledge of a disputed evidentiary

24   fact.

25           The record, for those of you who might need a

1   refresher, is established by either communicating with the

2   Court while the Court is in session, or by filing something on

3   the Court docket.  The Court is charged with the integrity of

4   the record.  Part of maintaining that integrity involves

5   court -- courts calling for parties to articulate matters on

6   the record.  It is also important to note that the record

7   contains past rulings made by a tribunal in the proceedings, or

8   in the case of a bankruptcy, an adversary to the proceeding.

9   Moreover, courts communicate with the parties to an action via

10  the record.  That is why this Court disclosed the ex parte

11  communications from counsel, regarding the restraining order

12  against Mr. Manookian, on the record in open court.  That is

13  why courts disclose these things.

14        Extrajudicial research, on the other hand, would be

15  information garnered through means other than reading the

16  record.  As independent investigation presumably falls under

17  the category of extrajudicial research, it also would require a

18  source outside the record.  In the matter before us, the record

19  extends back to November 6, 2019, and contains the 168 docket

20  entries in the main bankruptcy case, as well as the 225 docket

21  entries in this adversary proceeding.  Although the movants

22  insist that the judge has been prejudiced against

23  Mr. Manookian, the record reflects no such prejudice.  Although

24  movants insist that requiring the depositions to be held in the

25  courthouse reflects the presence of the Court's prejudice

1    against Mr. Manookian, what it more reasonably reflects is the

2    judge's familiarity with the case.

3              Mr. Spragens stated that Mr. Young called the

4    courtroom deputy to inform her of an order of protection

5    against Mr. Manookian by a creditor's attorney, and that was

6    how we started this case.  First of all, the courtroom deputy

7    is not a member of Judge Walker's chamber staff.  Secondly,

8    that is not how we started this case.  The hearing on March 17,

9    2022, involved cross motions to compel and reflected the

10   biggest issue so far in this adversary, discovery.  In fact,

11   the case is comprised mostly of three years of discovery

12   disputes with rulings reflecting the Court's stamina for

13   fairness and judiciable administration of the case.

14             Mr. Spragens sought to take advantage of the Court's

15   patience by stepping dangerously close to a line with his

16   accusation that this judge may have had communications with

17   judges in other tribunals about his client.  His accusation was

18   with absolutely no basis and was, as I stated, dangerously

19   close to the line drawn by Rule 11.  The fact is the applicable

20   standard here is an objective one applied to facts, not applied

21   to whatever imaginative scenario the movants can conjure up out

22   of thin air.

23             Simply because a ruling does not reflect the stated

24   interest of a party or non-party doesn't mean we default to

25   disqualifying prejudice.  The transcript shows that the

1   decision on March 17, 2022, as on all days, was so that there

2   would be no advantage or disadvantage to any party.

3   Illustrative of this, the order that Mr. Manookian's deposition

4   be scheduled the courthouse.  What is glaringly absent from the

5   motion is the fact that the judge ordered all depositions to be

6   conducted under the same terms in that order.  All parties,

7   including the plaintiff, were to have their depositions at the

8   courthouse.  This was another ruling in another discovery

9   controversy with another clearly objective, reasonable, and

10  fair ruling.

11          Moreover, none of these issues are material to the

12  case.  Material to the logistics of the case, sure.  But given

13  the inability of these parties and these witnesses to conduct

14  discovery without disagreeing about every little detail, it was

15  necessary for the judge to rule on all of the discovery matters

16  and to do so in an equitable, fair, and reasonable manner, and

17  that he did.

18          The expectation of lawyers in the discovery process,

19  as reflected in the applicable rules, is to conduct themselves

20  in a professional, civil, and agreeable manner in order to

21  resolve the case either on the merits or by settlement.  The

22  contentious nature of these discovery proceedings were a beast,

23  one might say a gorilla, with which the Court has tamed as best

24  as possible.

25          Furthermore, this Court never had to rely on

extrajudicial research. Now let's get back to the record for
this one. The record contains the rulings from other tribunals
that have found Mr. Manookian to have acted in bad faith,
engage in a pattern of obfuscation, and conduct himself in a
reckless manner. Specifically, a Williamson County judge found
that Mr. Manookian had knowingly, willfully, and intentionally
violated a protective order and then attempted to mislead that
court about that violation. That judge found Mr. Manookian's
behavior regarding discovery matters to be so egregious that he
imposed significant monetary sanctions against him. All of
this is part of the record in this case.

Additionally, this case did not find that Mr.
Manookian posed a threat. That would be the state court that
issued the restraining order. This Court simply sought to
honor that order, as federal courts do with most state court
orders, and to protect the integrity of the proceedings.
Movants neglect to mention that the judge stated having the
depositions in the courthouse protects everyone, including
Mr. Manookian.

Therefore, although the movants express their
perceptions of bias and prejudice, the record does not support
that as a reasonable view. The record shows not only
evenhanded judgment in this proceeding, but also illustrates
the Court's elevated patience with a painful number of
discovery disputes, including the ones that is the catalyst of

000190                                                    000190

Case 3:23-cv-00918   Document 6-1   Filed 10/13/23   Page 190 of 247 PageID #: 2465
ACCESS TRANSCRIPTS, LLC                     1-855-USE-ACCESS (873-2225)

 1  this motion.

 2          Since any ex parte communication was permissible and

 3  that it was not material, but concerned with security and

 4  administrative procedures within the Court, and because no

 5  extrajudicial research was conducted to impair this Court's

 6  impartiality, it is mandatory that I deny the motion to

 7  disqualify.  Since there was no reasonable possibility that my

 8  objectivity and neutrality has been compromised, it is

 9  incumbent that I remain on the case.  The absence of any

10  reasonable question regarding my impartiality demands that I

11  deny the motion to disqualify.

12          The Court will issue an order containing full

13  analysis and discussion.  The Court will also enter an order

14  scheduling an evidentiary hearing on Mr. Manookian's objection

15  to the motion to compromise in the main case, that hearing

16  being bifurcated into Mr. Manookian's standing issue and the

17  substance of his objections.  Any questions?

18          MR. SPRAGENS:  No, Your Honor.

19          MR. YOUNG:  No, Your Honor.

20          THE COURT:  All right.  Court will be adjourned.

21          THE COURTROOM DEPUTY:  All rise.

22      (Proceedings concluded at 9:32 a.m.)

23                      * * * * *

24

25

1

2                    **C E R T I F I C A T I O N**

3

4          I, Alicia Jarrett, court-approved transcriber, hereby

5    certify that the foregoing is a correct transcript from the

6    official electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9

10

11   _____

12   ALICIA JARRETT, AAERT NO. 428      DATE: May 5, 2023

13   ACCESS TRANSCRIPTS, LLC

14

15

16

17

18

19

20

21

22

23

24

25

FILED

02/04/2021

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 7, 2020 Session

## DAVID CHASE v. CHRIS STEWART ET AL.

### Appeal from the Circuit Court for Williamson County
### No. 2015-200     Michael Binkley, Judge
_____

### No. M2018-01991-COA-R3-CV
_____

A trial court held two attorneys in contempt, assessing damages and sanctions against them. Shortly before another hearing in which the court was to consider a supplemental award of attorney's fees, the judge of the trial court made comments in an unrelated case about one of the attorneys held in contempt. That attorney moved to recuse based, in part, on the judge's comments. The trial court denied the motion to recuse and later entered a supplemental order of damages against the attorneys. Because the judge's comments provide a reasonable basis for questioning his impartiality, we reverse the denial of the motion to recuse. And because retroactive recusal is appropriate, we also vacate the contempt and damages orders.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Brian P. Manookian, Nashville, Tennessee, pro se appellant.

Mark Andrew Hammervold, Elmhurst, Illinois, pro se appellant.

Brian P. Manookian, Nashville, Tennessee, for the appellant, Cummings Manookian PLC.

Mark Andrew Hammervold, Elmhurst, Illinois, for the appellant, Hammervold Law, PLC.

Gayle I. Malone, Jr., Charles I. Malone, and Beau C. Creson, Nashville, Tennessee, for the appellees, Dean Chase, Sandra Chase, and D.F. Chase, Inc.

Marcus M. Crider and Heath H. Edwards, Nashville, Tennessee, for the appellees, CK Global, LLC and NV Music Row, LLC.

## OPINION

## I.

## A.

In this consolidated appeal, we review the trial court's denial of a motion to recuse and its orders holding in contempt and sanctioning two attorneys, Brian Manookian and Mark Hammervold, and their respective law firms, Cummings Manookian PLC[1] and Hammervold Law, PLC. The orders on appeal arise from, but have little to do with, a case filed by David Chase ("Plaintiff") against multiple defendants. Mr. Manookian and Mr. Hammervold represented several of the defendants. Purportedly to defeat an element of the malicious prosecution claim brought by Plaintiff and to prove Plaintiff had not suffered reputational harm, Mr. Manookian subpoenaed individuals and entities that were not parties to the case. The non-parties included Plaintiff's parents, Dean Chase and Sandra Chase; and entities to which Plaintiff had some connection, D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC. Mr. Manookian also sought deposition testimony from Plaintiff's parents.

Wanting to protect confidential information, Dean Chase; Sandra Chase; D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC (collectively, "Petitioners") proposed an agreed protective order before responding to the subpoenas or submitting to the depositions. And, after negotiations, counsel reached an agreement on the terms of the protective order. Among other things, the proposed order defined confidential information, provided methods for both designating information as "confidential" and challenging such designations, and restricted the indiscriminate or mass designation of information as "confidential."

Counsel for Petitioners then proposed that the document production could proceed provided that Mr. Manookian would agree that the production was subject to the protective order despite it not being entered by the court. Mr. Manookian responded: "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." So counsel for Petitioners filed the proposed agreed protective order with the court. The same day, Petitioners produced

---

[1] After briefing in this appeal, Cummings Manookian PLC filed a voluntary bankruptcy petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Tennessee. Late last year, the Chapter 7 Trustee reported that "it is unforeseeable that the bankruptcy case will be resolved before April, 2021, at the earliest."

over 78,000 pages of documents in response to the subpoenas. Petitioners designated all of the documents as "confidential" under the proposed agreed protective order. In a cover letter, counsel for Petitioners stated that, while they "realize[d] that the Protective Order cautioned against mass designation of documents as 'confidential' . . . it would have been unduly burdensome upon our clients to review each of the . . . documents . . . ." Counsel for Petitioners offered to conduct a page-by-page review if Mr. Manookian's clients would pay for it. Counsel alternatively suggested that Mr. Manookian's clients could challenge any "confidential" designation to a specific document or documents.

Mr. Manookian objected to the mass designation and, in a filing with the court, withdrew his consent to the proposed agreed protective order. But, a few days later, he made another filing requesting that the court enter the proposed agreed protective order. Petitioners then filed a motion requesting the entry of a protective order and that the court sustain its confidentiality designations. They set the motion for hearing on October 30, 2015.

Before the hearing took place, Mr. Manookian filed documents and excerpts from the deposition transcripts of Dean and Sandra Chase, all of which had been designated as "confidential," in response to a motion filed by Plaintiff. Counsel for Petitioners appeared at an October 20, 2015 hearing on Plaintiff's motion and made an oral motion. Counsel requested that the court treat as confidential all documents already produced by Petitioners, as well as the deposition testimony of Dean and Sandra Chase. Counsel also requested that the response filed by Mr. Manookian, including the exhibits, be kept under seal. The court granted the oral motion.

At the October 30, 2015 hearing, the court again ruled in favor of Petitioners and ordered that "all pleadings or documents containing, attaching, or referencing documents, testimony, or information designated as confidential . . . were to be filed under seal." And the court "adopted,"[2] with modifications, the proposed agreed protective order. The court ordered that documents designated as "confidential" be protected consistent with the terms of the agreed protective order. The court's oral rulings at the October 20 and October 30 hearings were reflected in written orders entered on November 7, 2015, and November 6, 2015, respectively.

## B.

On February 25, 2016, Dean Chase, Sandra Chase, and D.F. Chase, Inc. moved for sanctions. They claimed that, on February 3, 2016, confidential materials, including video recordings of Dean Chase's and Sandra Chase's deposition testimony, were

---

[2] It is unclear if the court entered the proposed agreed protective order.

3

featured on two television news broadcasts and were also published online. And other media outlets had published stories using the same materials.

While the motion did not specifically allege that either Mr. Manookian or Mr. Hammervold provided the confidential materials to the media, it blamed the pair for use of confidential documents in separate litigation they had filed on behalf of another client against Dean Chase. The motion asked the court to identify who had violated its previous orders and to hold those parties or counsel in contempt and award costs, attorney's fees, and other expenses.

Following a hearing on the motion for sanctions, the court entered an order identifying four attorneys "whose actions in this matter strongly indicate violations of Tennessee Rule of Civil Procedure 37.02 and possible contempt of the orders of th[e] Court." The court granted leave to those "affected by alleged violations of Tennessee Rule of Civil Procedure 37.02 and violations of the corresponding Court Orders [to] file appropriate pleadings for sanctions, listing specifically each violation alleged to have occurred and the specific injury inflicted upon each party." Petitioners did so against three attorneys, including Mr. Manookian and Mr. Hammervold and their respective law firms.

After the hearing, the trial court found Mr. Manookian and Mr. Hammervold in contempt. The court found Mr. Manookian in contempt for using confidential materials in preparing, strategizing, and negotiating the separate lawsuit and in attaching a confidential document to a pleading in that lawsuit. And the trial court also found that Mr. Manookian had disclosed confidential materials to the media after the court had ordered that such documents not be disclosed. The trial court found Mr. Hammervold in contempt for allowing the filing of the confidential document in the separate lawsuit. Though Mr. Manookian made the filing, Mr. Hammervold was his co-counsel. As such, the court held that Mr. Hammervold was responsible as well.

The trial court also sanctioned Mr. Manookian and Mr. Hammervold under Tennessee Rule of Civil Procedure 37.02. The trial court first sanctioned both attorneys for the same actions for which it had found them in contempt. The court then found other actions of the two attorneys sanctionable. As to Mr. Manookian, the trial court sanctioned him for disclosing confidential materials to law enforcement and three attorneys not involved in the case before the court issued any ruling on the protective order. The court categorized those actions as an abuse of discovery. The court also found that he was not candid with the court and attempted to defraud the court. As to Mr. Hammervold, the trial court sanctioned him for Mr. Manookian's disclosure to the media. The court found that Mr. Hammervold "had knowledge of and was complicit in concealing the improper disclosure" from the court. The court reasoned that Mr. Hammervold had also abused the discovery process, failed to be candid with the court, and attempted to defraud the court.

4

Based on its finding of contempt—and, alternatively, its finding of sanctionable conduct—the trial court awarded damages to Petitioners in the form of attorney's fees and expenses against Mr. Manookian and Mr. Hammervold and their respective law firms. Considering affidavits filed by Petitioners' attorneys, the court awarded Petitioners $622,696.12. The trial court also granted counsel for Petitioners leave to supplement their affidavits with fees incurred for time spent preparing for the contempt hearing through the date of the contempt order.

C.

About a month after the contempt order and before the hearing on the supplemental fee request, the judge of the trial court referenced Mr. Manookian while presiding over a hearing in the case of *Elite Emergency Services, LLC v. Nesmith*. In open court, the judge said

> There was a lawyer, Mr. Brian Manookian, who I have released a one-hundred-twenty-two page memorandum and order on, who, among many, many other things, submitted a false and fake package, along with another person, to the Board of Professional Responsibility and the Court of the Judiciary.

> Well, come to find out that it was fake. And it was wrong. Channel 4 News picked it up and made it a headline . . . . Totally false. Totally false.

> The Board of Professional Responsibility saw what it was and said, "We're not going to investigate it, Judge Binkley." And I said, "Oh, please do. I'm begging you to investigate because you know how people are. They'll read half the story and say, 'Ah, that was a put-up. They're helping Judge Binkley out.'"

> I don't want that. I hired a lawyer and I said, "Let's do it right." Full investigation, dismissed, and it should've been. Now, Channel 4 News published it as if it were true. Now, what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?

> And as a judge it's probably good that I don't say a word. It's very difficult. But my day will come. And it's just about here . . . . I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come.

5

After the trial court made these comments, Mr. Manookian, on behalf of himself and his law firm, moved to recuse the judge.[3]  In his recusal motion, Mr. Manookian argued, among other things, that the above comments showed the court's bias against him.  The trial court denied the recusal motion, finding the statements made in open court "irrelevant to the issues in the present case."

Two days after the denial of Mr. Manookian's recusal motion, the trial court awarded Petitioners $126,073.09 in supplemental attorney's fees in a separate order.  In total, then, the trial court held Mr. Manookian, Mr. Hammervold, and their respective law firms jointly and severally liable for $748,769.21.  The trial court designated the original order of contempt and damages and the supplemental order of damages together as a final judgment under Tennessee Rule of Civil Procedure 54.02.

## II.

Mr. Manookian petitioned for an accelerated interlocutory appeal of the denial of his third recusal motion.  *See* TENN. SUP. CT. R. 10B, § 2.01.  And Mr. Manookian and Mr. Hammervold appealed the final judgment of contempt and damages.  We consolidated the interlocutory appeal with the appeal of the final judgment.

The parties' arguments focus both on whether the trial judge should have recused himself and on the merits of the contempt and damages orders.  We find the recusal issue dispositive.  As to that issue, the parties argue over various possible grounds for recusal.  We focus on the trial court's comments about Mr. Manookian in the unrelated proceeding.

### A.

Rule 10B of the Rules of the Supreme Court of Tennessee governs the procedure for "determin[ing] whether a judge should preside over a case."  TENN. SUP. CT. R. 10B.  When a trial court denies a motion to recuse, a party can either take an interlocutory appeal or raise the issue in an appeal after entry of final judgment.  *Id.* § 2.01.  In both scenarios, we review a trial court's ruling on a motion to recuse de novo.  *Id.*

In Tennessee, litigants "have a fundamental right to a 'fair trial before an impartial tribunal.'"  *Holsclaw v. Ivy Hall Nursing Home, Inc.*, 530 S.W.3d 65, 69 (Tenn. 2017) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)); *see Kinard v. Kinard*, 986

---

[3] The previous year Mr. Manookian filed two recusal motions, which were denied.  He sought accelerated interlocutory review of the denial of his first recusal motion.  *See* TENN. SUP. CT. R. 10B, § 2.01.  We affirmed the denial of that motion.  *Chase v. Stewart*, No. M2017-01192-COA-T10B-CV, 2017 WL 3738466, at *4 (Tenn. Ct. App. Aug. 29, 2017).  Mr. Manookian did not seek interlocutory review of his second recusal motion.

S.W.2d 220, 227 (Tenn. Ct. App. 1998) (reasoning that litigants "are entitled to the 'cold neutrality of an impartial court'" (quoting *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967))); *see also* TENN. CONST. art. VI, § 11. It "goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process." *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

Tennessee has long recognized that "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001); *see In re Cameron*, 151 S.W. 64, 76 (Tenn. 1912) ("[I]t is of immense importance, not only that justice shall be administered . . . , but that [the public] shall have no sound reason for supposing that it is not administered."). Of course, a judge should recuse when they have "any doubt as to [their] ability to preside impartially in [a] case." *Davis*, 38 S.W.3d at 564. But a judge must also "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." TENN. SUP. CT. R. 10, Rule 2.11(A). This test is "an objective one." *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008). It requires recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Davis*, 38 S.W.3d at 564-65 (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)).

A party seeking disqualification or recusal must support a recusal motion with an affidavit or declaration and "other appropriate materials." TENN. SUP. CT. R. 10B, § 1.01. When a party brings forward a trial court's comments as evidence to support a recusal motion, we must determine whether the comments "indicate that the judge has prejudged factual issues." *Alley*, 882 S.W.2d at 822. "Any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *Id.*

Here, Mr. Manookian submitted the declaration of Samuel Clemmons. In this declaration, Mr. Clemmons detailed the comments that the trial judge made about Mr. Manookian in the *Elite Emergency Services* case, to which Mr. Clemmons was a party.[4] Petitioners challenge Mr. Clemmons's declaration as "inherently suspect, at best." We disagree. Courts instead presume that testimony provided under oath and

---

[4] Petitioners argue that Mr. Manookian waived the right to seek recusal of the trial judge based on the judge's comments. A party waives the right "to question a judge's impartiality" if the party does not assert the grounds for recusal "in a timely manner." *Kinard*, 986 S.W.2d at 228 (citations omitted). A one-year delay in asserting grounds for recusal constitutes waiver. *Chase*, 2017 WL 3738466, at *3; *In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543, at *6 (Tenn. Ct. App. Aug. 31, 2016). Here, Mr. Manookian filed the third recusal motion twenty-two days after the judge's comments. Under the circumstances, we find that Mr. Manookian acted in a timely manner.

penalty of perjury is true. *See, e.g., Hogue v. Kroger Co.*, 356 S.W.2d 267, 271 (Tenn. 1962) ("This court certainly will not ascribe to the oath-taker the infamy of a perjurious mind. We think, with every presumptive support, that people normally are honest and tell the truth." (citation omitted)). In its order denying the recusal motion, the trial court treated the comments as if they had been made, so we do also.

In his comments, the judge claimed that Mr. Manookian "submitted a false and fake package . . . to the Board of Professional Responsibility and the Court of the Judiciary." The media ultimately "picked it up" and published a "[t]otally false" story about the judge. But, the judge continued, the media published the story "as if it were true." So, the judge wondered, "what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?"

The gist of the comments is that the judge blamed Mr. Manookian for the court's exposure to negative publicity, possibly drawing the scrutiny of the judge's family and friends. The judge was "crystal clear" and "transparent" about not liking that "at all." The court also did not like "many, many other things" Mr. Manookian had done. And the judge envisaged that "my day will come."

Taken in context, "a reasonable person would construe th[e] remarks as indicating" that the judge may have sought retribution against Mr. Manookian for a perceived wrongdoing unrelated to the contempt charges.[5] *See Alley*, 882 S.W.2d at 822. This possible motivation provides "a reasonable basis for questioning the judge's impartiality." *See Davis*, 38 S.W.3d at 564; *see also State v. Cobbins*, No. E2012-02025-CCA-10B-DD, 2012 WL 5266427, at \*22-23 (Tenn. Crim. App. Oct. 25, 2012) (recusal warranted based, in part, on trial court's comments that it was "[m]y time" and "my day had finally come").

Petitioners insist that the trial court was "impartial and entirely fair" to Mr. Manookian and Mr. Hammervold.[6] The record reflects that the judge showed

---

[5] In the order denying the motion to recuse, the trial court provided more context. The judge explained that Mr. Manookian had been providing information about the judge to Mr. Clemmons. Mr. Clemmons then used this information to file a complaint with the Board of Judicial Conduct. That complaint was later dismissed. In the judge's view, Mr. Manookian and Mr. Clemmons "have obviously worked together for the sole purpose of . . . attempt[ing] to publicly embarrass or ridicule the Court."

[6] Petitioners argue that Mr. Hammervold did not properly preserve the recusal issue for appeal. In response to our order directing the parties to respond to Mr. Manookian's Rule 10B petition for recusal appeal, *see* TENN. SUP. CT. R. 10B, § 2.05, Mr. Hammervold, on behalf of himself and his law firm, joined the petition. And as a party, he was entitled to raise the denial of the recusal motion in his brief, which he did. *See* Tenn. R. App. P. 3(h) (broadly allowing any party to raise any issue "upon the filing of a single notice of appeal"). Although Mr. Hammervold did not join Mr. Manookian's recusal motion in the trial court, the Rules of the Supreme Court of Tennessee speak of recusal as to proceedings, not as to parties. *See* TENN. SUP. CT. R. 10, Rule 2.11(A).

extraordinary patience and was thorough in his review of serious allegations against Mr. Manookian and Mr. Hammervold.  We do not conclude that the judge was actually partial.  But that is not the standard for recusal.  *See Kinard*, 986 S.W.2d at 228 ("[T]he public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial.").  Under Tennessee's objective standard, the judge's impartiality might reasonably be questioned.  So the judge should have recused himself.  *See Cook v. State*, 606 S.W.3d 247, 255 (Tenn. 2020) (reasoning that Tennessee's objective standard "'may sometimes bar trial by judges who have no actual bias'" (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))).

Petitioners also contend that, because the judge made the comments after the contempt order, the comments cannot be evidence of any predisposition against Mr. Manookian.  *See Alley*, 882 S.W.2d at 821.  We again disagree.  The unfavorable news story for which the judge claimed Mr. Manookian was responsible ran in February 2017.  And the trial court issued the contempt order in July 2018.  So the impetus for the judge's thoughts about Mr. Manookian may have existed for almost a year and a half before the court entered the contempt order.[7]  That the judge did not air those thoughts until after entry of the contempt order misses the point.

## B.

Having determined that recusal was appropriate, we must consider the impact on the final judgment of contempt and damages.  Retroactive recusal generally is not the appropriate remedy.  *See Watson v. Cal-Three, LLC*, 254 P.3d 1189, 1193 (Colo. App. 2011) ("Recusal provides prospective relief; it does not necessarily invalidate orders previously entered."); 46 AM. JUR. 2D *Judges* § 210, Westlaw (database updated Nov. 2020).  But, in *Liljeberg v. Health Services Acquisition Corp.*, the United States Supreme Court set forth a test to determine whether retroactive recusal is appropriate under the federal recusal statute.  486 U.S. 847, 863-64 (1988).  We find it appropriate to apply the *Liljeberg* test here.  Tennessee courts "may look to federal interpretation of similar federal laws for guidance in enforcing [Tennessee] statutes."  *Van Tran v. State*, 66 S.W.3d 790, 821 (Tenn. 2001) (Barker, J., concurring in part and dissenting in part); *see Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000) (interpreting Tennessee anti-discrimination laws), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010); *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445, 448 & n.2 (Tenn. 1996) (interpreting the Tennessee Uniform Arbitration Act); *Thomas v. Oldfield*, 279 S.W.3d 259, 261-62 & n.3 (Tenn. 2009) (interpreting the

---

[7] Although one of the two hearing dates on the contempt petition occurred before the media story ran, there is still a "reasonable basis for questioning" whether partiality may have affected the trial court's contempt order.  *See Davis*, 38 S.W.3d at 564.

9

Tennessee Rules of Civil Procedure); *State v. Clayton*, 131 S.W.3d 475, 478 (Tenn. Crim. App. 2003) (interpreting the Tennessee Rules of Criminal Procedure). Tennessee's recusal standard is identical to the federal standard, save for noun and pronoun usage. *Compare* TENN. SUP. CT. R. 10, Rule 2.11(A), *with* 28 U.S.C. § 455(a) (2018). And Tennessee courts have often cited the United States Supreme Court with approval on recusal issues. *See State v. Griffin*, 610 S.W.3d 752, 760 (Tenn. 2020) (citing *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1907-09 (2016)); *Cook*, 606 S.W.3d at 255 (citing *In re Murchison*, 349 U.S. at 136); *Bailey v. Blount Cty. Bd. of Educ.*, 303 S.W.3d 216, 239 (Tenn. 2010) (citing *Chapman v. California*, 386 U.S. 18, 23 n.8 (1967)); *Kinard*, 986 S.W.2d at 228 (citing *Offutt v. United States*, 348 U.S. 11, 14 (1954)); *Alley*, 882 S.W.2d at 821 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

The *Liljeberg* test "consider[s] the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. As to the parties in this case, the purpose of the right to impartiality "is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion." *State v. Benson*, 973 S.W.2d 202, 205 (Tenn. 1998) (citing *Chumbley v. People's Bank & Tr. Co.*, 57 S.W.2d 787, 788 (Tenn. 1933)).

As noted above, the basis for the judge's thoughts about Mr. Manookian may have existed for nearly a year and a half before the July 2018 contempt order. It likely existed at least since May 23, 2017, when the trial court entered the order denying an earlier recusal motion filed by Mr. Manookian. That order indicates that, by then, the judge suspected that Mr. Manookian was behind the news story and unfounded complaints about the judge made to the Board of Professional Responsibility and the Court of the Judiciary. The contempt order itself references the Board of Professional Responsibility complaint in an adverse credibility finding against Mr. Manookian. So once the court revealed its thoughts about Mr. Manookian in open court, one might reasonably question whether the court "had reached a prejudged conclusion" as to the contempt order. *See Benson*, 973 S.W.2d at 205. Although the contempt order is the product of over two years of litigation, under these circumstances "there is a greater risk of unfairness in upholding the judgment in favor of [Petitioners] than there is in allowing a new judge to take a fresh look at the issues." *See Liljeberg*, 486 U.S. at 868; *see also Olerud v. Morgan*, No. M2010-01248-COA-R3-CV, 2011 WL 607113, at *2-3 (Tenn. Ct. App. Feb. 18, 2011) (vacating orders of the trial court entered before a recusal motion was filed when the basis for recusal "was discovered . . . after the court entered critical rulings in the case").

Second, to deny retroactive relief could cause injustice in other cases. Our supreme court has cautioned judges about inappropriate remarks. *See Cook*, 606 S.W.3d at 257 (admonishing Tennessee judges "to refrain from [making] inappropriate

comments"); *see also Leighton*, 414 S.W.2d at 420 ("[T]he judge must be careful not to give an expression to any thought, or to infer what his opinion would be in favor of against either of the parties in the trial."). Allowing a remedy for inappropriate remarks even late in the proceedings would encourage judges to reflect on possible grounds for recusal through all phases of a case. *See Liljeberg*, 486 U.S. at 868 (Retroactive enforcement "may prevent a substantive injustice in some future case by encouraging a judge . . . to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.").

Third, allowing the contempt order to stand risks undermining public confidence in the judiciary. Surely, "'justice must satisfy the appearance of justice.'" *Liljeberg*, 486 U.S. at 864 (quoting *In re Murchison*, 349 U.S. at 136); *Cook*, 606 S.W.3d at 255 (quoting same). Here, when the judge mused that "my day will come," the judge also said that day is "just about here"—less than a month before awarding supplemental damages and finalizing the contempt order. And the judge mentioned that he had "released a one-hundred-twenty-two page memorandum and order on" Mr. Manookian, which was the order holding him in contempt. So the basis upon which it is reasonable to question the judge's impartiality is directly connected to the contempt order.

Because the trial court's impartiality might reasonably be questioned, the court should have recused itself. And under the circumstances of this case, retroactive recusal is warranted. In finding retroactive recusal warranted, we express no opinion on the merits of the contempt proceeding.

## III.

We reverse the denial of the third motion to recuse. And we vacate the contempt and damages order of July 20, 2018, and the order awarding supplemental attorney's fees and expenses of September 27, 2018. This case is remanded for reassignment and further proceedings consistent with this opinion.

_____

W. NEAL MCBRAYER, JUDGE

11

# knox news.

---

CRIME & COURTS

# Appeals court removes Tennessee judge from case with lawyer who revealed his secret arrest



**Jamie Satterfield**
Knoxville News Sentinel

Published 10:00 p.m. ET March 21, 2021

A Williamson County judge was convinced a Nashville lawyer with a reputation for legal trash-talking had exposed his secret.

Vengeance, Circuit Court Judge Michael Binkley publicly and repeatedly vowed, would be his.

"My day will come," Binkley told a courtroom of attorneys.

Just weeks later, it did, court records show.

Binkley slapped the attorney, Brian Manookian, and his legal partner with more than $700,000 in sanctions in a hotly contested battle between warring lawyers in a lawsuit.

Now, a state appellate court is booting Binkley off the bench in that case and striking down his sanctions order in an opinion that lays bare the very thing Binkley wanted to hide.

Binkley had been caught in a prostitution sting in 2010, two years before he was elected to the bench. But one of Tennessee's most powerful judges — former Davidson County General Sessions Court Judge Casey Moreland — erased all record of it.

"Once the court revealed its thoughts about Mr. Manookian in open court, one might reasonably question whether the court had reached a prejudged conclusion as to the contempt order," the Tennessee Court of Appeals opinion stated.

"When the judge mused that 'my day will come,' the judge also said that day is 'just about here' — less than a month before awarding supplemental damages and finalizing the contempt order."

Binkley did not return a phone call seeking comment.

## Judicial secrets abound

Moreland was considered one of Nashville's most powerful judges. The FBI would later reveal his dark side: trading court favors for sex, stealing money from the recovery court he founded and hosting trips with fellow judges and lawyers at which prostitutes were hired and marijuana was smoked.

Moreland's dark side was still under wraps, though, when Binkley — then a lawyer who wanted to be a judge — was nabbed in a prostitution sting on Dickerson Avenue in 2010, according to records reviewed by Knox News.

Moreland erased all record of the charge against Binkley the very same day. With his secret safe, Binkley ran for election to the Williamson County bench in 2012 and won.

An anonymous complaint to the Tennessee Board of Judicial Conduct about Moreland's behavior and the secret expungement of Binkley's arrest became public when it was leaked to Nashville journalists in February 2017.

Binkley was convinced Manookian had something to do with that leak, though it's still not clear why the attorney was at the top of his suspect list.

## 'My day will come'

Binkley — who even now refuses to publicly acknowledge his 2010 arrest and Moreland's secret expungement — suspected Manookian as early as May 2017, the appellate opinion states.

Manookian is a wealthy attorney known for his harsh rhetoric in interactions with opposing lawyers and even judges. He's been repeatedly slapped with complaints to the Tennessee Board of Professional Responsibility and has drawn temporary suspensions more than once.

Binkley publicly vowed revenge against Manookian in a speech to attorneys obtained by Knox News and from the bench.

"Now, what do I do when I'm sitting there watching (a media report), and my family is watching it, and all my friends are watching it?" Binkley said from the bench during a case that had nothing to do with Manookian.

"And as a judge it's probably good that I don't say a word," Binkley continued. "It's very difficult. But my day will come. And it's just about here … I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come."

Just weeks later, in July 2018, Binkley hit Manookian with more than $700,000 in contempt sanctions, labeling the attorney a leak and a liar. Manookian said he was innocent of both claims and wanted a new hearing before a new judge.

Binkley refused.

"What people are doing to judges, making up stuff in the media when it's totally false, it's happening," Binkley told a crowd of lawyers in a speech a few months later. "I've never turned in a lawyer in my entire career. But there's one, Brian Manookian, I'm going to turn in. And I've got 70 different examples, and I'm not stopping."

## Court: Vengeance is not yours

Binkley followed through with his threat, filing a series of complaints with the Tennessee Board of Professional Responsibility against Manookian.

Manookian, meanwhile, appealed the sanctions order.

In a ruling issued last month, the appellate court said there was no way the public could have faith in Binkley's fairness to Manookian given the judge's vows of revenge.

"Taken in context, a reasonable person would construe (Binkley's vow of revenge) as indicating that the judge may have sought retribution against Mr. Manookian for a perceived wrongdoing unrelated to the contempt charges," the appellate court ruled.

"Because the trial court's impartiality might reasonably be questioned, the court should have recused itself," the opinion stated.

The appellate court is striking down Binkley's sanctions order and ordering up a new hearing before a new judge. Manookian, meanwhile, is fighting Binkley's board complaints. In a document obtained by Knox News, Binkley is demanding secrecy if he submits to a deposition about his board complaints.

000207                                                                    000207

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | )    **Case No. 3:19-bk-07235** |
| **CUMMINGS MANOOKIAN, PLLC,** | )    **Chapter 7** |
| | )    **Judge Walker** |
| Debtor. | ) |
| | ) |

## BRIAN MANOOKIAN'S OBJECTION TO
## PROPOSED CHASE CLAIM AND SETTLEMENT

Brian Manookian is an attorney and the sole member and owner of Cummings Manookian, PLLC.  For the reasons articulated below, Mr. Manookian objects to the Chase Parties' proposed claim and settlement with the Bankruptcy Estate.  The date to file responses or objections to the Trustee's Motion is July 27, 2021 and the date of the scheduled hearing is August 11, 2021.[1]

## I.     INTRODUCTION

The Chase Claim rests on a judgment in a state court contempt proceeding that has since been vacated by the Tennessee Court of Appeals.[2]  After having their Petition for Rehearing denied, the Chase Parties offered to resolve their claims with Cummings Manookian in exchange for a $0 walk-away and mutual release.[3]  Inexplicably, the Trustee now proposes to ***negotiate up*** that offer to $250,000.

---

[1] The parties have agreed to postpone the hearing date due to a scheduling conflict and will file a proposed agreed order for the Court's consideration after all objectors are identified and consulted.

[2] *Chase v. Stewart, et al.*, No. M2018-01191-COA-R3-CV (Tenn. Ct. App. 2021), attached as **Exhibit 1.**

[3] Correspondence from Charlie Malone, March 18, 2021, attached as **Exhibit 2.**

1

Because the Chase Claim arises entirely out of a vacated and facially frivolous contempt proceeding; because the established and negotiated value of the Chase Claim is zero dollars; and because the negotiations between the Chase Parties and Special Counsel to the Trustee are rife with actual conflict and the appearance of a *quid pro quo*, Mr. Manookian requests that the proposed settlement be rejected.

## II.    FACTS

### A.    The Underlying *Chase v. Stewart* Matter

In 2015, Brian Manookian agreed to represent six defendants, *pro bono*, in a Williamson County Circuit Court case styled *Chase v. Stewart* ("the Chase Matter"). The Chase Matter was a malicious prosecution suit brought by real estate developer David Chase. Mr. Chase had been arrested during the early morning hours of June 8, 2014 for domestic violence after beating his girlfriend. Upon being booked into the Davidson County jail, Mr. Chase contacted attorney Bryan Lewis, who in turn called General Sessions Judge Casey Moreland, who arranged for Mr. Chase to be released from jail – notwithstanding a mandatory hold period – at which time Mr. Chase returned to his home and assaulted his girlfriend a second time, leading to his immediate re-arrest, national headlines, and, ultimately the Chase Matter.

David Chase filed *Chase v. Stewart* contending that various individuals conspired to have him arrested for domestic violence for the purpose of ruining his reputation and depriving him of his burgeoning career in real estate development. Brian Manookian, a partner with the firm Cummings Manookian PLLC, agreed to represent six (6) of the eight (8) defendants in Mr. Chase's lawsuit, and moreover, to do so on a *pro bono* basis.

2

As part of his representation, Mr. Manookian set out to prove that the dismissal of the criminal charges against Mr. Chase were not on the merits, but rather secured as part of a release-dismissal agreement with the Davidson County District Attorney. Doing so would defeat a central element of a malicious prosecution claim, in that the underlying charge must be dismissed on the merits as opposed to resulting from a negotiated settlement.

Toward that end, Mr. Manookian subpoenaed targeted materials from David Chase's employers, business entities, and parents (hereinafter "the Chase Parties"). On August 31, 2015, the Chase Parties responded by filing a Motion for the Entry of an Agreed Limited Protective Order (hereinafter the "ALPO") covering a narrow, specifically defined set of materials that could potentially be viewed as confidential.

The Trial Court never entered the ALPO as submitted by the Chase Parties, and the Chase Parties themselves immediately disregarded its terms. As such, and in the absence of any Order to the contrary, Brian Manookian disseminated certain of the Chase Parties' discovery materials to Media Outlets, the U.S. Attorney's Office, and the Federal Bureau of Investigation.

The Chase Parties responded by petitioning the Trial Court to hold Brian Manookian and Cummings Manookian in contempt of court for purported "violations" of a protective order that did not exist at the time of Mr. Manookian's dissemination.

Deep into the pendency of the years-long contempt proceedings, the Trial Court Judge, Michael Binkley, revealed that he held a pervasive personal animus against Brian Manookian over its belief that Mr. Manookian had filed a complaint with the Board of Judicial Conduct that led to widespread media reporting of the Trial Court Judge's arrest for solicitation of prostitution.

Brian Manookian and Cummings Manookian quickly moved for the Trial Court's recusal. The Trial Court not only refused to do so but began swiftly entering orders finding Manookian in contempt of court and awarding $748,769.21 in civil contempt damages against him and his law firm.

Brian Manookian and Cummings Manookian promptly appealed the Trial Court's Orders; arguing that the Trial Court was required to recuse itself from the matter; that the Trial Court's findings were not based in fact or law, but rather on an extreme, impermissible personal biases; and that, in any event, Brian Manookian and Cummings Manookian could not be held in contempt for violating an Order that did not exist.

**B.    Appointment of Phillip Young as a Receiver in the State Action**

While the Chase Appeal was pending, the Chase Parties filed a collections action asking the Williamson County Chancery Court to create a receivership over Cummings Manookian's accounts receivable and to specifically appoint Attorney Phillip Young as the Receiver to collect the $748,769,21 awarded by Judge Michael Binkley. The State Court did so, and Philip Young immediately began placing liens on Cummings Manookian's receivables and levying them as they came due.

Mr. Young collected tens of thousands of dollars owed to Cummings Manookian, ultimately paying all of that money to himself, and, in the meantime, instituting new adverse proceedings against Cummings Manookian, including seeking monetary awards against Cummings Manookian and asking the Court to hold Cummings Manookian in contempt.

**C.    Appointment of Phillip Young as Special Counsel in this Bankruptcy Proceeding**

While Phillip Young was acting as Receiver in the State Court Action – and while

the Chase Appeal was still pending – Mr. Manookian filed for bankruptcy on behalf of Cummings Manookian; in part, to seek protection from the increasingly punitive actions Phillip Young was taking against Cummings Manookian at the request of the Chase Parties.

The Bankruptcy Trustee petitioned to have Phillip Young – the same attorney who was concurrently pursuing Cummings Manookian's receivables on behalf of the Chase Parties as well as pursuing new sanctions against Cummings Manookian in the State Action – appointed as her Special Counsel in the Bankruptcy matter. Her request was granted over Mr. Manookian's objection, and Phillip Young began serving dual roles as Counsel for the Trustee in Cummings Manookian's Bankruptcy as well as Receiver in the Chase Parties' state court lawsuit against Cummings Manookian; roles in which he continues to serve as of the time of this filing.

**D.     The Court of Appeals' Decision and Denial of Rehearing**

On February 4, 2021, the Tennessee Court of Appeals released its holding in *Chase v. Stewart*. The Court of Appeals vacated the judgment of $748,769,21, finding that Judge Michael Binkley should have recused himself as a result of an appearance of bias; and further finding that the bias had existed for so long as to justify his retroactive recusal.

The Chase Parties petitioned the Court of Appeals for rehearing. Their Petition was denied in a multi-page order issued on March 16, 2021.[4]

**E.     The Chase Parties' Offer of a Walk-Away**

Two days after the Tennessee Court of Appeals denied the Chase Parties' Petition for Rehearing, the Chase Parties sent a settlement letter to Counsel for Brian Manookian

---

[4] *Chase v. Stewart*, Order on Petition for Rehearing, attached as **Exhibit 3**.

offering to "walk-away" from their purported claims against Brian Manookian and Cummings Manookian in exchange for no payment and with all parties executing mutual releases. The letter indicated that the Chase Parties would seek agreement for the "walk-away" settlement on behalf of Cummings Manookian from the Trustee.

## F. The Chase Parties' Unexplained Withdrawal from Negotiations and Simultaneous, Gratuitous Payment of Phillip Young's Fees in the State Action

Days after offering a walk-away settlement on their now-vacated claims, the Chase Parties *sua sponte* and gratuitously announced they had agreed to pay all of Phillip Young's outstanding fees in the State Collections action. This was significant for Mr. Young. As the Receiver of a collections action where the underlying judgment had been vacated, Mr. Young stood the likelihood of not only having his outstanding fees unpaid, but also having Cummings Manookian and the other parties against whom he had seized receivables and which he remitted to himself as Receiver, seek reassessment and repayment.[5]

## G. The Chase Parties New Proposed Settlement with State Receiver / Federal Bankruptcy Special Counsel Phillip Young

Shortly after having gratuitously agreed to pay Receiver Phillip Young's outstanding fees in the State Action, the Chase Parties and Special Counsel Phillip Young in the Bankruptcy Matter entered into a new settlement which is drastically worse for Cummings Manookian than the previously proposed "walk-away," but provides a quarter-million-dollar windfall for the Chase Parties.

---

[5] Indeed, at least one other Defendant in the state collections case, Hammervold PLC, has asked the State Trial Court to refund its receivables which were ultimately paid to Phillip Young. That request is currently pending before the Court. Phillip Young, as Special Counsel in the Bankruptcy matter, has not asked the State Court to refund Cummings Manookian's money paid to Receiver Phillip Young.

In exchange for releasing the <u>vacated</u> claims which the Chase Parties had previously only required a non-payment and mutual release, Special Counsel Phillip Young now proposes to pay the Chase Parties $250,000.

### III.    ARGUMENT

The proposed claim and settlement with the Chase Parties should be rejected. Cummings Manookian has no liability to the Chases.  Cummings Manookian has prevailed twice on appeal.  The Chase Parties have appropriately and recently valued their own claims at $0 by offering a walk-away.  That walk-away was apparently scuttled by new, and dubiously-ethical, negotiations by a conflicted Special Counsel with a result highly suggestive of a *quid pro quo*.

Moreover, the Chases' "claims" which Special Counsel seeks to compromise are facially frivolous and will cost Cummings Manookian nothing to defend – if such claims are even pursued.  The proposed settlement is, at best, not remotely in the interest of the Bankruptcy Estate and, at worst, the result of conflicted self-dealing on behalf of the Chase Parties and Mr. Young.  Brian Manookian, as the sole owner and member of Cummings Manookian, objects to its terms.

### A.    Cummings Manookian Has No Liability to the Chase Parties

As a threshold matter, it bears emphasis that Cummings Manookian has zero current or likely liability to the Chase Parties.  The Chase Parties "claim" is the threat of proceeding with a facially-frivolous contempt petition which has now been vacated and denied for rehearing.  As a result, there is no existing judgment against Cummings Manookian for the Trustee to "compromise," nor is there likely to ever be one.

*1.    Cummings Manookian has Repeatedly Prevailed Against the*
     *Chase Parties on Appeal*

The Chase Parties' Claim, as originally filed in this bankruptcy action, consisted of a $748,000 judgment from the Williamson County Circuit Court. That judgment has now been vacated, and the petition for rehearing has been denied. The only legally-binding basis for the Chase's assertion that Cummings Manookian once owed them money no longer exists. At best and at present, the Chase Parties are left with a set of unproven allegations in a state court contempt proceeding; an action that may not even be currently prosecuted against Cummings Manookian.

2.      *The Chase Parties Existing "Claim" is Properly Valued at a Walk-Away*

As recognized by the Chase Parties, the proper value of their existing "claim" is zero.[6] Following the denial of their Petition for Rehearing with the Tennessee Court of Appeals, the Chase Parties sought to compromise their "claim" against Cummings Manookian and the other parties involved in the contempt proceeding in exchange for a mutual release and walk-away.

The Chase Parties sought a walk-away, in part, because they justifiably now fear being sued for damages by Cummings Manookian to recover the funds that were levied by State Court Receiver Phillip Young. Stated alternatively, Cummings Manookian has legitimate and cognizable claims against the Chase Parties as a result of their seizing funds through Receiver Phillip Young for which they no longer hold a judgment.

The idea that Cummings Manookian would pay any sum of money to the Chase Parties – much less $250,000 – after (1) the underlying judgment has been vacated, (2) the Chase Parties have nevertheless seized funds belonging to Cummings Manookian

---

[6] *See* **Exhibit 2**.

without returning them post-vacated judgment, and (3) the Chase Parties have offered a $0 walk-away and mutual release is farcical.  Rather than act in the Bankruptcy Estate's interest, Special Counsel for the Trustee proposes to negotiate **_up_** Cummings Manookian's liability from $0 to a quarter of a million dollars.

3.     *The Underlying Chase Claims are Facially Frivolous*

In any event, the underlying claims in the contempt proceeding are facially frivolous.  The gravamen of the Chases' Contempt Proceeding is a claim that Brian Manookian violated a protective order by disseminating discovery materials to the media and law enforcement.  But the protective order had not been entered at the time of Mr. Manookian's dissemination.  It is axiomatic that one cannot violate an order that does not exist.  Likewise, one cannot be held in contempt for taking otherwise lawful actions that have not been proscribed by a Court.  Finally, the Chase Parties have conceded they have no damages from Mr. Manookian's actions other than incurring attorney's fees in pursuing the contempt proceeding itself.  The underlying, unproven, and unproveable "claims" the Trustee proposes to settle are facially frivolous.

## B.     THE TRUSTEE HAS FAILED TO INVESTIGATE THE CHASE CLAIM

It is additionally worth emphasizing – because it is emblematic of a consistent issue in this case – that the Trustee appears to have made little to no effort to investigate the Chase Claim or subject it to minimal scrutiny. Special Counsel for the Trustee, Phillip Young, did not even contact the attorneys who represented Cummings Manookian in the appeal or underlying contempt proceedings to evaluate the merits of the claim.

Indeed, it is difficult to address the Trustee's reasoning for proposing a quarter million-dollar settlement with the Chase Parties because no reasoning is ever articulated

in its proposal. The Trustee appears to suggest that there is some uncertainty as to whether the Court of Appeals' opinion impacts the judgment against Cummings Manookian. This is either a deliberate attempt to mislead this Court or a display of profound misunderstanding of basic litigation. The only judgment against Cummings Manookian was the same order that the Court of Appeals entirely vacated.

Likewise, the Trustee appears to suggest that because the underlying contempt proceeding dragged on for a number of years that Cummings Manookian *could possibly* incur costs in defending a renewed proceeding. Preliminarily, this presumes that the Chase Parties will renew the proceeding, which Mr. Manookian believes is highly unlikely. But moreover, it fails to consider (and the Trustee, in fact, failed to even inquire into) Cummings Manookian's costs in defending the prior action: $0.

Cummings Manookian's liability to the Chase Parties is entirely derivative. Cummings Manookian may only be held liable if its agent, Brian Manookian, is found liable. Brian Manookian has – and will continue to – vigorously defend any action by the Chase Parties at no expense to Cummings Manookian.

In sum, the Trustee has neither adequately scrutinized the Chase Claim or articulated any bases in the interest of the Bankruptcy Estate for a significant payment; or why that payment should be $250,000 as opposed to any other randomly selected number. Instead, the Trustee bizarrely frames her proposal as a negotiation down from a vacated $750,000 judgment when, in reality, she has negotiated up from the currently existing $0 obligation and the contemporaneously proposed $0 walk-away.

## C.   SPECIAL COUNSEL HAS NEGOTIATED A DEAL RIFE WITH ACTUAL CONFLICTS AND HIGHLY SUGGESTIVE OF A *QUID PRO QUO*

As articulated above, Special Counsel Phillip Young has significant, ongoing actual conflicts that are particularly egregious in his dealings on behalf of the Bankruptcy Estate with the Chase Parties.  Prior to the Bankruptcy Filing, the Chase Parties sued Cummings Manookian and asked the Court specifically to appoint Phillip Young as the Receiver to levy Cummings Manookian's receivables.  In that role, Receiver Phillip Young has seized money belonging to Cummings Manookian, paid himself that money, and pursued new punitive actions against Cummings Manookian.  The position staked out by Mr. Young as Receiver is undeniably and expressly adverse to Cummings Manookian and beneficial to the Chase Parties – and it continues to be.

In his concurrent role as Special Counsel in Cummings Manookian's bankruptcy, Phillip Young has declined to institute any action to recoup the Cummings Manookian money paid to Receiver Phillip Young in fulfillment of a now-vacated judgment.  And in what is highly suggestive of a *quid pro quo* (and conclusive of an actual conflict), Special Counsel Phillip Young proposes to pay the Chase Parties $250,000 of Cummings Manookian's funds in the Bankruptcy Proceeding shortly after the Chase Parties gratuitously agreed to pay Receiver Phillip Young's fees in the Cummings Manookian collections action.  Particularly in light of their days-earlier offer of a walk-away, this arrangement gives the appearance that the Chase Parties have secured a payment of Cummings Manookian's funds from Special Counsel Phillip Young in exchange for making a payment to Receiver Phillip Young.

Brian Manookian will shortly be filing a comprehensive Motion to Disqualify Phillip Young following receipt of certain materials in the state collections action.  In the

interim, Mr. Manookian objects to the proposed settlement negotiated by Phillip Young

serving dual roles as both Receiver and Special Counsel.

## IV. CONCLUSION

For all of the foregoing reasons, Mr. Manookian objects to the proposed claim and

settlement with the Chase Parties.

Date:  July 27, 2021                                     Respectfully submitted,


                                                        */s/ John Spragens*
                                                        John Spragens (TN Bar No. 31445)
                                                        Spragens Law PLC
                                                        311 22nd Ave. N.
                                                        Nashville, TN 37203
                                                        T: (615) 983-8900
                                                        F: (615) 682-8533
                                                        john@spragenslaw.com

                                                        *Attorney for Manookian PLLC and*
                                                        *Brian Manookian*




## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed July 27, 2021 and
served electronically upon all parties in interest or their counsel as indicated on the
receipt issued by the Court's electronic filing system.


                                                        */s/ John Spragens*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No. 3:19-bk-07235 |
| CUMMINGS MANOOKIAN, PLLC, | ) Chapter 7 |
| | ) Judge Walker |
| Debtor. | ) |
| | ) |

## MOTION TO DISQUALIFY BANKRUPTCY JUDGE CHARLES WALKER

Brian Manookian, through counsel, respectfully requests that Judge Walker recuse himself from this matter.[1]

## I.  INTRODUCTION

This is a Chapter 7 bankruptcy.  The Debtor is Cummings Manookian, PLLC, a law firm.  Brian Manookian is the sole member and owner of Cummings Manookian.  The Trustee seeks approval of a proposed settlement arising out of a now-vacated contempt order.  Mr. Manookian has objected to that settlement, and the Court has scheduled an evidentiary hearing to adjudicate the dispute.

Regrettably, during the pendency of this matter – and after the Trustee sought approval of the disputed settlement – the Court belatedly disclosed that it had engaged in multiple *ex parte* communications about Mr. Manookian, including with counsel for the Trustee.  Despite the Court's unambiguous ethical obligation to disclose the details of

---

[1] A recusal appeal in this matter's companion adversary proceeding is currently pending before the District Court.  Movant respectfully submits that recusal appeal is operative on, and stays, the bankruptcy proceeding as well.  To the extent the Court has concluded that the adversary proceeding recusal appeal does not stay this proceeding, Movant asks the Court to recuse itself in this proceeding as well.

those *ex parte* communications, it has repeatedly refused to do so, instead putting the burden on Mr. Manookian to produce evidence of the Court's own communications. The Court has also prohibited Mr. Manookian from discovering the extent of the *ex parte* communications directly from the Court itself.

The Court declined to disqualify itself in a related adversary proceeding in this matter, issuing multiple strongly worded orders about Mr. Manookian and Mr. Manookian's counsel over their attempts to seek disclosure of the Court's *ex parte* communications. As detailed below, multiple statements in those orders confirm that the Court harbors evident bias against Mr. Manookian.

## II.  LEGAL STANDARD

Canon Three of the Code of Conduct for Federal Judges provides that the Court shall not have *ex parte* communications, except in limited circumstances, and even then must give all parties prompt notice of the communications and an opportunity to respond.

> Except as set out below, <u>a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers</u>. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, <u>the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested</u>. A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;
>
> (c) obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the

person to be consulted and the subject matter of the advice
and affording the parties reasonable opportunity to object and
respond to the notice and to the advice received; or

(d) with the consent of the parties, confer separately with the
parties and their counsel in an effort to mediate or settle
pending matters.

Emphasis Added.

The Tennessee Rules of Professional Conduct are likewise clear that attorneys may

not engage in *ex parte* communications with the Court.  Rule 3.5 states that, "A lawyer

shall not seek to influence a judge, juror, prospective juror, or other official by means

prohibited by law; communicate ex parte with such a person during the proceeding unless

authorized to do so by law or court order."

Finally, Federal law mandates that "[a]ny justice, judge, or magistrate judge of the

United States shall disqualify himself in any proceeding in which his impartiality might

reasonably be questioned."  28 U.S. Code § 455(a).  Engaging in improper *ex parte*

communications in violation of the Federal Code of Conduct for Judges is, definitionally,

conduct resulting in a judge's impartiality being reasonably questioned.  Failing to

disclose *ex parte* communications under these circumstances likewise gives rise to

reasonable questions about a judge's impartiality.

### III.  FACTUAL BACKGROUND

**A.      The Bankruptcy Court Engages in *Ex Parte* Communications About Mr.
Manookian.**

On March 17, 2022, the Court opined from the bench that Mr. Manookian was the

critical witness in this matter; stating that "most of this is going to be driven by additional

information that's available, not to the Trustee at this moment, but is locked away deep

inside Mr. Manookian's brain somewhere." (Doc. 161-1, Transcript at P. 49:2-5). Judge Walker went on to state that, with respect to critical questions of fact regarding the Debtor, "Mr. Manookian holds the keys to the kingdom. Id. at 49:15-16.

As the hearing progressed, the Court ordered, over objection, that certain depositions involving Brian Manookian be held in a secured location in the courthouse. Counsel for Mr. Manookian raised routine, logistical arguments in opposition to this directive, primarily about parking and cost to travel downtown when depositions are routinely taken at attorneys' offices.

Surprisingly, in order to justify its rationale for this Order, the Court raised what it termed the "100 pound gorilla in the room on that issue," namely, what Judge Walker believed to be Manookian's "past behavior before the tribunals."

The Court then said, "I've had at least two lawyers call the Court and say they don't feel comfortable if your client is going to appear, and, you know, the Court takes those concerns very seriously and makes no conclusion on whether they are valid, they are perceptions which drive behaviors of other parties." Dkt. No. 161-1, Transcript of Pretrial Conference, Page 84:11-23 (Emphasis Added).

At that hearing, well over a year into bench-trial cases over which he would preside, Judge Walker suprised Movant by casually admitting having participated in multiple *ex parte* conversations regarding Brian Manookian, the same very individual he had just identified as the key witness in the bankruptcy and adversary proceedings; but moreover, the Court then began holding forth on why it found Brian Manookian to be a particularly dangerous or unstable litigant: "[Brian Manookian's] past behavior before tribunals" justify ordering that depositions be conducted at the Courthouse over "security concerns" about Mr. Manookian.

As explained below, the Court's comments were not only factually wrong – Mr. Manookian has conducted hundreds of depositions without incident, and no court has ever found that he acted even remotely inappropriately, much less in a physically threatening manner, during a deposition – they betrayed animus toward the very person that Judge Walker has gone to great lengths to identify as the central factual witness in this case. And that animus is not based on evidence or past proceedings in the case, as nothing before the Court suggested that Mr. Manookian posed a security concern or had conducted himself inappropriately.

Indeed, the Court's views on Mr. Manookian can only be based on the Court's *ex parte* communications, which the Court acknowledged in its remarks during the hearing, or on extrajudicial investigation by the Court.  Unfortunately, as briefed in the companion proceeding, the Court declined in the March 17, 2022 hearing – and continues to refuse – to provide any meaningful detail about its *ex parte* communications about Mr. Manookian, a key party and witness in this case.

**B.      The Bankruptcy Court Declines to Disclose the Substance of its *Ex Parte* Communications or Promptly Rule on a Motion to Disqualify**

After obtaining the transcript of the hearing, Mr. Manookian along with the Adversary Party Defendants promptly filed a motion asking the Court to disqualify itself and detail the dates, substance of, and parties to each of its *ex parte* communications, pursuant to 28 U.S.C. § 455(a) & (b)(1) and Canon Three of the Code of Conduct for Federal Judges (prohibiting judges from engaging in *ex parte* communications about a pending matter and, in the event an unauthorized *ex parte* communication is received, requiring prompt disclosure of the subject matter and an opportunity for the parties to respond).  Dkt. No. 161.

Rather than ruling on the motion or making the compulsory disclosure, the Court set an evidentiary hearing, on its own initiative, calling for "[p]resentation of evidence" on the motion, but not until more than six weeks later on June 29, 2022.  Dkt. No. 165.

The Court did not explain how or why it expected to receive testimonial evidence on the disqualification motion, nor did it explain how Manookian could obtain evidence regarding the Court's own only recently revealed *ex parte* communications— definitionally known exclusively to the Court and not Manookian.

The Court did not — and to this day, has not — disclosed any additional information about the *ex parte* communications that formed the basis of its March 17, 2022 ruling.

## C.   The Court Prevents Manookian from Obtaining Discovery in Advance of the Evidentiary Hearing and Again Declines to Recuse or Disclose the Substance of its *Ex Parte* Communications

Facing an evidentiary burden and lacking information about the newly disclosed *ex parte* communications, Manookian reluctantly availed himself of the one tool a litigant can use to obtain evidence for presentation to a Court: a deposition.  He noticed a limited deposition of Judge Charles M. Walker to take place two weeks before the evidentiary hearing set and insisted upon by Judge Walker.

Notwithstanding the atypical conduct of the Bankruptcy Judge in setting an evidentiary hearing on its own recusal without providing information necessary for a party to, a party noticing a deposition of a judge is admittedly and undoubtedly atypical.  Sensitive to that fact, Manookian went out of his to ensure his request was minimally invasive and limited solely to their pending motion.  To that end, Manookian specifically confined the scope of the deposition to two topics of inquiry: (1) Judge Walker and his staff's communications about this matter with third parties outside of court proceedings

and (2) Judge Walker and his staff's investigation into this matter, the parties, or witnesses outside of the Court record. Dkt. No. 177.

Within twenty-four hours of filing the Notice of Depositions, the Court issued an order *sua sponte* quashing the Notice and declaring it unenforceable. Dkt. No. 178. Consistent with his earlier actions, rather than take the opportunity to disclose the substance or details of his *ex parte* communications, Judge Walker used the order to variously attack Manookian and the movants; accuse them of "tainting the proceedings"; and to assign improper motives to their attempt simply to discover information that Judge Walker himself was required to disclose as a result of extrajudicial communications that did not involve Manookian.

Evidence of the same is saturated through the Order. Declining its fourth opportunity to simply provide a reasonable or innocent explanation for the *ex parte* communications, the Court wrote:

- "As to the first consideration, the Court finds that the Notice serves no purpose other than to waste the resources of the United States for private purposes… and is a misuse of the resources available in order to avail oneself of the justice provided by the bankruptcy system." Dkt. No. 178.

- "The request is inappropriate as the request for testimony from the sitting judge serves no purpose other than to taint the proceedings before the Court." *Id.*

- The request for testimony of the judge sitting on the case is sought in order to contaminate the exercise of judicial and quasi-judicial responsibilities by federal judicial personnel." *Id.*

- For the twelfth and thirteenth factors, deposing the judge on a case is a manipulation of the judicial system in an effort to taint the proceedings." *Id.*

Having refused to promptly or voluntarily disclose the substance of his *ex parte* communications, Judge Walker prohibited Manookian from discovering the same via his testimony after unilaterally setting the matter for an evidentiary hearing.

Another point is necessarily made. Judge Walker referenced having "multiple" communications with more than one attorney. Manookian was able to question only one party during discovery – Counsel for the Trustee – about whether he had engaged in such communications. He admitted having done so but denied any specific recollections a year later. The problematic nature of his purported lack of recollection is compounded by the Judge's refusal disclose details about the *ex parte* communications; importantly the Court referred to *multiple such ex parte* conversations, but only one such conversation has ever been identified.

At the eventual evidentiary hearing the Court declined to permit argument or evidence, and refused to provide an accounting of the *ex parte* communications.

Instead, the Court read a statement into the record that that it would decline to rule on the motion as a result of the appeal of his order quashing the notice of his deposition. Dkt. No. 182.

**D. Manookian Appeals Judge Walker's Order Quashing the Subpoena to Himself regarding his *Ex Parte* Communications**

After Judge Walker quashed the subpoena to himself seeking details of his *ex parte* communications, Manookian appealed, seeking an interlocutory ruling requiring the Bankruptcy Court to detail the substance of its *ex parte* communications, or in the alternative, to disqualify Judge Walker. *Manookian PLLC v. Burton*, Case No. 3:22-cv-00474.

Following briefing on the matter, the Court held that interlocutory appeal was not warranted, and that Manookian's request to disqualify Judge Walker in the adversary proceeding was not yet ripe, given that Judge Walker, himself, had not yet ruled upon the motion. *Manookian PLLC v. Burton*, Case No. 3:22-cv-00474.

## E.     Judge Walker Denies the Motion to Disqualify, Mistakenly Relying on a Long-Vacated State Trial Court Order

With the appellate stay lifted, on April 4, 2023, the Bankruptcy Court took up the hearing on the Adversary Parties' Motion to Disqualify Judge Walker.  Judge Walker denied the motion at the hearing and entered his written order detailing his reasoning and analysis the following day.  (Dkt. No. 229).

Notably, the Court – once again – refused to actually provide any detail of the content of the Court's *ex parte* communications or even the participants to the conversations.  Instead, he repeatedly *suggested* (without actually stating)  that any such *ex parte* conversations he'd referenced were possibly administrative or logistical in nature; accused Movants and their attorneys of attempting to weaponize the issue; and yet again markedly declined simply to detail who he or his staff spoke to, the dates of the conversations, what was said, or why he did not promptly alert the other parties to the communications, as is required by the judicial code of conduct, and it is required for good reason.

Relying on that long-vacated order – whose reversal had been filed with the Bankruptcy Court more than a year prior – Judge Walker stated:

> The record contains the rulings from other tribunals  that have found Mr. Manookian to have acted in bad faith,  engage in a pattern of obfuscation, and conduct himself in a   reckless manner. Specifically, a Williamson County judge found that Mr. Manookian had knowingly, willfully, and

9

intentionally violated a protective order and then attempted to mislead that court about that violation. That judge found Mr. Manookian's behavior regarding discovery matters to be so egregious that he imposed significant monetary sanctions against him. All of this is part of the record in this case. (Transcript of Hearing on Motion to Recuse Judge Charles M. Walker (Docket No. 161) 21:2-11)), April 4, 2023. *Also,* Finding in Order Denying Recusal (Docket No. 229 at 16).

Judge Walker's reliance on a long-vacated order, by a state court judge who was then *disqualified as a result of his bias against Mr. Manookian*, is perfectly emblematic of the reasons the Court is required to recuse here. A reasonable observer would question the Court's impartiality in this matter. Moreover, the Court's own statements evidence apparent bias against Mr. Manookian.

## IV. ARGUMENT

### A. The Court Engaged in Multiple *Ex Parte* Communications regarding Brian Manookian that Require Disqualification.

The Court is required to disqualify itself from this matter because it engaged in multiple prohibited *ex parte* communications about Brian Manookian and this proceeding[2] with "at least two [unidentified] lawyers" while this action has been pending.[3]

The Court then failed to promptly notify the parties of its repeated *ex parte* conversations as required by the Code of Conduct for United States Judges.[4] Instead, the

---

[2] Brian Manookian is the sole member of the Debtor, Cummings Manookian, and the Sole Member of the Defendant, Manookian PLLC.

[3] Transcript of Pretrial Conference and Motion Hearing, March 17, 2022, Pages 84:15-85:11. On April 21, 2022, the Manookian Parties learned that the Trustee, through her Special Counsel, has additionally had at least one improper *ex parte* communication with the Court. Deposition of Phillip Young, Transcript Forthcoming.

[4] Code of Conduct for United States Judges, Canon 3(A)(4).

Court only disclosed their occurrence much later, and only then to justify the Court's order that depositions in this matter be conducted at a secure courthouse location.  In doing so, the Court attributed its order to unarticulated "concerns" about Brian Manookian which were communicated directly to the Court by undisclosed attorneys in various *ex parte* phone calls, but that neither the Court nor those attorneys disclosed to Mr. Manookian.

As a result, Manookian was never able to respond to the *ex parte* representations, or even make a record regarding those improper communications for review by a superior court.  To this day, potentially years after the *ex parte* communications in this still-pending case, Manookian thus remain in the dark as to the substance of those prohibited communications, although their clear corrosive effect on the proceeding has become clear.

The Court and the as-yet unidentified attorneys have, intentionally or not, engaged in conduct that violates multiple provisions of the Code of Conduct for United States Judges as well as the Rules of Professional Conduct governing attorneys licensed in Tennessee.[5]

The Court's repeated *ex parte* communications with practicing attorneys, regarding this case and the parties to it, which were not disclosed at the time, and only revealed in order to support a subsequent ruling, require recusal.  The Court's additional comments about whatever it believes "Mr. Manookian's past behavior" consists of, also require recusal.

---

[5] *Id. See, also*, Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.5, Impartiality and Decorum of the Tribunal ("A lawyer shall not seek to influence a judge, juror, prospective juror, or other official by means prohibited by law; communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order.").

Both statements reveal that this Court has engaged in prohibited *ex parte* communications and independent investigations, and also incorporated and relied upon the information gained in those improper exercises in its rulings and approach to this case.

28 U.S.C. § 455(a) states that "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This recusal standard is objective; the relevant inquiry is whether a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986) (internal quotation marks omitted), aff'd, 486 U.S. 847 (1988); *see Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc. (In re Continental Airlines Corp.)*, 901 F.2d 1259, 1262 (5th Cir. 1990); *In re Faulkner*, 856 F.2d 716, 720-21 (5th Cir. 1988).

The Court's conduct in conducting and allowing repeated *ex parte* communications; failing to promptly disclose the occurrence of those communications; failing to ever disclose the total substance and participants to those conversations; conducting apparent independent investigations into this matter; and relying upon both improper sources of information require immediate recusal. It further requires full disclosure of the circumstances and substance of the *ex parte* communications and independent investigation.

**B.    The Court's refusal to make the required disclosures de facto creates the appearance of impropriety and give rise to a reasonable questioning of its impartiality.**

The federal statute on recusal is found at 28 U.S.C. § 455. Section 455(a) states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself

in any proceeding in which his impartiality might reasonably be questioned." The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned.

A reasonable person would conclude that Judge Walker's impartiality might reasonably be questioned given the following chain of events:

1. Judge Walker receives and engages in multiple *ex parte* communications "with at least two lawyers" who "call[ed] the Court" to raise "serious concerns" about "your client [Brian Manookian]."[6] Judge Walker does not disclose those conversations promptly on the record.

2. Over a year later, Judge Walker first mentions his *ex parte* communications in open court as justification for a contested ruling. Judge Walker again does not take the opportunity to disclose the details of the *ex parte* communications on the record.

3. When Movants promptly seek Judge Walker's belated disclosures and recusal via written motion, Judge Walker sets the request for evidentiary hearing (despite the fact that he is the sole holder of such evidence known to Manookian). In setting the hearing, Judge Walker again declines the opportunity to disclose the details of the communications at issue on the record.

4. After Manookian issues a subpoena to Judge Walker on the limited topic of his *ex parte* communications, Judge Walker quashes the subpoena in written order taking the time to excoriate Manookian and his motives; but again, refusing to simply detail the *ex parte* communications on the record.

---

[6] Transcript of Pretrial Conference, Page 84:11-23.

5.   When the Adversary Parties appeal the quashing of their subpoena, Judge Walker requires the parties to appear for an in-person hearing where, after assembling the parties, he simply reads a statement into the record that he will not act on the matter while subpoena is on appeal. Having summoned all to the Courthouse to read a statement into the record, Judge Walker again refuses include within that record any details of his *ex parte* communications.

6.   Judge Walker holds the lengthy, in-person recusal hearing, during which he refuses to testify or otherwise disclose any details of the very communications at issue – known to him and required to be disclosed by the U.S. Code of Conduct.

7.   Judge Walker denies his recusal in a lengthy written order, largely relying on a long-vacated state court order regarding Brian Manookian. In authoring that order, Judge Walker again refuses to simply disclose, or otherwise explain, the details of the very *ex parte* communications upon which the controversy hinges.

These facts would lead any objective observer to question Judge Walker's impartiality.  Indeed, no objective observer <u>would fail to question</u> Judge Walker's impartiality given these facts and the seven (7) discrete occasions upon which Judge Walker either in person, or in writing, declined to comply with a Canon of Judicial Conduct whose fundamental purpose is to ensure impartiality.

It is exceptional that a sitting federal bankruptcy judge would reveal having participated in multiple *ex parte* communications and not only refuse to voluntarily disclose their details, but actively block measures to discover their contents and the identities of the parties thereto.  Indeed, Movant is unable to find an analog in federal

case law because this simply does not appear to happen. But commenters have cataloged the effect of such behavior in state courts.

"Failure to disclose a conversation and its contents creates the appearance of impropriety." Leslie W. Abramson, The Judicial Ethics of *Ex parte* and Other Communications, 37 Houston Law Review 1343, at 1375 (2000). Emphasis added. Citing *Bell v. State*, 655 N.E.2d 129, 132 (Ind. Ct. App. 1995) (holding that "the trial judge created an appearance of impropriety" by "failing to fully disclose the extent of his [*ex parte*] conversation"); *Niblock v. State*, 711 P.2d 771, 772-73 (Kan. Ct. App. 1985) (deferring to the state's supreme court to determine an ethical violation where the trial judge responded to a letter from state corrections officials and then presided over a hearing presenting the same issue without revealing the letter to the parties or counsel).

"A trial judge's failure to disclose participation in a banned communication or reveal its contents will likely result in the conclusion that the judge engaged in an ethical violation." *Abramson* at 1376 (citing *State v. Rich*, 907 P.2d 1382, 1383-84 (Ariz. 1995) (en banc) (placing the burden on the appellee to prove that there was no reversible error where the judge failed to disclose an improper *ex parte* communication with the jury)); *In re Wheatley*, 697 N.E.2d 938, 941 (Ml. App. Ct. 1998) (vacating and remanding where the trial judge created the appearance of impropriety by failing to disclose the receipt of an improper *ex parte* communication).

The reasoning underpinning these decisions is sound and in accord with the federal rules governing disclosure of *ex parte* communications. The very act of refusing to do so shakes the confidence of parties to the proceedings.

A judge's refusal to simply follow the rules put in place to protect the integrity of the proceedings is, itself, de facto grounds for a reasonable observer to reasonable

question the judge's impartiality.  Judge Walker has, for reasons known to him, decided that he will not disclose or otherwise detail the multiple conversations he acknowledged having with at least two lawyers about this case.  That decision requires disqualification.

## C. The Bankruptcy Judge's Actions in Response to Efforts to Discover the Content, Identities, and Extent of *Ex Parte* Communications Warrant Disqualification.

The Bankruptcy Court's response to Mr. Manookian's request that he simply make the disclosures already required by the Judicial Code of Conduct confirms the need for his disqualification.  Rather than simply make the disclosure, Judge Walker issued a vitriolic order repeatedly asserting that Manookian had acted with improper motives.  These are those statements as to Manookian's Request that the Judge simply comply with the existing Federal Judicial Canon:

- "The request is inappropriate as the request for testimony from the sitting judge serves no purpose **other than to taint the proceedings before the Court.**" Dkt. No. 178. Emphasis Added.

- The request for testimony of the judge sitting on the case is sought **in order to contaminate** the exercise of judicial and quasi-judicial responsibilities by federal judicial personnel." Dkt. No. 178. Emphasis Added.

- For the twelfth and thirteenth factors, deposing the judge on a case is a manipulation of the judicial system **in an effort to taint the proceedings**." Dkt. No. 178.  Emphasis Added.

Strikingly, the Court made its view of a litigant plain, concluding that he was attempting to "manipulat[e] the judicial system" and trying to "taint the proceedings"— when, in fact, Mr. Manookian was trying to meet an evidentiary burden incorrectly imposed by the Court when it set an evidentiary hearing on a recusal motion about *ex parte* communications known only to the Court.  Setting aside every prior argument in

this brief, this Court's own rulings confirm that the Court no longer meets the objective criteria required to preside over this case. The Court has deemed the mere attempt to gain information about the Court's *ex parte* communications as not only a personal attack, but an effort to "taint" and "contaminate" the proceedings, summarily concluding that Mr. Manookian acted with improper motives. A reasonable observer would conclude that the Court's impartiality is in question, and the interests of justice would be served by another bankruptcy judge handling this case.

Finally, the Court's reliance on a vacated state court order to justify its comments about Mr. Manookian additionally confirms the Court's evident bias against Mr. Manookian. The specific order from which Judge Walker quoted and relied on as the basis for his rulings was issued and authored by a state-court judge who was subsequently removed from that case by the Tennessee Court of Appeals as a result of evident bias against Mr. Manookian. Moreover, as the Court was or should have been aware, the quoted order had long been vacated by the time the Court relied upon it.[7]

## V. CONCLUSION

For all these reasons, the Court should conclude that disqualification is warranted and required by controlling law. Moreover, the Court should detail the dates, substance of, and parties to each of its *ex parte* communications about Mr. Manookian as well as details of any independent investigation it conducted.

---

[7] In the same order the Court stated that Mr. Manookian had been "disbarred by the Tennessee Supreme Court." That statement was not only unrelated to the issue to be resolved, but it was and is false. It is unclear where the Court obtained that information that was apparently material to its ruling about Mr. Manookian, and it provides further reasonable grounds to question the Court's impartiality.

Date:  August 23, 2023                    Respectfully submitted,


                                          */s/ John Spragens*
                                          John Spragens (TN Bar No. 31445)
                                          Spragens Law PLC
                                          311 22nd Ave. N.
                                          Nashville, TN 37203
                                          T: (615) 983-8900
                                          F: (615) 682-8533
                                          john@spragenslaw.com

                                          *Attorney for Manookian PLLC and*
                                          *Brian Manookian*


### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed August 23, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                          */s/ John Spragens*

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No: 3:19-bk-07235 |
| | ) | Chapter 7 |
| | ) | Judge Walker |
| Debtor. | ) | |

**<u>TRUSTEE'S RESPONSE TO</u>**
**<u>MOTION TO DISQUALIFY BANKRUPTCY JUDGE CHARLES WALKER</u>**

Jeanne Ann Burton, Chapter 7 Trustee herein, by and through special counsel, hereby respectfully responds to Brian Manookian's Motion to Disqualify Bankruptcy Judge Charles Walker (Doc. 187) (the "Recusal Motion"), as follows:

1.      The Recusal Motion filed by Brian Manookian in this matter on August 23, 2023 is strikingly similar to the one he and Manookian PLLC filed in Adversary Proceeding No. 3:20-ap-90002 (the "AP"), which was docketed at Docket No. 161 in the AP.  Because the Trustee has already responded to these allegations and calls for recusal once (and the Court denied Mr. Manookian's motion), she incorporates herein by reference her Response to Brian Manookian and Manookian PLLC's Motion to Disqualify Bankruptcy Judge Charles Walker (the "AP Response") filed in the AP at Docket No. 174.

2.      Not only is the Recusal Motion without substantive merit, Brian Manookian is procedurally barred from once again raising this issue, for two reasons.  First, the Recusal Motion should be denied due to collateral estoppel.  The doctrine of collateral estoppel "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action."  *In re Markowitz*, 190 F.3d 455, 461 (6th Cir. 1999).  "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects

their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-54 (1979).

3.     Where a federal court has previously made a finding or entered an order, federal law of collateral estoppel must be applied. *J.Z.G. Resources v. Shelby Ins. Co.*, 84 F.3d 211, 213-14 (6th Cir. 1996). Under federal law, the following elements must be satisfied in order for collateral estoppel to apply:

> (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation;
> (2) the issue was actually litigated and decided in the prior action;
> (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation;
> (4) the party to be estopped was a party of the prior litigation (or in privity with such a party); and
> (5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Hammer v. INS*, 195 F.3d 836, 840 (6th Cir. 1999).

4.     All five elements for collateral estoppel are clearly and unequivocally met in this matter. This Court conducted a hearing on April 4, 2023 in the AP in which it considered a motion to recuse filed by Mr. Manookian. After conducting the evidentiary hearing, the Court denied Mr. Manookian's recusal request (Doc. 229). Mr. Manookian is making the exact same allegations and arguments in the Recusal Motion as were previously made, and denied, in the AP. This recusal issue (1) is the identical issue that was previously resolved in the AP; (2) was litigated and resolved in the AP; (3) was essential to the outcome of that matter; (4) involves the same party, as Mr. Manookian was involved in the prior recusal motion; and (5) involves a party that had an opportunity to, and indeed did, participate in the prior litigation. As such, Mr. Manookian's thinly veiled attempt to relitigate the recusal issue in this matter is barred by the doctrine of collateral estoppel.

2

5.      Second, for the reasons stated by the Trustee in her Motion to Strike Brian Manookian's Objection and to Preclude his Participation in the September 29, 2021 Hearing for Lack of Standing (Doc. 136) (the "Standing Motion"), Mr. Manookian has no standing in this matter (the main bankruptcy case) to request Judge Walker's recusal. The Trustee hereby incorporates by reference the Standing Motion.

WHEREFORE, for all of the foregoing reasons, the Trustee respectfully requests that the Court immediately deny the Recusal Motion and grant the Trustee such other relief as the Court deems necessary and appropriate.

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:    (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

3

## Certificate of Service

The undersigned hereby certifies that a copy of the preceding document was electronically filed and served via the Court's ECF system this 24th day of August, 2023.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:     (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

4




Charles M. Walker
U.S. Bankruptcy Judge
Dated: 8/28/2023

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE: )
)
Cummings Manookian, PLLC, )
)
Debtor. )
)
_____ )
.

Case No: 3:19-bk-07235
Chapter 7
Honorable Charles M. Walker

**ORDER DENYING**
**MOTION TO DISQUALIFY JUDGE CHARLES WALKER**

THIS MATTER is before the Court on the motion of Brian Manookian ("Movant") to

disqualify Judge Charles Walker (ECF. #187). The Trustee has filed a Response (ECF. #188), and

the Court has reviewed the pleadings and finds that the motion fails for the following reasons:

a. <u>Untimeliness</u>

On May 5, 2022, in adversary 3:21-ap-90002, Brian Manookian and Manookian PLLC

(" Adversary Movants"), filed a Motion to Disqualify Bankruptcy Judge Charles Walker

("Adversary Motion"). That motion cited to remarks made on the record in a hearing held by

Judge Walker on March 17, 2022 ("the Hearing"), over a year before the filing of this Motion

("Bankruptcy Motion"). The eighteen months that have passed since the events that are alleged

to support recusal render this Bankruptcy Motion untimely. See *In re Haas*, 292 B.R. 167, 181

(Bankr. S.D. Ohio 2003), citing *Am. Express Travel Related Servs. Co., Inc. v. Fraschilla* (*In re*

*Fraschilla*), 235 B.R. 449, 459 (9th Cir. BAP 1999) (noting that the timing of a recusal motion

"may affect the weight ascribed to the evidence said to be probative of bias or prejudice"). See also *LeVay v. Morken*, 590 F.Supp.3d 1037 (E.D. Mich. 2022) (noting that the most recent judicial conduct complained of was thirteen months prior to the motion for recusal and therefore, rendered the request untimely); *United States v. White*, 582 F.Supp.3d 525 (E.D. Mich. 2022)(finding recusal motion untimely where motion was brought more than seven months after alleged conduct demonstrating extrajudicial bias); *In re International Bus. Mach. Corp*., 45 F.3d 641, 643 (2d Cir.1995) ("[A] prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."); *Katzman v. Victoria's Secret Catalogue*, 939 F. Supp. 274, 277 (S.D.N.Y. 1996)(citations omitted)("(1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for the delay.")

Movant was aware of pending matters in the main bankruptcy case at the time he filed the Adversary Motion – specifically, Movant's Renewed Objection to Proposed Settlement (ECF 180), Exhibit and Witness List (ECF 184), and Notice of Filing Order of Dismissal in State Action (ECF 185). Yet, with all of these filings in the main bankruptcy case in anticipation of trial, Movant made no move to seek recusal until the eleventh hour before an evidentiary hearing regarding his standing as a party to the main case – better said, his standing to bring any motion or seek any relief in the main case. Movant has offered no good cause for the delay – in fact, no cause at all has been presented. Since, nothing on the record prevented or restricted Movant's involvement in the main case, his failure to seek recusal timely is no one's fault but his own.

2

b.  <u>Collateral Estoppel</u>

The Movant is procedurally barred from seeking recusal due to the doctrine of collateral estoppel. Actions are collaterally estopped "once an issue is actually litigated and necessarily determined, that determination is conclusive in subsequent suits based on a different cause of action but involving a party or privy to the prior litigation." *In re Maresh*, 277 B.R. 339 (Bankr. N.D. Ohio 2001) citing *Dowling v. United States*, 493 U.S. 342, 347, 110 S.Ct. 668, 672, 107 L.Ed.2d 708 (1990). Since the Movant has essentially duplicated the Adversary Motion in the Bankruptcy Motion by making the identical allegations regarding the identical issues involving the identical parties, collateral estoppel is applicable and a basis for denial.

c.  <u>Order Denying Motion to Recuse Judge Walker</u>

Not only was this issue previously litigated, but this Court issued an Order Denying the Adversary Motion. The findings and ruling of this Court's Order Denying Motion to Recuse Judge Walker (ECF 229, 3:21-ap-90002) are hereby incorporated and made a part hereof.

Further, the Adversary Motion states, albeit in a footnote, that the appeal currently pending regarding this Court's denial of the Adversary Motion "is operative on, and stays, the bankruptcy proceeding as well." (ECF 187). It appears this statement is placed in a footnote because it did not merit an actual argument. The Movant proposes no cause whatsoever for a stay and offers no argument or support for any of the elements required for such a stay.

The criteria governing a motion for stay under Rule 8007[1], which are similar to the factors considered in the issuance of a preliminary injunction, include: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) harm to others; and (4) whether the public interest will be served. *In re Target Graphis, Inc*., 372 B.R. 866, (E.D. Tenn. 2007)

---

[1] Fed. R. Bankr. P. 8007. Stay Pending Appeal; Bonds; Suspension of Proceedings.

citing *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991); *In re Bradford*, 192 B.R. 914, 917 (E.D.Tenn.1996). Therefore, Movant here must show, by a preponderance of the evidence, he will likely prevail on the merits of his appeal, he will suffer irreparable injury if the stay is denied, other parties will not be substantially harmed by the stay, and the public interest will be served by granting the stay. *Id*, citing *In re Level Propane Gases, Inc*., 304 B.R. 775, 777 (Bankr.N.D.Ohio 2004). The footnote of the Bankruptcy Motion alleging a stay exists is woefully inadequate to act as a stay to these proceedings. Movant offers no actual request for a stay and no allegation or argument that supports a stay, nor did he properly seek or obtain a stay pending appeal from any appropriate court.

Conclusion

Movant has brought this untimely motion to recuse at the eleventh hour before a hearing to determine his standing to seek relief in this bankruptcy case and after having fully participated in the case for eighteen months after the conduct alleged as a basis for recusal. He has brought it despite the previously fully litigated identical motion having been denied in the adversary proceeding, and now seeks to stay these proceedings without offering a scintilla of support or complying with the procedural requirements to obtain a stay. For all of these reasons, the motion is not well-taken and, therefore,

IT IS HEREBY ORDERED that the Motion to Disqualify is DENIED:

a) as untimely,

b) as prohibited by collateral estoppel, and

c) in the absence of a stay pending appeal, for the reasons stated in the Order of this Court in adversary 3:21-ap-90002 entered April 5, 2023 at ECF 229.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

000245 000245

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **Case No. 3:19-bk-07235** |
| | **Chapter 7** |
| **CUMMINGS MANOOKIAN, PLLC** | **Judge Walker** |
| Debtor. | |

## BRIAN MANOOKIAN'S NOTICE OF APPEAL
## AND STATEMENT OF ELECTION

Brian Manookian ("Appellant"), through counsel, gives notice of his appeal from the Bankruptcy Court's August 28, 2023 Order (Doc. 189). In furtherance of the same, Appellant states as follows:

**Part 1: Identity of Appellant**

1.      The name of the Appellant is Brian Manookian. Mr. Manookian is the sole owner and member of the Debtor, Cummings Manookian, PLLC.

**Part 2: Subject of the Appeal**

2.      Appellant appeals from the Court's Order Denying the Motion to Disqualify Bankruptcy Judge Charles Walker (Doc. 189). The Order was entered on August 28, 2023.

**Part 3: Parties to the Appeal**

3.      The names of the Parties to the Order appealed from as well as the contact information for their attorneys are:

1

a. Debtor Cummings Manookian
Jay R. Lefkovitz
Lefkovitz & Lefkovitz, PLLC
312 East Broad Street, Suite A
Cookeville, TN 38501
(931) 528-5297 (T)
931-526-6244 (F)
JLefkovitz@lefkovitz.com

b. Trustee Jeanne Anne Burton
Phillip Young
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
(615) 465-6008 (T)
phillip@thompsonburton.com

c. Creditor Grant, Konvalinka & Harrison, P.C.,
John P. Konvalinka
Grant, Konvalinka & Harrison, P.C.
633 Chestnut Street Suite 900 Republic Centre
Chattanooga, TN  37450-0900
(423) 756-8400 (T)
(423) 756-6518 (F)
jkonvalinka@gkhpc.com

d. Creditor D.F. Chase, Inc.
Daniel Puryear
Puryear Law Group
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
(615) 255-4859 (T)
(615) 630-6602 (F)
dpuryear@puryearlawgroup.com

## **Part 4: Election to have appeal heard by District Court**

4. Appellant elects to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Date:  August 28, 2023                              Respectfully submitted,


                                                    */s/ John Spragens*
                                                    John Spragens (TN Bar No. 31445)
                                                    Spragens Law PLC
                                                    311 22nd Ave. N.
                                                    Nashville, TN 37203
                                                    T: (615) 983-8900
                                                    F: (615) 682-8533
                                                    john@spragenslaw.com

                                                    *Attorney for Manookian PLLC, Brian
                                                    Manookian, Afsoon Hagh, and Hagh
                                                    Law PLLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed August 28, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                                    */s/ John Spragens*